1                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3      - - - - - - - - - - - - - - - - - x

4      UNITED STATES OF AMERICA,                 :

5             Plaintiff,                          :    Criminal Action No.
                                                       1:17-cr-10305-ADB
6          v.                                     :

7      JOSEPH BAPTISTE AND                        :
       ROGER RICHARD BONCY,
8                                                 :
               Defendants.
9                                                 :

10     - - - - - - - - - - - - - - - - - x

11

12      BEFORE THE HONORABLE ALLISON D. BURROUGHS, DISTRICT JUDGE

13

14                          EVIDENTIARY HEARING

15

16                      Wednesday, February 5, 2020
                               9:37 a.m.

17

18

19

20
       John J. Moakley United States Courthouse
21     Courtroom No. 17
       One Courthouse Way
22     Boston, Massachusetts

23
       Rachel M. Lopez, CRR
24     Official Court Reporter
       raeufp@gmail.com
25

```
1                          A P P E A R A N C E S

2

     On behalf of the Plaintiff:
3
          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
4         BY:  KRISS BASIL
          John Joseph Moakley Courthouse
5         One Courthouse Way, Suite 9200
          Boston, Massachusetts  02210
6         (617) 748-3387
          kriss.basil@usdoj.gov
7

8         UNITED STATES DEPARTMENT OF JUSTICE
          BY:  ELINA RUBIN-SMITH
9         1400 New York Avenue, Northwest
          10th Floor
10        Washington, D.C.  20005
          (202) 616-1617
11        elina.rubin-smith@usdoj.gov

12

13   On behalf of Defendant Baptiste:

14        FICK & MARX, LLP
          BY:  WILLIAM W. FICK AND DANIEL N. MARX
15        24 Federal Street
          4th Floor
16        Boston, Massachusetts  02110
          (857) 321-8360
17        wfick@fickmarx.com
          dmarx@fickmarx.com
18

19   On behalf of Defendant Boncy:

20        GREENBERG TRAURIG, P.A.
          BY:  JARED E. DWYER
21        333 S.E. 2nd Avenue
          Miami, Florida  33131
22        (305) 579-0564
          dwyerje@gtlaw.com
23

24

25
```

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of Defendant Baptiste:                          <u>Page</u>

JASON HINTON

       By Mr. Marx                                      10

       By Mr. Basil                                     55

       By Mr. Dwyer                                    180

       By Mr. Marx                                     187

       By Mr. Basil                                    198

ARIELLE HINTON

       By Ms. Rubin-Smith                              200

       By Mr. Marx                                     232

**EXHIBITS**

                                                        <u>Marked</u>

Number 7                                                  9


                                                    <u>Admitted</u>

Number 8                                                 14

Number 9                                                 55

Number 10                                               131

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3              THE DEPUTY CLERK:  Court is in session, you can be
 4    seated.
 5              This is criminal matter 17-10305, United States vs.
 6    Joseph Baptiste.
 7              Will counsel identify themselves for the record.
 8              MS. RUBIN-SMITH:  Yes.  Good morning, Your Honor.
 9    Elina Rubin-Smith on behalf of the United States.
10              MR. BASIL:  Good morning, Your Honor.  Kriss Basil
11    for the United States.  And I wanted to, with the Court's
12    indulgence, just introduce the Court to my paralegal,
13    Jennifer Lewis, or Jen Lewis.  She'll be assisting us.  I
14    expect, over the years to come, you'll see her here with me.
15    And as you know, we always rely on the paralegals, and they
16    make us much better.
17              THE COURT:  She might be my favorite person in the
18    courtroom today.
19              Oh, except Mr. Dwyer.
20              MR. BASIL:  Maybe we should let him go first, Your
21    Honor.
22              MR. DWYER:  Good morning, Your Honor.  Jared Dwyer
23    on behalf of Richard Boncy, who is not present.
24              MR. MARX:  Good morning, Your Honor.  Daniel Marx
25    on behalf of Dr. Joseph Baptiste, who's here before the
```

1    Court.

2              MR. FICK:  And William Fick for Dr. Baptiste.

3              THE COURT:  Mr. Fick, aren't you getting tired of

4    being in here?

5              MR. FICK:  You know, it's not like it was a 50-day

6    trial or anything.

7              THE COURT:  You feel like it's already been a long

8    week?

9              MR. FICK:  That I will agree with.

10             THE COURT:  Witnesses are sequestered, correct?  We

11   couldn't remember.

12             MS. RUBIN-SMITH:  Yes, Your Honor.

13             MR. FICK:  We agree that they will be.  Everyone is

14   here now, but I understand Mr. Hinton is first, so

15   Mrs. Hinton will step out.  So that's right.

16             THE COURT:  Okay.  And that's where we are, right?

17   You're about to call Mr. Hinton?

18             MS. RUBIN-SMITH:  Yes, Your Honor.  We have just a

19   few issues we'd like to raise to the Court before we call

20   Mr. Hinton.

21             THE COURT:  Utterly shocked to hear it.

22             MS. RUBIN-SMITH:  Just a few.  We would request

23   that the Court conduct an in camera review of the marital

24   privilege document that Mr. Baptiste has withheld.  There's

25   one document that he has represented to withheld because of

1   the marital communications privilege.  All we know is that

2   it's about their travel arrangements.  We think it could be

3   relevant to their representation of Mr. Baptiste.

4           THE COURT:  Okay.  Happy to do it.

5           MS. RUBIN-SMITH:  Thank you, Your Honor.

6           Also, in the two most recent productions that we

7   have received, there are a lot of white, blank spaces in the

8   documents.  We would like to have counsel make a

9   representation that nothing privileged and potentially within

10   the scope of the waiver has been redacted and that it is just

11   header information that's been redacted.  And we would also

12   like for them to make the representation that they've

13   produced all documents and received the documents from

14   Mr. Hinton and Mrs. Hinton that are within the scope of the

15   waiver.

16           MR. MARX:  I have the document here, if Your Honor

17   would like to look at it.  We did explain to counsel for the

18   Government that, at the request of Mr. and Mrs. Hinton, we

19   withheld this document, which is solely between them and not

20   with Dr. Baptiste or Attorney LaRoche, but it's with the

21   Court's judgment.  I'm happy to make the representation again

22   to counsel for the Government that the only thing that's been

23   redacted from the production that was recently made is header

24   information indicating that those had been forwarded to us by

25   Mr. Hinton and Mrs. Hinton, respectively.

1          And finally -- forgetting now, what other

2   representations?

3          THE COURT:  The white space.

4          MR. MARX:  No, that's the white space.  The only

5   thing that's been taken out of -- or was they're something

6   else?

7          THE COURT:  The production.

8          MS. RUBIN-SMITH:  Yes, the documents.

9          MR. MARX:  Yes, Your Honor.  I can represent again

10  that everything that we received, from the exception of that

11  document from Mrs. Hinton and Mr. Hinton, including the paper

12  files that have now been collected from Mr. Hinton and

13  produced to the Government, has all been turned over.

14         MS. RUBIN-SMITH:  And we understand that the Court

15  did not compel for Mr. Baptiste to produce his own documents

16  with counsel, but we would like counsel to make the

17  representation that Mr. Baptist does not have any documents

18  within the scope of the waiver that have not otherwise been

19  produced by Mr. LaRoche, Mr. Hinton, and Mrs. Hinton.

20         MR. MARX:  I'm not sure what to say to that, Your

21  Honor.  Based on Your Honor's order, we dutifully complied

22  with that order and turned over everything the Court asked us

23  to.  We haven't gone and tried to figure out what may exist

24  in other places, that may or may not be included.  If the

25  Government has concerns that there seems to be something

1    missing, or a gap in the production, we're happy to address

2    those.  But in the abstract, I'm not sure how to make that

3    representation.

4              THE COURT:  Karen, I can't log on to this.

5              MS. RUBIN-SMITH:  We have no ability to -- we have

6    no insight to say what's missing.  There could be an e-mail

7    that Mr. Baptiste still has that has been deleted --

8              THE COURT:  What more do you want him to say than

9    what he just said?  He says, "We complied with the order.  I

10   turned over everything the Court asked us to."

11             MS. RUBIN-SMITH:  That's correct.  That's

12   everything from Mr. Hinton and Mrs. Hinton and Mr. LaRoche's

13   files, but there has been no representation made on the

14   record that Mr. Baptiste does not have anything in his own

15   files that is within the scope of the privilege waiver, that

16   has not --

17             THE COURT:  Does Mr. Baptiste have anything in his

18   own files that's within the scope of the privilege waiver

19   that you haven't turned over to them?

20             MR. MARX:  Not that I'm aware of, Your Honor, but I

21   can't be sure.  We haven't made that search and inquiry.  But

22   after producing over 1,600 pages of material in connection

23   with this hearing, I think it's evident to everyone that

24   Dr. Baptiste was not a prolific sender or receiver of

25   e-mails, substantive e-mails, about this.  So to the extent

1    that Mr. Hinton did or Attorney LaRoche did, I'm very

2    confident they're now in the possession of the Government, to

3    the extent they still exist.

4         THE COURT:  Okay.  Let me read this, please.

5         (The Court reviews the document.)

6         THE COURT:  All right.  The gist of this is that

7    they are talking about -- the Hintons, when they will be able

8    to be present at the trial and when they won't, because of

9    work and kids' school commitments.

10        MS. RUBIN-SMITH:  Okay.  Thank you, Your Honor.

11        THE COURT:  There's nothing of any substance in

12   here beyond that.

13        Karen, why don't you mark this as an exhibit so we

14   have it.

15        THE DEPUTY CLERK:  Okay.  Exhibit 7.  That's the

16   next.

17        (Exhibit No. 7 marked for identification.)

18        THE COURT:  And can you -- so Exhibit 7 is the

19   e-mail that's been withheld on a marital privilege claim,

20   that I have just reviewed and deemed -- I didn't actually

21   make a ruling on the privilege, but I'm going to make a

22   ruling on relevance.

23        Who's going to call the witness?  You guys?

24        MR. MARX:  Yes, Your Honor.

25        THE COURT:  Go.

```
 1            MR. MARX:  We call Jason Hinton.

 2            (The witness was duly sworn.)

 3            THE DEPUTY CLERK:  Thank you.  You may be seated.

 4            Can you please state your name and spell your last

 5    name for the record.

 6            THE WITNESS:  Yes.  My name is Jason Hinton.  Last

 7    name H-i-n-t-o-n.
```

**JASON HINTON**

```
 9        having been duly sworn, testified as follows:
```

**DIRECT EXAMINATION BY COUNSEL FOR DEFENDANT BAPTISTE**

```
11    BY MR. MARX:

12    Q.  Good morning, Mr. Hinton.

13    A.  Good morning.

14    Q.  Do you know the defendant in this case, Dr. Joseph

15    Baptiste?

16    A.  Yes.

17    Q.  And how long have you known Dr. Baptiste?

18    A.  I think I first met Dr. Baptiste in and around 2000.

19    Q.  And how is it that you know Dr. Baptiste?

20    A.  Dr. Baptiste at that time was a friend of my

21    father-in-law, and he was and is a respected member of this

22    Haitian community in the Washington, D.C., area.  I had the

23    opportunity to make his acquaintance, because I was

24    interested in traveling to Haiti.  I had never been there.

25    And so for my first trip in Haiti, I went on one of the
```

1    National Organization for the Advancement of Haitians, often

2    called NOAH, one of their medical mission trips, where I was

3    able to participate in that mission, not as a doctor, I'm not

4    a doctor, but just providing logistical support, moving

5    things, crowd control, whatever might be.  But that's when I

6    first -- around that time was when I first really met

7    Mr. Baptiste.

8    **Q.**  And have you maintained a social relationship amongst

9    your families since then?

10    **A.**  No.  In the last five years, six years, we started to

11    develop a relationship because my father-in-law -- well, my

12    mother-in-law passed away about six years ago, and my

13    father-in-law was very upset about it.  They had been married

14    over 40 years.  And Dr. Baptiste and his wife, Michelle, they

15    started to invite him over to the house a lot, because they

16    knew he was lonely and suffering.

17          My father-in-law is low vision, and so oftentimes I

18    would drive him there and drop him off -- well, I say them,

19    because I would take my father-in-law, and then my

20    father-in-law would take my son, his grandson, and the

21    grandson became very good friends with his young son, Joey.

22    But it's within that time frame that I began to interact with

23    them on a much more regular basis and began to develop a

24    relationship with the Baptists.

25    **Q.**  Mr. Hinton, are you an attorney?

1  **A.**  I am an attorney.

2  **Q.**  And where did you go to law school?

3  **A.**  To Widener University School of Law in Wilmington,

4  Delaware.

5  **Q.**  And when did you graduate?

6  **A.**  I graduated in 1998.

7  **Q.**  Are you a member of any state bar?

8  **A.**  Maryland and New Jersey.

9  **Q.**  And after law school, where did you go to work?

10  **A.**  Well, I didn't have a job coming out of law school, so I

11  went to Maryland, Silver Spring, where my wife is from.  She

12  wanted to go home.  We got married in law school.  So we went

13  to Silver Spring, studied for the bar, and then I worked for

14  the Commerce Committee as a paid legislative intern while I

15  was waiting for my bar results.  So that was my first job

16  after law school.

17  **Q.**  And at some point, did you work in the Maryland State's

18  Attorney's office?

19  **A.**  I started working there in October of 2017.

20  **Q.**  And prior to 2017, did you have any other professional

21  legal experience doing criminal law?

22  **A.**  No.

23  **Q.**  Okay.  And what did you do in the Maryland State's

24  Attorney's office?

25  **A.**  I did bond hearings.  So people would be arrested.  I was

1    actually located within the jail, and I made recommendations

2    related to bonds.

3    **Q.**   And about how long did you have that job?

4    **A.**   From October 2017 until late May, early June 2019.

5    **Q.**   And since leaving the Maryland Attorney's office, do you

6    have any professional experience doing any criminal law?

7    **A.**   No.  In fact, my only legal experience prior to that, I

8    was working in civil defense litigation from 19 -- from 2000

9    to end of 2001 and early 2002.  And in between those times,

10   early 2002 to October of 2017, I never worked as an attorney.

11   **Q.**   Where do you currently work?

12   **A.**   I currently work for Kalik & Associates.

13   **Q.**   And what do you do there?

14   **A.**   Federal election compliance work.  It has to do with

15   campaign contributions and disbursements.  It's not a legal

16   position.  It's more of an operations position, where I

17   track -- serve more or less as a bookkeeper, in showing that

18   the FEC reports are properly prepared for and then reported.

19   **Q.**   Mr. Hinton, have you ever defended a client in a federal

20   criminal case?

21   **A.**   No.

22   **Q.**   Have you ever defended a client in any criminal case?

23   **A.**   No.

24   **Q.**   Have you ever represented a client in a federal case of

25   any kind?

1    **A.**  No.

2    **Q.**  In your opinion, did you have the relevant expertise to

3    serve as co-counsel in this federal criminal case?

4    **A.**  No.  And in fact, when Joe first told me what was going

5    on, I told him that I cannot be his attorney.

6    **Q.**  And you made that clear to Dr. Baptiste?

7    **A.**  Absolutely.

8    **Q.**  And did you also make that clear to Attorney LaRoche at

9    some point?

10   **A.**  Oh, yeah, early on.  I told him that I'm not an attorney.

11   **Q.**  Okay.  We'll get to that for a minute.

12            MR. MARX:  Your Honor, may I approach, just for

13   efficiency sake, to give him a copy of --

14            THE COURT:  Yes.  You don't have to ask to

15   approach, just do it.

16            THE DEPUTY CLERK:  I'll just give it the next

17   number.

18            MR. MARX:  I believe we're up to 8.

19            (Exhibit No. 8 admitted into evidence.)

20   BY MR. MARX:

21   **Q.**  Mr. Hinton, do you recognize this document that I'm

22   putting in front of you as Exhibit 8?

23   **A.**  Yes.

24   **Q.**  And what is that?

25   **A.**  This was a declaration that I made in relationship to --

1    or in relation to Dr. Baptiste's motion related to a new

2    trial on the basis of ineffective assistance of counsel.

3    **Q.**  And if you turn to page 5, is that your signature on this

4    document?

5    **A.**  Yes.

6    **Q.**  You can put that aside for a second, but we're going to

7    refer to it a few times in the course of our discussion.

8    **A.**  Counsel, if I could just -- I didn't tell Donald that I

9    wasn't an attorney, I told -- what I meant to say was I told

10   Donald that I was not competent to manage this case as a

11   defense attorney.

12   **Q.**  Understood.  Thank you for that clarification.  We'll

13   talk a little bit more about those discussions in a minute.

14          Let's start with, when did you first talk with

15   Dr. Baptiste about this case, this criminal matter?

16   **A.**  I think it had to be 2018, late spring.  He asked me if

17   he could talk to me, he had a matter.  And so I met with him,

18   and he asked me if I knew anything about the Foreign Corrupt

19   Practices Act.  I told him I was familiar with it.  So that

20   would be about the time frame.

21   **Q.**  And at that point, did he have a defense lawyer who was

22   representing him in the case?

23   **A.**  Yes.  He told me he was being represented by a

24   Mr. Benowitz and that Mr. Benowitz wanted him to plea, and

25   that he didn't do anything wrong and that he didn't want to

1    plea, and he asked me if I could help him find a new

2    attorney.

3    **Q.**   And did he come to you seeking sort of general legal

4    advice about things like the FCPA?

5    **A.**   I would say no.  I think he came to see if it was

6    something that I was familiar with, maybe even something I

7    could handle.  But at that point in time, I was not asked to

8    provide him any legal analyses or anything.

9    **Q.**   And at some point, did Dr. Baptiste start looking for a

10   new lawyer?

11   **A.**   Yes.

12   **Q.**   And as a lawyer and a family friend, did he ask you for

13   your assistance in finding a new lawyer?

14   **A.**   Yes.

15   **Q.**   Okay.  And did you help him?

16   **A.**   I did.

17   **Q.**   Okay.  And describe for us what you did to help him find

18   a new attorney in this case to take over for Attorney

19   Benowitz?

20   **A.**   I reached out to some professionals, some attorneys that

21   I knew, to see if they knew any people.  Plus, I reached out

22   to some attorneys that I had encountered in my own

23   professional experience.  And I made some calls on his

24   behalf, to see if they'd be willing to meet with

25   Mr. Baptiste.

1    **Q.**  And did one of those lawyers include Donald LaRoche?

2    **A.**  Yes.  Mr. LaRoche was probably the fourth or fifth

3    attorney who was contacted.

4    **Q.**  And how long have you known Attorney LaRoche for?

5    **A.**  I met him in that process.  So it is about a year and a

6    half now.

7    **Q.**  And how is it that you came to be connected with him in

8    the first place?

9    **A.**  Well, the first few attorneys didn't work out for

10   whatever reasons, and Joe asked me if I knew anybody who was

11   in the Boston area.  He asked me because I went to school up

12   here.  I said I could I reached out to some people that I

13   know, and I did, so he was recommended to me through a

14   network of friends.

15   **Q.**  Is it fair to say that before that connection, you didn't

16   have any professional experience at all with Attorney

17   LaRoche?

18   **A.**  It's fair to say that.

19   **Q.**  In your affidavit, on the first page in Paragraph 6, you

20   indicate -- you state that Attorney LaRoche seemed like a

21   good fit to serve as defense counsel.  Why did you think

22   Attorney LaRoche was a good fit for this case, at that time

23   when you initially met him?

24   **A.**  There was a few reasons.  One, he was in Boston, and

25   there was a concern of having to move people in and out of

1   the area, attorneys in and out of the area, and the costs

2   that that could incur.  So he is in Boston.

3        Two, I had seen his website, and it suggested that

4   he had a very robust firm and legal capacity, so it seemed as

5   though it was a very professional outfit.  He said that he

6   worked in the federal courthouse and he had relationships

7   with the judges here.  And he said that he had worked, I

8   think, in the Suffolk County prosecutor's Office, so it

9   seemed like he had the requisite criminal trial experience to

10  be somebody who was worthy of being introduced to Joe.

11  **Q.**  And at some point, did Dr. Baptiste actually engage

12  Attorney LaRoche to take over for Attorney Benowitz?

13  **A.**  Yes.

14  **Q.**  And once Dr. Baptiste hired Attorney LaRoche, did you

15  continue to play any role in helping out Dr. Baptiste?

16  **A.**  No, not at that time.

17  **Q.**  Okay.  Now, at some point before the trial, did you start

18  to have concerns about the job that Attorney LaRoche was

19  doing?

20  **A.**  The December trial date or the June -- the December 2018

21  trial date or the June?

22  **Q.**  Well, let's start with when he became engaged.  At some

23  point after he became engaged, but before the trial.  We can

24  start with before the December trial, if it's easier to break

25  it up into pieces, did you start to have concerns about the

1    job he was doing?

2    **A.**   He seemed to have a lot of trouble with the discovery

3    that was turned over by the prosecution.  He often said they

4    would send him thumb drives that couldn't be opened and

5    discussed a number of issues that he was having accessing

6    that information.  It was something that he hadn't remedied

7    for quite some time after -- I think he initially received it

8    maybe around September or October of 2018, and it seemed like

9    a lot of time was passing.

10          In subsequent conversations, he regularly would

11   show that he didn't really -- he hadn't yet accessed that

12   information, and then when he had, his-- if he were to make

13   any comments about what he saw, he would say things like,

14   "Well, the person who said 'pay for play' on the video was

15   another guy with an accent, it wasn't Joe.  I think that

16   they're confused."

17          There would be times between the first December

18   trial date and the time when he got that initial discovery

19   from the prosecution, where I would see him at Joe's, and he

20   never seemed to have much more to say than that.

21          And before going into the December trial, I did ask

22   Joe if he was comfortable with Donald, and Joe said he seems

23   to have a good background.  He's also Haitian, which that

24   means he'll understand the way I communicate and that could

25   be very valuable once we're in court.  So he said he was.  I

1    said okay.  I think that was going into like the November
2    time frame.
3           As we got closer to that initial December trial
4    date, I asked him, you know, had he begun to prepare his
5    case, and he said, "They're going to supersede, so there's no
6    reason for me to do anything right now."
7    **Q.**  Okay.  And after the Government superseded and the trial
8    was continued to the following summer, during that period did
9    you develop any further concerns about Attorney LaRoche's
10   performance in this case?
11   **A.**  Not until many months later.  In December, in late
12   December, right after Christmas, I started experiencing what
13   I thought were flu-like symptoms, and I tried to tough it out
14   and stay at home.  My second daughter's birthday is
15   December 31st, and I didn't want to ring any alarms for how I
16   was feeling, going into her birthday, primarily because her
17   mother had had a stroke in 2009, just before her birthday.
18   So I wasn't feeling well, I didn't want to alarm her.  That's
19   a very tough part of the year for her; she still deals with
20   some issues related to that.
21          And so as we moved past her birthday on
22   December 31st, on January 1st, I went to the hospital.  And
23   it turned out I was suffering from sepsis, and all my organs
24   were shutting down and I was near death.  And I was in the
25   hospital for about two weeks.  They thought at one point I

1    had a flesh eating virus.  They thought they were going to

2    have to remove my arm.  But it wasn't.  It just -- it

3    actually was a strep virus that had somehow gotten into my

4    arm and from which had shut down my system.

5           After the two weeks in the hospital, and luckily

6    you know, the lord kept me, I then recovered from home for

7    about a month and a half.  So I had no contact with Donald

8    probably until around March of 2019.

9    Q.  And when you reengaged with Attorney LaRoche in that

10   spring, did you have any impression about whether he had been

11   busy preparing for the trial?

12   A.  Not when I reengaged but -- the reason I reengaged is

13   because Joe asked me if I had heard from Donald -- I'm sorry,

14   Dr. Baptiste.  I call him Joe.  Dr. Baptiste asked me if I

15   had heard from Donald, and I said no.  I had other fish to

16   fry at the time.  And he said, "Well, I haven't heard from

17   him either.  Can you help me get in touch with him?"

18           And at that time, I did reach out to Donald, and he

19   eventually did contact me back and he said, "Yeah, I've been

20   meaning to get in contact with the Baptists, but I have a

21   number of family issues and other cases going on right now.

22   When I come through those, I plan to meet with him and go

23   over some new discovery that the prosecution has provided."

24   Q.  And going forward from that period, toward the actual

25   trial in June, did you continue to have concerns about

1    Attorney LaRoche's level of preparation?

2    **A.**  As we got closer to June and his -- when I would ask him

3    what the discovery looked like, had he -- was there anything

4    new that was worthy of talking to Joe about, had he spent

5    time going through the discovery with Dr. Baptiste, he would

6    say, "No, we haven't gone through that yet.  I'm still going

7    through these other things.  But you know, I should be done

8    with that."  And I think he had a week-long -- he's a pastor,

9    he had a week-long Christian event going on.  He said, "When

10   I return from that, my calendar should be clear, and I'll

11   begin to go through the evidence and sit down with Joe then."

12          So clearly telling me that, I did have concerns

13   about whether or not he was prepared, and I did voice those

14   to Joe, to Dr. Baptiste.

15   **Q.**  And during that period before the trial, did Attorney

16   LaRoche ever describe to you what his trial strategy was

17   going to be?

18   **A.**  No, he never discussed trial strategy.  That's one of the

19   things that gave me cause for concern.  Not that he would

20   discuss it with me, but his observations from a year prior,

21   with the one video with the FBI agent talking about pay for

22   play and not Joe, his commentary never really changed.  He

23   seemed to have no new insight, regardless of the fact that he

24   had received new discovery.  At that time, I didn't know that

25   he hadn't reviewed the discovery, the audio and the video

1    that had been provided to him, but I did have questions.

2    Q.   And as far as you know, did he describe -- did Attorney

3    LaRoche describe for Dr. Baptiste what his trial strategy was

4    going to be?

5    A.   Never in front of me, and as far as I know, he did not.

6    Q.   And during the same time period leading up to the trial,

7    did Attorney LaRoche share work-product with you, as far as

8    his trial preparation?

9    A.   Yeah.  He would send -- he would include me on e-mails

10   when he would send his motions to the Court, just mostly as

11   informational, to let me know that he had done it, to let Joe

12   know that he had done it.  So, yes.

13   Q.   Any documents that you asked that he had done legal

14   research or analysis of the charges or potential defenses?

15   A.   No, I never saw that from Donald.  And so occasionally, I

16   would look into things that I had questions about or that Joe

17   had questions about and provide research that I had found

18   that I thought might be relevant to his questions or my own

19   questions.

20   Q.   Did he share any work-product that suggested he had

21   prepared to examine witnesses at the trial?

22   A.   No.

23   Q.   Did he share any work-product or evidence that suggested

24   he had identified helpful defense material in the extensive

25   discovery in this case?

1    **A.**   No.  He never provided that, and he never seemed to

2    follow up on suggestions from Joe or myself about people he

3    should consider talking to; for example, folks in the Haitian

4    government about what it takes to start an organization

5    inside of Haiti, to incorporate one, for example, to speak

6    with and to subpoena the former, I guess, executive director

7    of NOAH, somebody who was knowledgeable about the activities

8    of that organization.

9         It was not clear -- excuse me, it was clear that he

10   had not talked to any of these witnesses in his preparations

11   for trial, with the exception of the executive director of

12   NOAH.  He had spoken to him, but he never subpoenaed him.

13   **Q.**   Is that Eric Walcott?

14   **A.**   Yes.

15   **Q.**   So let's get to the actual trial itself.  Did you attend

16   the trial?

17   **A.**   I did.  I wasn't going to; however, in June of last year,

18   I had the opportunity to start working with Kalik &

19   Associates, and that gave me a moment in time where I could

20   come up and support the trial.  And the reason why that had

21   to happen was because of all the time I spent out of work

22   earlier in the year, I did not have leave to come up for the

23   trial.  So I never intended to be here.  However, when I was

24   offered that job, I decided it would be a nice change for me.

25   That's when I was able to arrange within my schedule that I

1    could be here before starting that next job.

2    **Q.**  And did you attend the entire trial?

3    **A.**  No, I wasn't here the entire time.  I was here -- I think

4    I was here for a few days, went home for like three when the

5    trial started, and then was here for the remainder of it.  I

6    was here for -- I think I missed three days of the trial, but

7    I'm not sure.

8    **Q.**  And during the trial, where did you sit in the courtroom?

9    **A.**  So that was actually a point of concern for me with

10   Donald, because I made it clear to Donald that I wasn't

11   barred in Massachusetts and I wasn't part of the federal bar

12   in Massachusetts and I didn't want to offend the Court by

13   sitting at the lawyer's table.  And he told me that he spoke

14   with the judge and that it would be okay for me to sit up

15   there and run the audio-visual equipment for him, when it was

16   time for him to use the evidence, whether he was doing a

17   direct or a cross.  And based on that limited role, that's --

18   and because he said we had permission of the Court, I sat at

19   the table.

20   **Q.**  So did you file an appearance in the case?

21   **A.**  No, I did not.

22   **Q.**  Were you ever admitted *pro hac* in this court?

23   **A.**  No.

24   **Q.**  Did you consider yourself to be Attorney LaRoche's

25   co-counsel?

1    **A.**   No.

2    **Q.**   Did you have access to all of the discovery in the case?

3    **A.**   Absolutely not.

4    **Q.**   Did you examine any witnesses at the trial?

5    **A.**   I did not.

6    **Q.**   Did you attend the sidebars with the Judge?

7    **A.**   No.

8    **Q.**   Did you ever address the Court in any way?

9    **A.**   No.

10   **Q.**   Did you think you could address the Court, that that

11   would have been appropriate, given your limited role?

12   **A.**   No.

13   **Q.**   You said you were at the defense table in a limited role

14   to help Attorney LaRoche with audio and video presentations.

15   Did he ever make any audio or video presentations at trial?

16   **A.**   No.

17   **Q.**   Did he ask you to prepare, in advance to play, any audio

18   or video that he wanted to use as part of a defense

19   presentation?

20   **A.**   No.

21   **Q.**   And as far as you know, given your limited role as

22   providing that technical assistance, do you know whether he

23   ever, in fact, prepared any such audio or video to use as

24   part of any defense presentation?

25   **A.**   He never prepared that, at least not in the run-up to the

1    trial.

2    **Q.**   Now, a moment ago, you mentioned a few witnesses.  So I

3    just want to be clear, before the trial, did you and

4    Dr. Baptiste and Attorney LaRoche have conversations about

5    potential defense witnesses in the case?

6    **A.**   Yes.

7    **Q.**   And did you identify particular defense witnesses who

8    might be helpful at trial?

9    **A.**   I identified categories of people; for example, "Get the

10   guy from the Haitian Government who was in control of foreign

11   corporations incorporating inside of Haiti," for example.

12   The reason why I knew of that position is because there had

13   been a timeframe within my professional experience where I

14   did some work is Haiti, and so I was familiar with how

15   organizations were incorporated -- or foreign organizations

16   could be incorporated inside of Haiti.

17              I know that Dr. Baptiste named some individuals by

18   name.  Those names -- those exact names escape me, but they

19   also were people either from the embassy or the government of

20   Haiti or Mr. Walcott, who he thought could be called in

21   helping him, being Dr. Baptiste, who Dr. Baptiste thought

22   could be called in helping him to build a defense case for

23   this case.

24   **Q.**   Okay.  So just -- to use your word, focusing on the

25   categories for a minute, were the potential defense witnesses

1    that you discussed with Attorney LaRoche people who might

2    have talked, for example, about Dr. Baptiste's charitable

3    work in Haiti?

4    **A.**  Yes.

5    **Q.**  And could they also have talked about his involvement

6    with NOAH, the National Association for Advancement of

7    Haitians, over the years?

8    **A.**  Yes.

9    **Q.**  Could some of those witnesses also have talked about

10   establishing nonprofit organizations in Haiti?

11   **A.**  Yes.

12   **Q.**  Could some of them have talked about public and private

13   development projects in Haiti?

14   **A.**  There and elsewhere.

15   **Q.**  Would some of those witnesses also have familiarity with

16   Haitian law and business practices?

17   **A.**  Yes.

18   **Q.**  And as far as you know, other than speaking with Alex

19   Baptiste, Dr. Baptiste's brother, did Attorney LaRoche

20   follow-up with any of these potential defense witnesses?

21   **A.**  I know that he spoke to Mr. Walcott.  I don't believe he

22   spoke to anyone else in the run-up to the trial.  I know

23   during the trial, he finally did call one of the people that

24   Dr. Baptiste had been asking him to call for quite some time.

25   The gentleman did speak to him, but because the case was

1    almost over, he said, "It doesn't make sense for me to come,"

2    so he's like, "He's not coming."

3    **Q.** Do you know whether Attorney LaRoche made any

4    arrangements in advance to ensure that Eric Walcott would be

5    available as a witness at the trial?

6    **A.** He didn't.  I asked him on several occasions whether he

7    had been subpoenaed, and he said, yes, he was going to get to

8    it, yes, he going to get to it.  And then Mr. Walcott had

9    a family matter, his wife to be is, I forget where exactly,

10   but from a country in the Sub-Saharan part of Africa and they

11   had to go there.  And so he did not appear for trial and had

12   not been subpoenaed to do so.

13   **Q.** And this other witness that you mentioned, who Attorney

14   LaRoche contacted during the trial, did you make any efforts

15   to subpoena that witness?

16   **A.** No.

17   **Q.** And other than those two, as far as you know, did he

18   contact any potential defense witnesses?

19   **A.** I know of nobody else that he contacted.

20   **Q.** And as far as you know, did Dr. -- excuse me, did

21   Attorney LaRoche ever consult with any potential defense

22   experts who might have testified in this case?

23   **A.** They did not.

24   **Q.** Moving from witnesses for a moment, before the trial did

25   you and Dr. Baptiste and Attorney LaRoche discuss the

1   importance of gathering evidence about NOAH for the trial?

2   **A.**   Absolutely.

3   **Q.**   And in this case, did the money laundering charges

4   involve NOAH specifically?

5   **A.**   I believe so.

6   **Q.**   Let me ask you a more broad question.  I'm not trying to

7   test your memory.  Did you understand that the allegation in

8   this case, or the allegations in this case involve some kind

9   of impropriety dealing with NOAH and Haiti?

10  **A.**   Well, I don't believe that NOAH was named as an

11  organization that was part of the indictment, but I do

12  believe that the prosecution asserted a theory that the money

13  laundering that Dr. Baptiste was conspiring to commit,

14  allegedly, would involve NOAH.

15  **Q.**   And so was it your understanding that the allegations

16  that involved the banking activity related to NOAH and Haiti?

17  **A.**   Yes.

18  **Q.**   And in your view, was it important for Dr. Baptiste to be

19  able to establish at trial that NOAH was, in fact, a

20  legitimate charity?

21  **A.**   Yes.

22  **Q.**   And was it also important that Dr. Baptiste could

23  establish at trial that NOAH had legitimate bank accounts in

24  Haiti?

25  **A.**   Well, I would say that slightly differently.  There was

1   an NGO in NOAH that was attempting to establish bank accounts

2   in Haiti, that is a separate organizations from NOAH in

3   Washington, D.C.  NOAH in Washington, D.C. did not have bank

4   accounts in Haiti.

5   **Q.**  And did you discuss these sorts of issues with Attorney

6   LaRoche and Dr. Baptiste before the trial?

7   **A.**  From the standpoint of Donald should have an

8   understanding of what organizations are where, that was

9   discussed.  From the standpoint of understanding what it took

10  to incorporate in Haiti, you can't just show up in Haiti as a

11  business and open a bank account, there are procedures and

12  steps involved, which is why I said he should talk to the

13  people within the Haitian government to tell you where that

14  falls and when that's allowed inside of Haiti.  I know this

15  because I did work in Haiti, not because of some legal

16  background that I have.

17          And what I know from that process is, you can't

18  open a bank account in Haiti until you've been approved by

19  the government to form what's actually a *société anonyme*, not

20  an incorporation.  Then that *société* has to be printed.  The

21  declaration of that *société* has to be printed in a local

22  *moniteur*, the national *moniteur*.  And then after that has

23  occurred, as it's become a part of the publication of record,

24  then you can open a bank account, at which point you have to

25  open up a dollars account and a gourdes account.

1          So there are procedures that you must follow to get

2   to the point where you can actually establish a bank account,

3   the first of which being you have to actually be incorporated

4   inside of Haiti.  So that was why it was important to know

5   the difference between NOAH and the NGO in Haiti, and NOAH,

6   the nonprofit in Washington, D.C.

7   **Q.**  Mr. Hinton, I'm going to put on the table in front of you

8   a binder that's been already marked as Exhibit 1.

9          MR. MARX:  Does the Court still have a copy of the

10  binder?

11         THE COURT:  I have it, but not up here.

12         You guys were short a binder, we gave ours back

13  last time.

14         MR. MARX:  Yes, I believe the Government took the

15  existing binders last time.  So that's an extra, if the Court

16  would like to look at it.  The exhibit copy is now in front

17  of Mr. Hinton.

18         And I don't have my own binder.  But if I did the

19  tabs right --

20  BY MR. MARX:

21  **Q.**  Mr. Hinton, if you could turn to Tab B-14, please.  It

22  should be a document Bates labeled BAP 00996?

23  **A.**  Yes.

24         MS. LEWIS:  Do you want me to --

25         MR. MARX:  I think everyone has it.

1    BY MR. MARX:

2    **Q.**   Do you see that, Mr. Hinton?

3    **A.**   Yes.

4    **Q.**   Okay.  And do you recognize this document?

5    **A.**   Yes.

6    **Q.**   Okay.  And what is this?

7    **A.**   This is -- it looks like a note from Dr. Baptiste,

8    showing the date in which NOAH NGO status was official.

9    **Q.**   Okay.  And if you flip through the document, does this

10   appear to be an e-mail thread between you, Attorney LaRoche,

11   and Dr. Baptiste about NOAH and Haiti?

12   **A.**   Yes.

13   **Q.**   And if you look at the top of the third page, this is the

14   one Bates stamped BAP 00998.  Do you see an e-mail that you

15   wrote there?

16   **A.**   Yes.

17   **Q.**   You're talking about NGO organizational documents related

18   to NOAH and Haiti, and you say, "This is important because of

19   the timeline of the NGO's creation stabs at the heart of the

20   conspiracy to commit money laundering charge."

21         Do you see that?

22   **A.**   Yes.

23   **Q.**   Okay.  What do you mean by that?  Why was it important to

24   be able to establish the timeline of when NOAH Haiti was set

25   up?

1   **A.**  Well, my assessment, the fact that it took several years

2   for NOAH the NGO to be established and because the opening

3   statement of the bank account has to happen at the end of

4   that process, that the timing of when that account opened was

5   not necessarily relevant to what was being alleged by the

6   prosecution.

7   **Q.**  If you turn to the next page, this conversation

8   continues.  It appears that you've forwarded the actual

9   announcement of the certification of NOAH Haiti on this

10   e-mail thread; is that right?

11   **A.**  I'm sorry, where is that?

12   **Q.**  On the next page, page 4 of 5, BAP 00999.

13   **A.**  Uh-huh.  Okay.  And what was your question?  I'm sorry.

14   **Q.**  So this french information that's been translated from *Le*

15   *Moniteur* --

16   **A.**  Uh-huh.

17   **Q.**  -- this appears to be the actual announcement of the

18   certification, or whatever the proper term is, of NOAH in

19   Haiti; is that right?

20   **A.**  Yes.

21   **Q.**  And do you see at the top of that page, you wrote another

22   e-mail in which you say the timeline of the NGO's formation

23   and banking provides a reasonable alternative to the

24   Government's allegation that the bank account is a tool in

25   the money laundering scheme.  Do you see that?

1    **A.**  Yes.

2    **Q.**  Okay.  And so these were views that you expressed to

3    Attorney LaRoche; is that right?

4    **A.**  That's correct.

5    **Q.**  Okay.  And as far as you know, did he follow-up to

6    collect any of the evidence that you identified that might

7    help make this case about NOAH and Haiti?

8    **A.**  He did not.

9    **Q.**  Did he tell you why he didn't do that?

10   **A.**  He didn't tell us why he didn't do much of anything.  I

11   think that he was -- I don't think he wanted to expose

12   himself as not having prepared.

13   **Q.**  At trial, did he present any evidence that he had

14   gathered about NOAH and Haiti or its banking activity?

15   **A.**  No, he didn't.

16   **Q.**  Did he call any witnesses to testify about NOAH and

17   Haiti?

18   **A.**  No.

19   **Q.**  Before the trial, did you and Attorney LaRoche and

20   Dr. Baptiste also talk about the importance of establishing

21   Dr. Baptiste's long history of charitable works in Haiti?

22   **A.**  Absolutely.

23   **Q.**  And what sort of work, just very generally, did

24   Dr. Baptiste do, charitable work in Haiti over the years?

25   **A.**  It was extensive, and I became primarily familiar with it

1    because I helped him to update his Linkedin and Facebook

2    accounts in 2018, and at which point I actually became

3    knowledgeable of just how long NOAH had been in existence,

4    going back to the '80s, the number of charitable missions he

5    had spent -- that he had provided there, often paid for out

6    of his own pocket.  It was not a nonprofit organization that

7    was seeking to raise funds from elsewhere.  Most of the

8    expenditures came from him and then from the doctors who went

9    on his trips.  I know that he put money towards the

10   restoration of monuments and churches and things like that in

11   Haiti, as well.  I don't have his whole record with me now,

12   but I will say that it was a 30-year history of philanthropy.

13   **Q.**  And in your view, was that an important issue for the

14   trial in this case?

15   **A.**  Absolutely.

16   **Q.**  And why is that?

17   **A.**  Because, from what I had seen in the indictments, for

18   example, it appeared to me that NOAH, as a true philanthropic

19   type of organization, had been diminished.  And that seemed

20   to me, from a strategic communication perspective, to be done

21   on purpose, so that he could be painted more so as a

22   criminal, rather than as a charitable individual.

23   **Q.**  In your view, did Dr. Baptiste's long history of

24   charitable work in Haiti also relate to issues about whether

25   he would have any motive or need to bribe anyone in Haiti?

1    **A.**  It was relevant to me from the sense that he has worked,

2    through NOAH, with every president since President

3    Aristide's, I believe, second stint as president of Haiti.

4    It might be before that, but I know at least going back that

5    far, which goes back into the '90s.  That was whether they

6    were leftist governments or rightist governments.  He was

7    able to work with all of them.  For --

8            And what a lot of people probably -- not that they

9    don't know it, but probably have never thought about when it

10   comes to a country like Haiti, is a lot of the government

11   bureaucrats are recycled from administration to

12   administration, because there's a lot of brain drain in

13   Haiti.  So the people that stay and are willing to work

14   within the government and who develop an expertise,

15   regardless of what part of the government that's in, whether

16   it's agriculture or economy or tourism, or whatever the case

17   might be, they tend to be called upon government after

18   government.  And these were the people that he had

19   relationships with.  He did not need to bribe people to have

20   access.  He had earned access through several decades of

21   charitable activity.

22   **Q.**  And were these the types of issues you talked about with

23   Attorney LaRoche and Dr. Baptiste before the trial?

24   **A.**  I told -- I told Donald that he needed to be able to

25   paint Dr. Baptiste in the light of his charitable

1    organization and that he should fight any opposition from the

2    prosecutor's side, which attempted to either keep that

3    information out of the courtroom or attempted to diminish it,

4    so that they could paint him as some type of criminal.

5    **Q.**   Mr. Hinton, if you would, turning that binder in front of

6    you to Tab B-5, it should be a document Bates stamped

7    BAP 00947 on its first page.

8    **A.**   D-5?

9    **Q.**   B-5.

10   **A.**   I have D-1 through 4, and then it stops.

11   **Q.**   B.

12   **A.**   Oh, I'm sorry.

13   **Q.**   "B" as in boy?

14   **A.**   B-5.  And what is the number?

15   **Q.**   It should have a Bates label BAP 00947?

16   **A.**   Okay.

17   **Q.**   Okay.  So just to speed things up, is this another e-mail

18   thread between you and Attorney LaRoche regarding this trial?

19   **A.**   Yes.

20   **Q.**   And if you look at the bottom of the page, there's an

21   e-mail that you wrote on April 18, 2019, so approximately two

22   months before the trial, about the, quote, charitable deeds

23   of Joe.

24            Do you see that?

25   **A.**   Yes.

1    **Q.** And you write to Attorney LaRoche:

2            "This is a key point.  If you cannot present them

3    in Court" -- referring to Dr. Baptiste' charitable deeds --

4    "he becomes unable to put his three decades of philanthropy

5    in Haiti before the jury.  Without that, he's just an

6    unscrupulous business man with no real regard or connection

7    to Haiti and its authorities.  However, with this

8    information, it becomes foundational that he was simply

9    trying to help Haiti get its deal and that the three decades

10   of connectivity is why he didn't need to bribe anybody."

11           Do you see that?

12   **A.** Yes.

13   **Q.** Okay.  And so that's something that you discussed

14   directly with Attorney LaRoche; is that right?

15   **A.** Yes.

16   **Q.** Okay.  And as far as you know, did Attorney LaRoche do

17   anything to follow-up, to make that presentation to the jury

18   at trial?

19   **A.** He did not.

20   **Q.** Did he present any defense evidence that would have

21   supported this argument about Dr. Baptiste's charitable works

22   at trial?

23   **A.** No, the jury did not hear that.

24   **Q.** And did he call any witnesses who could have testified

25   about Dr. Baptiste charitable works, or the reputation and

1    connection that, as you put it, he had earned in Haiti over

2    many decades?

3    **A.**   He did not.

4    **Q.**   And did he tell you why he didn't do any of those things?

5    **A.**   No.  He also didn't tell me that.  We discovered that.

6    **Q.**   Let's talk about the discovery in the case for a minute.

7    Before the trial, did you recommend to Attorney LaRoche that

8    he should meet with Dr. Baptiste and you to review the audio

9    and video recordings in the case?

10   **A.**   Yes.  Dr. Baptiste was telling me that he was having

11   trouble getting connected with Attorney LaRoche, and he had

12   asked me again to see if he could get Donald to come over

13   because he wanted to know what it is that the Government had.

14   And so on Joe's behalf, I reached out to Donald again to say,

15   "Hey, bring this stuff over.  We'd like to see it."

16   **Q.**   And did that happen more than once, that you had asked

17   Attorney LaRoche to make time to meet with Dr. Baptiste and

18   you to review the recordings in the case?

19   **A.**   Yes.  That first happened before the December trial date,

20   when they turned over the first part of their discovery, them

21   being the prosecutors.  He did show up one time, then showed

22   the video that we've been talking about with the FBI agent

23   talking about pay for play.  He showed that snippet of it and

24   didn't share, really, much else.

25             And then around March, when Dr. Baptiste reached

1    out to me, asking me if I had heard from Donald and I told

2    him no, I called Donald and I told him that Dr. Baptiste was

3    looking for him and wanted to see the evidence.  That would

4    then be -- that would then happen a few more times up until

5    the beginning of trial, during which time he still never came

6    to present anything or share anything with Dr. Baptiste.

7    **Q.**  And did Attorney LaRoche assure you in the months and

8    weeks leading up to trial that he'd make time to review the

9    discovery with Dr. Baptiste?

10   **A.**  Yeah.  It was always like, "Yeah, I just have to finish

11   this child custody matter.  I have this murder case that I'm

12   dealing with.  I have this rape case I'm dealing with.  When

13   these things are over, I'll be able to get to it.  Oh, I have

14   this christian weekend thing planned.  When that's over, I'll

15   be able to start to look at it."  And that was, I think,

16   around May.

17   **Q.**  Did -- other than actually meeting to review recordings

18   or discovery with you, did Attorney LaRoche ever give

19   Dr. Baptiste or you copies of the discovery, so you could

20   review it on your own time?

21   **A.**  He never gave us copies, like physical copies.  And I

22   think the one item that I remember him sharing was the

23   transcript of the conversation between Dr. Baptiste and his

24   brother, Alex Baptiste.

25   **Q.**  And was that a transcript that Attorney LaRoche had

1    prepared?

2    **A.**  No.

3    **Q.**  As far as you know, did Attorney LaRoche prepare

4    transcripts of any of the recordings and the discovery in

5    this case?

6    **A.**  He did not.

7    **Q.**  Did he ever show you, or as far as you know,

8    Dr. Baptiste, a copy of a transcript of any recording he had

9    made in this case?

10    **A.**  Oh, no.  Definitely not.

11    **Q.**  In your affidavit, at Paragraph 16, this is on page 4,

12    you say, "I believe that Attorney LaRoche did not prepare in

13    any meaningful way to cross-examine the prosecution's

14    witnesses, including the two undercover agents.  I never saw

15    any work-product or other notes from Attorney LaRoche

16    concerning exculpatory excerpts from the recordings or other

17    evidence he planned to use on cross-examination.

18           When cross-examining FBI Special Agent Ornello

19    Arlati, the prosecution's first witness, Attorney LaRoche was

20    unable to elicit any helpful testimony.  Instead, he

21    repeatedly elicited damaging testimony."

22           Sorry, my mistake, I meant to read to you

23    Paragraph 15.  That has nothing to do with reviewing the

24    discovery.  My apologies, Mr. Hinton.

25           In Paragraph 15, you write, "During the trial,

1    often while the prosecutors examined witnesses, Attorney

2    LaRoche reviewed, for the first time, many transcripts of the

3    audio and video recordings."

4          Why do you say that?  Why was that your impression

5    that he was doing that first time?

6    **A.**   Because he said that.  He said he had never seen these

7    things before, he had never reviewed these things before, and

8    he literally was sitting in his room, trying to take notes at

9    the hour, minute, second mark of where he heard something

10   interesting.  Dr. Baptiste would be in the room with him,

11   trying to watch a different set of recordings to help

12   Attorney LaRoche identify or understand the context of where

13   these comments were coming from.  He was watching the

14   excerpts from the videos or audios that he heard in the

15   courtroom that day and so was trying to go back to understand

16   all that had been presented, either by the prosecution or

17   even by Attorney Dwyer.

18   **Q.**   And is that what you mean by "catch-up sessions" in your

19   affidavit?

20   **A.**   Yes.  I call them catch-up sessions, because he was not

21   prepared beforehand, and he was trying to understand what was

22   in these videos and these audio recordings, after having

23   heard them for the first time in the courtroom.  So he was

24   trying to catch up on what he didn't know existed.

25   **Q.**   Now, some of the recordings in this case, some of the

1  intercepted communications, those were in -- were not in

2  English; is that right?

3  **A.**   That's correct.

4  **Q.**   Sometimes it was in Haitian Creole?

5  **A.**   Yes.

6  **Q.**   And sometimes in French?

7  **A.**   Yes.

8  **Q.**   And did the Government prepare, as far as you know,

9  translations of the communications that weren't originally in

10 English?

11 **A.**   Well, they presented them during the trial, that's the

12 first I had heard or seen of them.

13 **Q.**   Did you ever hear Attorney LaRoche make comments about

14 whether the Government's translations of non-English

15 communications, for example, the conversations in Haitian

16 Creole, whether those translations were accurate?

17 **A.**   I do think he had some questions about a portion of the

18 transcripts.  Whether or not -- whether or not the FBI agent

19 that provided the translation had translated them properly,

20 one -- one instance in particular related to "greasing paws,"

21 instead of "greasing palms."  I think there might have been

22 something related to money under the table versus money on

23 the table, but that's all I recall.

24 **Q.**   And Attorney LaRoche, he is a Haitian Creole speaker; is

25 that right?

1    **A.**  Yes.  That's part of the reason why Dr. Baptiste wanted

2    him as his defense attorney.

3    **Q.**  Mr. Hinton, turn to the tab in the binder labeled B-7, B

4    as in boy, 7.  It should be a document Bates labeled

5    BAP 00960.

6    **A.**  Okay.

7    **Q.**  Let me know when you're with me.

8    **A.**  I am.

9    **Q.**  Okay.  Again, so just to keep things moving here, this is

10   another e-mail thread, also before the trial.  This one is on

11   May 20, 2019, between you, Attorney LaRoche, and

12   Dr. Baptiste; is that right?

13   **A.**  Yes.

14   **Q.**  And in fact, if you flip a few pages into this document,

15   after the e-mail thread, at the page Bates labeled BAP 00963,

16   there's an attachment, which is a side-by-side Haitian Creole

17   transcription translation.  Do you see that?

18   **A.**  Yes.

19   **Q.**  And was it your understanding that this was a translation

20   that the Government created of an intercepted communication?

21   **A.**  Yes.

22   **Q.**  And was this the translation that you referred to when

23   you said you remember once Attorney LaRoche showing you a

24   translation of a call?

25   **A.**  Yes.

1    **Q.**  Okay.  Do you remember ever seeing any other translations

2    of calls that Attorney LaRoche had identified in this case?

3    **A.**  I don't recall seeing anything else.

4    **Q.**  Okay.  Turn back to your e-mail for a second, and at the

5    bottom -- actually, I'm going to ask you to turn to page 2,

6    because of the way that Gmail prints its e-mail threads.  So

7    at the bottom of page 2, so this is the Bates page BAP 00960.

8    Do you see you wrote an e-mail to Attorney LaRoche and CCed

9    Dr. Baptiste that starts, "Good morning, all"?

10   **A.**  Yes.

11   **Q.**  And you write, in reference to the attached transcript,

12   "A few things jump out at me."

13          And then flip to the next page.  In Paragraph 2,

14   you write, "I now have to question the translator's true

15   knowledge of Creole.  Even if I acknowledge that the

16   translator is supposed to provide an exact translation rather

17   than a contextual translation, the translation is wrong.

18   '*Blanc*' means 'white,' not 'white people,' so whether

19   contextual or exact, the translation is errant."

20          Do you see that?

21   **A.**  Uh-huh.

22   **Q.**  Okay.  And then you raise other concerns you have about

23   the translation.  And at the bottom of your e-mail, you say,

24   "The fact that they used this translation as the basis of

25   their prosecution is unconscionable."

1          Do you see that?

2   **A.**  I'm sorry, where is that part?

3   **Q.**  At the bottom of our e-mail, the last paragraph, starting

4   with the, "The fact"?

5   **A.**  Okay.

6   **Q.**  Do you see that?

7   **A.**  Yes.

8   **Q.**  Okay.  So these were issues that you discussed directly

9   with Attorney LaRoche; is that right?

10  **A.**  Yes.

11  **Q.**  Identifying concerns about the quality and accuracy of

12  the Haitian Creole translations in this case; is that right?

13  **A.**  Yes.

14  **Q.**  Do you know whether Attorney LaRoche engaged a translator

15  to create his own translations of these intercepted

16  communications?

17  **A.**  He did not.

18  **Q.**  Do you know whether he engaged a translator even to

19  review the Government's translations to see whether they were

20  accurate?

21  **A.**  He did not.

22  **Q.**  At trial, did he present any evidence to challenge the

23  accuracy or validity of the Government's translations of

24  these Haitian Creole conversations?

25  **A.**  He did not.

1    Q.   And these were critical pieces of evidence in the case.

2    Is that fair to say?

3    A.   I believe so.

4    Q.   Did he tell you why he didn't have a translator who could

5    put on defense translations of the critical calls in this

6    case?

7    A.   As I said before, I don't think Donald really wanted to

8    expose his lack of preparation for the case, and a lot of

9    this stuff we became aware of during trial, as we witnessed

10   the trial occurring.

11   Q.   In your affidavit, Mr. Hinton -- hopefully I can get the

12   paragraph right this time.  In Paragraph 13, so this is on

13   page 3, you say, "As the trial date approached, it became

14   apparent to me that Attorney LaRoche did not understand the

15   legal elements of the charges or the evidence that the

16   prosecution planned to present."

17           How would you say that became apparent to you in

18   the lead-up to the trial?

19   A.   Two things I remember in particular, the first being he

20   made an explanation of what entrapment was, and he said that

21   entrapment could not be asserted as an affirmative defense

22   because Joe didn't know that he was dealing with the FBI.

23   That seemed to be bogus to me; not necessarily that the

24   defense could or could not be asserted, but that wasn't the

25   reason.  And second, up until trial, Joe, Dr. Baptiste, was

1    consistently asking Donald what the money laundering charge

2    was about, and Donald continued, over time, to have trouble

3    explaining what that charge was.

4    **Q.**  You also say, in Paragraph 13, that, "Attorney LaRoche

5    was unable to articulate what he could or should say in his

6    opening statement."

7            When did you make that realization, or when did you

8    observe that?

9    **A.**  I wasn't here for the beginning of the trial.  I was down

10   in Maryland.  And my wife called me and said, "I'm worried."

11           I said, "What do you mean?"

12           She said, "I asked Donald if he had prepared his

13   opening statement and generally what was his strategy," and

14   he could not articulate anything, ultimately telling her that

15   he wasn't going to discuss it with her.

16           And I think she called me and said, "I don't think

17   he's prepared to give an opening statement."

18           So I recommended some things he could put with his

19   opening statement, under the theory that I didn't know if he

20   had prepared one or not, number one.  And two, if he did not,

21   at least he would have something.  I did that from Maryland.

22   **Q.**  Turning the binder marked Exhibit 1, to Tab B-21, please,

23   Mr. Hinton.  It should be a document Bates labelled

24   BAP 01086.

25           Do you see that?

1    **A.**  Yes.

2    **Q.**  And this, again, is another Gmail thread between you and

3    Attorney LaRoche and Dr. Baptiste; is that right?

4    **A.**  Yes.

5    **Q.**  And in this one, the first e-mail, Attorney LaRoche is

6    e-mailing you and Dr. Baptiste a draft of his opening

7    statement.  He's doing that at 4:06 in the morning, on

8    Monday, June 10th; is that right?

9    **A.**  Yes.

10    **Q.**  That's the day before the trial was starting; is that

11    right?

12    **A.**  Yes.

13    **Q.**  Is that the first time you saw any draft of his opening

14    statement?

15    **A.**  Yes.

16    **Q.**  And when you say you did the best you could to provide

17    suggested edits from down in Maryland, is this what you're

18    talking about?

19    **A.**  Yes.

20    **Q.**  And at that point, did you have access to all the

21    discovery in the case?

22    **A.**  He had never shared the discovery with me, other than

23    Alex Baptiste's transcript and the portions of the video

24    where the FBI agent was saying "pay for play."

25    **Q.**  So with -- with regard to the discovery or the evidence

1    in the case, your knowledge of the case was limited to what

2    Attorney LaRoche had shared with you; is that right?

3    **A.**  From a discovery perspective, that encapsulates it.  I

4    saw some of the motions back and forth, so I learned from

5    those documents.  And I saw the indictment and the

6    superseding indictment, so I was informed by those documents,

7    as well.  But that would be it.

8           The lion's share of the evidence, which was

9    presented both by the prosecutors and counsel, Attorney

10   Dwyer, I saw those for the first time in this courtroom.

11   **Q.**  So is it fair to say that although you tried to help and

12   suggest edits, you weren't in a position to write an opening

13   for this case, because you didn't know the case?

14   **A.**  I think that's accurate.

15   **Q.**  Let's go -- let's bookend this and go to the other end of

16   the trial.  Let's talk about the closing for a minute.  This

17   is Paragraph 19 of your affidavit, on page 5.

18   **A.**  I'm sorry, where is that?

19   **Q.**  In your affidavit, page 5, Paragraph 19.

20   **A.**  Okay.

21   **Q.**  You write, "After the close of evidence, Attorney LaRoche

22   was unable to articulate what he could or should say in his

23   closing argument.  I worked overnight to draft a document

24   containing suggestions to assist Attorney LaRoche.  A copy of

25   that e-mail and document are attached as Exhibit A."

1            When did it first become clear to you that Attorney

2    LaRoche, at the end of the trial, wasn't able to prepare a

3    closing?

4    **A.**   Well, I thought his performance during the trial made me

5    very weary about his capacity to try the case at any portion

6    of the trial.  However, when we got back to the hotel, the

7    night before he was supposed to give his close, he was still

8    trying to watch some of the video evidence for the first

9    time.  It was -- it got to be very late that evening, his

10   eyes were glassing over.  He hadn't begun to type anything.

11   And so at that point, I decided that I had to try to jump in.

12   **Q.**   And at that point, you still didn't have access to all

13   the discovery in the case; is that right?

14   **A.**   Well, I hadn't reviewed it.  I had seen it in the

15   courtroom, but I did not have a familiarity with it.  I had

16   not mapped what was where.  I just kind of had to go by what

17   I recalled from the trial itself.

18   **Q.**   And you hadn't even attended the entire trial; is that

19   right?  You told us that earlier?

20   **A.**   I saw most of it, but I wasn't here the first day and

21   maybe a day or two after that.

22   **Q.**   Okay.  Had you ever written a closing argument for a

23   federal criminal case before?

24   **A.**   No.

25   **Q.**   Did you consider yourself competent to write the closing

1   in this case?

2   **A.**   I didn't consider myself competent, but I considered

3   myself more competent than Donald.

4   **Q.**   And were you in court when Attorney LaRoche delivered his

5   closing?

6   **A.**   No -- wait.  Hold on.  I was here for that.  I missed the

7   prosecution's closing.  But that document was sent very early

8   in the morning, because I worked through the night into the

9   morning to send it to Donald.  I think we got here just

10   before he started to deliver it.

11   **Q.**   But that's helpful.  That actually solved the mystery for

12   me, because the e-mail we just looked at, you sent at 11:00

13   in the morning?

14   **A.**   Yes.

15   **Q.**   So you actually missed Attorney Basil's closing?

16   **A.**   Yes.

17   **Q.**   Because you were home writing Attorney LaRoche's closing

18   at the hotel?

19   **A.**   Yes.

20   **Q.**   But you did come to court and hear Attorney LaRoche

21   deliver that closing?

22   **A.**   I don't remember if I heard all of it, but I heard a

23   significant portion of it.

24   **Q.**   And did he essentially read what you wrote, word for

25   word?

1    **A.**  Yes, with different pastoral inflections of the type you

2    would expect in a Baptist church, but otherwise, it was what

3    I wrote.

4    **Q.**  And did that surprise you?

5    **A.**  By that time, no.

6    **Q.**  Did that concern you?

7    **A.**  Every night we went back to the hotel, we were all

8    concerned, and we were all very scared for Dr. Baptiste.

9    Knowing that he would be reading a closing that he didn't

10   write provided some level of comfort, but I felt it was as

11   though not enough, way too late, and I was fearful for the

12   verdict that was coming.

13            MR. MARX:  Can I have one minute, Your Honor?

14            THE COURT:  Yes.

15            (Counsel confers.)

16            MR. MARX:  Nothing further at this time, Your

17   Honor.

18            THE COURT:  Hold on one second, Mr. Basil.

19            Go ahead.

20            (Discussion off the record.)

21            MS. RUBIN-SMITH:  Your Honor?

22            MR. BASIL:  Your Honor, I'm going to mark as

23   whatever the next exhibit is, it'll be actually the whole of

24   the production we received from them, which is BAP 1162

25   through 1688.  And I have a copy for the Court.

```
 1                THE COURT:  I think it's 10, right?
 2                THE DEPUTY CLERK:  Yes, it's Exhibit 9, number 9.
 3                MS. RUBIN-SMITH:  9?
 4                THE DEPUTY CLERK:  Yeah.
 5                (Exhibit No. 9 admitted into evidence.)
 6                MR. BASIL:  I apologize to the Court, I wrote "10"
 7      on my copy.
 8                THE COURT:  It's all right.  My fault.
 9                MR. MARX:  Kriss, do you have a copy for us?
10                (Discussion off the record.)
11                MR. BASIL:  May I inquire, Your Honor?
12                THE COURT:  Yup.
13                CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF
14      BY MR. BASIL:
15      Q.  Good morning, Mr. Hinton.
16                Are you represented by an attorney here today?
17      A.  I am not.
18      Q.  Do you have any kind of an attorney-client relationship
19      with Mr. Marx or Mr. Fick?
20      A.  No.
21      Q.  And you declined to speak with the Government prior to
22      your testimony here today, right?
23      A.  Your first request, yes.
24      Q.  Okay.  So I asked you, and you didn't respond.  And then
25      Ms. Rubin-Smith asked you, and you responded and said no; is
```

1    that correct?

2    **A.**  I responded to the e-mail that I remember getting fairly

3    quickly.

4    **Q.**  How many times have you spoken with Mr. Marx and Mr. Fick

5    about this case?

6    **A.**  Several.

7    **Q.**  How many?  How many is several?

8    **A.**  I don't know the exact number, but I met Mr. Marx for the

9    first time -- I met him in person for the first time last

10   month.  I think I spoke to him in December.  And I met

11   Mr. Fick in June.  So maybe five, six times in total.

12   **Q.**  So that's in-person meetings you're talking about?

13   **A.**  No, just having spoken to him.

14   **Q.**  How many times have you met with him in person?

15   **A.**  In person?

16   **Q.**  Yes, sir.

17   **A.**  When Dr. Baptiste was looking for a new attorney, after

18   the trial, he asked me to come to the meeting where Mr. Fick

19   was present.  I met Mr. Fick then.  And then I met Dan Marx

20   in person for the first time last month.

21   **Q.**  Have you communicated with Mr. Marx and Mr. Fick

22   specifically about your testimony here today?

23   **A.**  Not specifically about my testimony, but they did ask me

24   my impressions of what I experienced in the courtroom.

25   **Q.**  How many times have you talked to them about your

1    testimony -- the substance of your testimony here today that

2    you just gave?

3    **A.**   I would say three times.

4    **Q.**   When was the last time?

5    **A.**   Last month.

6    **Q.**   Have you spoken to them since the evidentiary hearing on

7    January 14th about your testimony here today?

8    **A.**   No.

9    **Q.**   Have you talked to your wife about your testimony here

10   today?

11   **A.**   No.  Not in that regard, no.

12   **Q.**   Okay.  And your wife is Arielle Hinton.

13   **A.**   Arielle.

14   **Q.**   Arielle?  Okay.  I'm going to call her by Ms. Hinton; is

15   that okay?

16   **A.**   Or Mrs. Hinton.

17   **Q.**   Ms. Hinton is a lawyer; is that correct?

18   **A.**   She is.

19   **Q.**   Okay.  She is a state prosecutor in Maryland; is that

20   right?

21   **A.**   She is.

22   **Q.**   And she was then a current state prosecutor in Maryland

23   in May and June of 2019; is that correct?

24   **A.**   Yes.

25   **Q.**   And you were formerly a state prosecutor in Maryland, as

1    well, right?

2    **A.**   Yes.   For Montgomery County.

3    **Q.**   Okay.   And isn't it true that a state legal counsel in

4    Maryland is not allowed to provide legal counsel to anyone

5    else in any jurisdiction, when they're currently a state

6    prosecutor in Maryland?

7    **A.**   Yes.

8    **Q.**   Do you have notes of your communications with Mr. Marx

9    and Mr. Fick?

10    **A.**   I do not.

11    **Q.**   What documents have you reviewed to prepare for your

12    testimony today?

13    **A.**   None.   I reviewed them before.   I reviewed them in

14    January.

15    **Q.**   And what were those?

16    **A.**   I reviewed my affidavit, and I reviewed the e-mails that

17    they asked me to send, that you had requested.

18    **Q.**   Do you have communications with Dr. Baptiste about this

19    case that have not been turned over to Mr. Fick and Mr. Marx?

20    **A.**   No.

21    **Q.**   Do you have communications with Attorney LaRoche about

22    this case?

23    **A.**   No.

24    **Q.**   Do you have communications with anyone else about this

25    case in general, that is, the Government's prosecution of

1    Dr. Baptiste, that you have not turned over to Mr. Marx and

2    Mr. Fick?

3    **A.**   Not that I know of.  I mean, my communications were with

4    Attorney LaRoche, Attorneys Fick and Marx, and then there

5    were some communications between my wife and me.  I believe

6    all of those communications have been turned over by myself

7    and my wife.

8    **Q.**   And do you speak Haitian Creole yourself?

9    **A.**   Survival, at best.  I did spend two to three years there

10   working.

11   **Q.**   What were you doing in Haiti?

12   **A.**   International development work.

13   **Q.**   Okay.

14   **A.**   After the earthquake.

15   **Q.**   What was your affiliation?  What organization were you

16   there with?

17   **A.**   Was I there with?  The work was through the European

18   Development Fund and the US Army.  The US Army South would be

19   the organization.

20   **Q.**   Have you deleted any documents related to this case?

21   **A.**   No.

22   **Q.**   Okay.  So you filed an affidavit in this case, right?

23   **A.**   Uh-huh.

24   **Q.**   I'm sorry, you have to say "yes" or "no."

25   **A.**   I'm sorry.  Yes.

1   **Q.**  It's okay.  And that's an affidavit under oath, right?

2   **A.**  Yes.

3   **Q.**  And you intended that to be a complete and accurate

4  account of your role in the preparation and conduct of the

5  defense in this case; is that correct?

6   **A.**  Based on how I recollected at that time, yes.

7   **Q.**  And you understand that this proceeding right now has to

8  do with the purported ineffective assistance provided by

9  Donald LaRoche to Mr. Baptiste, right?

10  **A.**  Yes.

11  **Q.**  And you knew your affidavit had to do with that, as well,

12  correct?

13  **A.**  Yes.

14  **Q.**  The identity of the attorneys providing legal advice to

15  Dr. Baptiste in advance of trial, that's an important issue

16  to consider in a case involving ineffective assistance,

17  right?

18  **A.**  Sure.

19  **Q.**  And the work actually done by attorneys as part of a

20  defense case, that's also something important when thinking

21  about ineffective assistance, right?

22  **A.**  Sure.

23  **Q.**  Because you had -- the judge, the Court, has to look at

24  all of the advice that Dr. Baptiste was receiving in advance

25  of trial to make an evaluation, right?

1    **A.**  Sure.

2    **Q.**  And you knew that when you wrote your affidavit, right?

3    **A.**  Yes.

4    **Q.**  Other than you, who is responsible for the wording of

5    your affidavit?

6    **A.**  No one else.

7    **Q.**  You did go over your affidavit with your wife, didn't

8    you?

9    **A.**  I don't recall, but maybe.

10   **Q.**  Did you, in fact, send a copy of the affidavit to your

11   attorneys, copying your wife?

12   **A.**  To my attorneys?  I don't have any attorneys.

13   **Q.**  Sorry.  To these attorney here, Fick and Marx?

14   **A.**  If that's what it says, then, yes.

15   **Q.**  So Mrs. Hinton knew you were providing an affidavit,

16   correct?

17   **A.**  Yes.

18   **Q.**  Did you go over your affidavit with Dr. Baptiste?

19   **A.**  Did I go over it with him?

20   **Q.**  Yes, sir.

21   **A.**  You mean like did I review its contents with

22   Dr. Baptiste?

23   **Q.**  Yes.

24   **A.**  Or did he receive a copy?  I just want to be certain,

25   what did you mean.

1    **Q.**  How about all of the above.  Did you go over it in any

2    way?  Did you talk about it with him?

3    **A.**  He knew that I was sending an affidavit, because he knew

4    that his attorneys had requested one from me.

5    **Q.**  Did you go over the content of that with him?

6    **A.**  No.  He did not help develop anything in that document.

7    **Q.**  Did you fact check anything in your affidavit with him

8    before you filed it?

9    **A.**  No.

10   **Q.**  So we're looking now at Exhibit 8 that the defendant's

11   counsel marked.  This is your affidavit.

12           Do you have a copy there in front of you?

13   **A.**  Exhibit 8?

14   **Q.**  Yes, sir.

15   **A.**  Yes.

16   **Q.**  And in Paragraph 5, you say you have no professional

17   experience in federal criminal law, right?

18   **A.**  That's a fact.

19   **Q.**  Okay.  And you said that because you viewed yourself

20   then, as now, as being incompetent to be a federal criminal

21   defense lawyer; is that right?

22   **A.**  Trial attorney, absolutely.

23   **Q.**  In Paragraph 7 of your affidavit, you said you made it

24   very clear to Attorney LaRoche and Dr. Baptiste that you

25   didn't have the necessary experience -- expertise or

1    experience to serve as co-counsel in the case, right?

2    **A.**  Yes.

3    **Q.**  You say that, "Nevertheless, as a favor to the Baptiste

4    family, I attempted to assist Dr. Baptiste by helping to

5    coordinate communications and concerns with Attorney LaRoche,

6    right?

7    **A.**  Begrudgingly, yes.

8    **Q.**  Now, in a case, legal defense in a criminal case,

9    co-counsel might do things like do legal research, right?

10   **A.**  Law clerks, too.

11   **Q.**  And co-counsel does that, as well, right?

12   **A.**  Does what?

13   **Q.**  Legal research in a case?

14   **A.**  If you say so.

15   **Q.**  Okay.  And co-counsel might analyze evidence in the case,

16   right?

17   **A.**  If they have access to it.

18   **Q.**  So that's a yes?

19   **A.**  If they have access to it.

20   **Q.**  And co-counsel might help to develop trial strategy,

21   right?

22   **A.**  They might.

23   **Q.**  And co-counsel might review and comment on motions,

24   right?

25   **A.**  Sure.

1  **Q.**  And co-counsel might suggest additional motions, right?

2  **A.**  Yes.

3  **Q.**  And co-counsel might evaluate success in defeating

4  Government motions in limine, right?

5  **A.**  Sure.

6  **Q.**  And co-counsel might draft suggested motions, right?

7  **A.**  Yes.

8  **Q.**  For example, co-counsel might draft a motion about *Brady*

9  issues in a criminal case, right?

10  **A.**  Sure, as might law clerks.

11  **Q.**  And co-counsel might work on an opening with lead

12  counsel, right?

13  **A.**  Might.

14  **Q.**  Okay.  And co-counsel might also work on a closing,

15  right?

16  **A.**  He might or she might.

17  **Q.**  And co-counsel might write witness examinations, right?

18  **A.**  Yes.

19  **Q.**  And you did all of these things in this case, didn't you?

20  **A.**  I think I have testified to the opening and closings.  In

21  terms of witness cross-examinations, is there something that

22  you're referring to?

23  **Q.**  We'll get to that.

24  **A.**  Okay.

25  **Q.**  Now, in your affidavit, in Paragraph 8, you state, "In

1    the months before trial, it was very difficult to arrange

2    calls or meetings with Attorney LaRoche, who was rarely

3    available."

4            And you say that LaRoche was always too busy to

5    meet with you, right?

6    **A.**   To meet with Dr. Baptiste and me.

7    **Q.**   Yes.  And you say that, in Paragraph 9, LaRoche never

8    provided the recordings to Baptiste or you to review, right?

9    **A.**   Yes.

10   **Q.**   In fact, did you not meet with Baptiste and LaRoche at

11   Baptiste's house on multiple occasions?

12           MR. MARX:  Objection, Your Honor.  Just misstates

13   Paragraph 9.  It says he didn't provide them to review

14   independently.  I just want to make sure the testimony is

15   clear.

16           MR. BASIL:  I'll just keep going, Your Honor.

17           THE COURT:  It says what it says.

18   BY MR. BASIL:

19   **Q.**   In fact, you met with Baptiste and LaRoche at Baptiste's

20   house on multiple occasions to talk about this case, right?

21   **A.**   Yes.

22   **Q.**   And on at least one of those occasions, LaRoche played

23   audio of meetings between Dr. Baptiste and Special Agent

24   Ornello Arlati, right?

25   **A.**   I don't remember the names, but can you explain what

1    happened in that recording?  Is that the one I've been

2    describing?

3    **Q.**  Well, that's exactly what I'm getting at, sir.

4    **A.**  Okay.

5    **Q.**  There was a meeting where Mr. LaRoche played an audio

6    recording of an agent with a foreign accent, correct?

7    **A.**  Yes.

8    **Q.**  Okay.  And in that same meeting, your wife was there,

9    Mrs. Hinton was there for that meeting, wasn't she?

10   **A.**  I don't recall that.

11   **Q.**  And Mr. LaRoche, he played that audio for her to hear, as

12   well, didn't he?

13   **A.**  I just said I don't recall that.

14   **Q.**  And in addition, in that meeting, Mr. LaRoche went over

15   notes from an FBI interview of Mr. Baptiste in Miami, right?

16   **A.**  Potentially.

17   **Q.**  That was a meeting where there was a female agent and a

18   male agent, and they approached him in a hotel room, right?

19   **A.**  Yes.

20   **Q.**  Okay.  And so you went over that with Dr. Baptiste and

21   Mr. LaRoche, as well, right?

22   **A.**  What do you mean by "went over that"?

23   **Q.**  You reviewed it in a meeting with Dr. Baptiste and

24   Mr. LaRoche, right?

25   **A.**  Yes.

1    **Q.**  And that had to do with the motion to suppress, right?

2    **A.**  Potentially.  I don't remember the exact context, but we

3    did review that.

4    **Q.**  Now today, you testified that you reviewed a video where

5    an agent talks about pay to play, right?

6    **A.**  Yes.

7    **Q.**  Okay.  Now, there is no video of the meeting in 2014,

8    with Special Agent Ornello Arlati, is there?

9    **A.**  If you say there's not, there's not.

10   **Q.**  Okay.  So if you reviewed a video, that would be yet

11   another thing that had been reviewed, right?  There's no

12   recording of pay to play spoken by an agent with a foreign

13   accent, and there might be an audio of that, right?

14   **A.**  I thought I heard audio of that, yeah.

15   **Q.**  And today, you also saw a video of that, right?

16   **A.**  I guess so, yes.

17   **Q.**  So there's at least two pieces from the discovery that

18   Attorney LaRoche went over with you with Dr. Baptiste, right?

19   **A.**  You just said there's no video of it.  How could there be

20   two?

21   **Q.**  Sir, you testified that there was a video.  So was there

22   a video or wasn't there?

23   **A.**  Did you provide one?

24          MR. BASIL:  Your Honor, could you just direct him

25   to answer the question?

1          THE COURT:  Well --

2          MR. BASIL:  I'll move on.

3          THE COURT:  Why don't you ask another question?

4          MR. BASIL:  Yup.

5          THE COURT:  Mr. Hinton, he's not going to answer

6    your questions.  So you answer his questions, or you say you

7    can't answer the question.  But you can't respond back to him

8    with a question.

9          THE WITNESS:  Yes, Your Honor.

10   BY MR. BASIL:

11   **Q.**  Did you review any audio between Dr. Baptiste and the

12   FBI?

13   **A.**  I thought I reviewed a video, as I said.  You seem to

14   have corrected me and said, at most, I heard an audio.  That

15   being said, I heard the words "pay for play" said by

16   something -- someone other than Joe, so whatever that was, I

17   observed that.

18   **Q.**  Did you also review audio of that, that conversation that

19   you just described?

20   **A.**  Well, I had to hear something.

21   **Q.**  So basically, in your testimony today, Attorney LaRoche

22   had access to video of meetings with the FBI.  He also, based

23   on what you just said, had access to audio of meetings with

24   the FBI, right?

25   **A.**  Yes.

1    **Q.**  And he had access to the reports of the interviews that

2    the FBI did, right?

3    **A.**  Sure.

4    **Q.**  Okay.  And you went over those with him, right?

5    **A.**  I went over the ones I said I went over.  There would

6    be far fewer --

7    **Q.**  Right.  And your wife went through those FBI reports with

8    you and Dr. Baptiste, as well, didn't she?

9    **A.**  You're asserting that.

10    THE COURT:  It was a question.  You can --

11    THE WITNESS:  I don't recall what my wife saw, but

12    she's here today.

13    MR. BASIL:  Yes.

14    BY MR. BASIL:

15    **Q.**  Now, in Paragraph 10 of your affidavit, you say Attorney

16    LaRoche did not have transcripts made of any recordings, and

17    therefore, he did not provide any such transcripts to

18    Dr. Baptiste or to me before trial, right?

19    **A.**  Yes.

20    **Q.**  Okay.  In fact, didn't Mr. LaRoche provide copies of

21    Government discovery that included transcripts to you and to

22    your wife?

23    **A.**  I know that he provided me the transcript for Alex

24    Baptiste.  I also know that there are mountains of

25    transcripts at this trial that I had never seen before.

1  **Q.**  And you reviewed documents that were produced by the
2  Government as exhibits for trial in this case, right?  You,
3  yourself, did that.
4  **A.**  I reviewed Dr. Alex Baptiste's transcript, yes.
5  **Q.**  But according to you today, you didn't review anything
6  else, just that?
7  **A.**  I'm telling you that's what I recollect.
8  **Q.**  So you might -- you might just be forgetting the things
9  that you reviewed in advance of trial; is that right?
10  **A.**  What I'm remembering is seeing a lot of information for
11  the first time in this trial and that being my overwhelming
12  recollection.
13  **Q.**  Now, in Paragraph 11 of your affidavit, you say that
14  before trial, Attorney LaRoche did not speak with any
15  individuals identified in the indictment, other than Alex
16  Baptiste, and that's a co-conspirator in the case, right,
17  according to the Government?
18  **A.**  According to the Government, yes.
19  **Q.**  Jared Dwyer, counsel for his named co-defendant Richard
20  Boncy, and he didn't contact any of the witnesses in any
21  significant manner, right?
22  **A.**  I think I said he spoke to Eric Walcott, as well.
23  **Q.**  But you didn't say that in your affidavit, right?  That's
24  new today, you talking about Mr. Walcott?
25  **A.**  Well, I guess I didn't think about it then.

1    **Q.**  Were there other things that you didn't think about when

2    you wrote your affidavit, that are pertinent to Mr. LaRoche's

3    preparation for trial in this case?  Can you think of any

4    right now?

5    **A.**  No.

6    **Q.**  Is there anything about your affidavit that you want to

7    correct before I go further?

8    **A.**  The one thing that I will correct from my affidavit, that

9    I can recall, rereading it recently, was the timing that I

10   left the State's Attorney's office.

11   **Q.**  I'm sorry, I misheard you.

12   **A.**  The timing that I left the State's Attorney's office.

13   **Q.**  When did you leave the State's Attorney's office?

14   **A.**  Before I came up here for trial.  I was supposed to leave

15   in May.  I was asked to put in a full two weeks, so it was

16   off by about two weeks.

17   **Q.**  So you did know -- back at Eric Walcott, you did know

18   that LaRoche was in contact with him about being a witness,

19   right?

20   **A.**  Yes.

21   **Q.**  And you knew that Mr. Walcott, in fact, plans to be a

22   witness in this case, right?

23   **A.**  Can you say that again?

24   **Q.**  Sure.  You knew that Mr. Walcott planned to be a witness

25   in this case.

1    **A.**  I don't know that he planned to be a witness.  I don't

2    know what was in his head.

3    **Q.**  You had been in contact with him, too, haven't you?

4    **A.**  I've spoken to Walcott, yes.

5    **Q.**  And you talked to him about testifying in this case,

6    right?

7    **A.**  I was there when he was discussing being present for the

8    case, yes.

9    **Q.**  Okay.  So did you -- who else was present for that

10   conversation with Mr. Walcott?

11   **A.**  Donald and Joe.

12   **Q.**  Okay.  Was Arielle Hinton also there for that?

13   **A.**  She was rarely at any of these meetings.

14   **Q.**  Was she at the meeting where there was a discussion with

15   Eric Walcott about his potential testimony in this case?

16   **A.**  I don't recall that, but she is here.

17   **Q.**  Let's talk about discovery generally for a moment.  There

18   was a wiretap on Baptiste's phone in this case, right?

19   **A.**  Okay.

20   **Q.**  Yes?

21   **A.**  Yes, I think so.

22   **Q.**  Okay.  So the calls in this case were from a wire that

23   had Baptiste as a participant in the calls, right?

24   **A.**  That's what I recall, yes.

25   **Q.**  Okay.  And he had calls -- Mr. Baptiste had calls with

1    Richard Boncy on the wire, right?

2    **A.**   Okay.  Yes.

3    **Q.**   Okay.  And he had calls with someone named

4    "Axan Abellard" on the wire, too, right?

5    **A.**   Yes.

6    **Q.**   And he was a participant.  Dr. Baptiste was a participant

7    in those calls, right?

8    **A.**   Yes.

9    **Q.**   And there were e-mails from Baptiste's Gmail account in

10   this case, right?

11   **A.**   Yes.

12   **Q.**   And he had access to that Gmail account in advance of

13   trial, right?

14   **A.**   Who's "he"?

15   **Q.**   Dr. Baptiste.

16   **A.**   Of course.  It's his account.

17   **Q.**   Yeah.  In fact, he sent you e-mails from that account in

18   preparation for trial, didn't he?

19   **A.**   Yes, he did send me e-mails.

20   **Q.**   And there are pictures of money that came in in this

21   case, as well, right?

22   **A.**   Uh-huh.

23   **Q.**   Is that a yes?

24   **A.**   Yes.

25   **Q.**   Okay.  And those pictures were taken off of

1    Dr. Baptiste's phone, right?

2    **A.**  I believe that's what you presented in trial, yes.

3    **Q.**  And Dr. Baptiste, he had his phone in advance of trial,

4    right?

5    **A.**  Yes.

6    **Q.**  Mr. Baptiste --

7    **A.**  I don't know if it's the same phone with the same

8    pictures, but he had a phone.

9                (Counsel confers.)

10               MR. BASIL:  There's a dispute about whether the

11   images of the phone came off the image of the phone.  They

12   were, in fact, produced in --

13               THE WITNESS:  But I don't know if he had that same

14   phone at trial.  That's what I'm saying.

15   BY MR. BASIL:

16   **Q.**  Now, you knew that the FBI approached Dr. Baptiste in

17   Miami in December of 2015, right?

18   **A.**  Yes.

19   **Q.**  And you knew that when they approached him, he agreed to

20   cooperate with the FBI's investigation, right?

21   **A.**  That's not how it was presented to me.

22   **Q.**  You knew that he then went ahead and retained an attorney

23   named David Benowitz, right?

24   **A.**  No.  I learned about that after the fact.

25   **Q.**  You do know that he had an attorney, David Benowitz?

1   **A.**  Yes.

2   **Q.**  Have you ever spoken to Mr. Benowitz?

3   **A.**  I met him here in January.

4   **Q.**  Now, were you aware that Mr. Benowitz met with the

5   Government and received a reverse proffer about the FCPA

6   charges and the conspiracy in this case?

7   **A.**  Can you explain what that means?

8   **Q.**  Were you aware that Attorney Benowitz met with the

9   Government and received a presentation of the evidence of

10  Dr. Baptiste in this case?

11  **A.**  What I'm aware of is Attorney Benowitz and Dr. Baptiste

12  were supposed to meet with the Government to see some portion

13  of evidence that Dr. Baptiste -- that they held the meeting

14  before Dr. Baptiste arrived, so he never saw it.  And I know

15  that because Donald and Dr. Baptiste told me that.

16          THE COURT REPORTER:  Could you get a little bit

17  closer to the microphone?

18          THE WITNESS:  Oh.  Sorry.

19  BY MR. BASIL:

20  **Q.**  Did you know that, Mr. Benowitz, after he met with the

21  Government, he met with Dr. Baptiste to review the evidence

22  that he had heard about from the Government?

23  **A.**  That's not how it was presented to me.

24  **Q.**  Did you know that at some time after that Dr. Baptiste

25  then gave a proffer in the mode of cooperation, while

1   represented by Mr. Benowitz, in which he discussed agreeing

2   with Richard Boncy that they would make a job offer to Axan

3   Abellard?  Did you hear that?

4   **A.**   I did hear that, but I heard that in this trial.

5   **Q.**   You knew that Dr. Baptiste subsequently, while

6   represented by Mr. Benowitz, entered a plea agreement in this

7   case, right?

8   **A.**   Um -- I do know that there was a statement of facts

9   given.  I don't know what the procedure was, per se.

10   **Q.**   So you know that Dr. Baptiste signed a statement of facts

11   in this case, right?

12   **A.**   Did he sign it?

13          I can't ask a question.

14          I know that there was one presented.  It appeared

15   it had been written by the Government.  I don't know if he

16   actually signed it, no.

17   **Q.**   Well, you knew that Donald LaRoche succeeded in keeping

18   out that piece of evidence at trial, right?

19   **A.**   Yes.  But I didn't know if it was signed or not.

20   **Q.**   Let's -- did you ever review that statement of facts with

21   him, with Dr. Baptiste?

22   **A.**   Did I review it with Dr. Baptiste?

23   **Q.**   Yes.

24   **A.**   No, not with him.

25   **Q.**   Never talked to him about the allegations or the

1    admissions that he made in that statement of facts?

2    **A.**  He talked to me about the fact that there was a statement

3    of facts that he had signed -- sorry, that he had agreed to,

4    I guess, not that he had signed, but that he agreed to and --

5    but that he did that because he wasn't under the impression

6    that he was going to be tried and that what was alleged did

7    not actually happen.  And that's why he wanted a new

8    attorney, because he said, "I didn't do this and I shouldn't

9    go to jail for it."

10   **Q.**  So Dr. Baptiste told you that he had agreed to a

11   statement of facts that wasn't true?

12   **A.**  He told me that the Government had presented him with a

13   statement of facts and that he did not believe -- he believed

14   that he was supposed to cooperate with them.  But that when,

15   I guess, the Government started talking about jail, he said,

16   "This isn't true, and I do not stand behind it."  This, of

17   course, is a paraphrase.

18   **Q.**  Okay.  So some time after he agreed to the statement of

19   facts, he decided that he didn't want to plead guilty; is

20   that correct?

21   **A.**  I don't believe he ever intended to plead guilty.

22   **Q.**  He breached a plea agreement, didn't he?

23              MR. MARX:  Objection, Your Honor.

24              THE COURT:  Basis?

25              MR. MARX:  I'm not sure what any of this has to do

1    with anything, but Your Honor ruled he had no obligation to

2    enter that plea agreement and it wasn't breached.

3              THE COURT:  Well, that's not what he's asking

4    questions about.  Overruled.

5    BY MR. BASIL:

6    Q.  He breached a plea agreement, didn't he?

7    A.  I'm not sure about breached, but he no longer -- he did

8    not stand by it.

9    Q.  He fired Mr. Benowitz, right?

10   A.  He believed Dr. Benowitz had made a decision from the

11   meeting he was not at and was not in his best interest, so he

12   decided to seek new counsel.

13   Q.  And you helped Mr. Baptiste find a new lawyer, right?

14   A.  Yes.  He asked me if I could represent him in the matter,

15   and I told him I could not but I could help him find an

16   attorney.

17   Q.  And you were present when LaRoche was retained by

18   Baptiste, right?

19   A.  I was.

20   Q.  And that was in August of 2017, right?

21   A.  It was in August.  I'm not sure if that happened by phone

22   or in person.

23   Q.  And earlier today, I believe when you -- you were asked

24   by Mr. Marx when you first had conversations with

25   Dr. Baptiste about this case, and I think you testified at

1    that time it was the spring of 2018.  But it was really 2017,

2    right?

3    **A.**  I don't recall, but -- the time frame, but it was at the

4    time that you -- that the Government was pressing him to

5    either sign the plea agreement or get new counsel.

6    **Q.**  Okay.  Now, after you met with LaRoche and Baptiste and

7    LaRoche was retained, LaRoche traveled to Boston to meet with

8    prosecutors about the case in early August, right?

9    **A.**  Yes.  I recall him taking that trip.

10   **Q.**  Okay.  And did you know that LaRoche talked about the

11   statement of facts with prosecutors at that meeting?

12   **A.**  I do not -- I do not recall him telling me exactly what

13   was talked about at that meeting.

14   **Q.**  Did you know that LaRoche then turned down a plea deal

15   for Dr. Baptiste a couple of days after that?

16   **A.**  That sounds familiar, yes.

17   **Q.**  What role did you play in that decision by Dr. Baptiste?

18   **A.**  Absolutely none.

19   **Q.**  And you knew that Baptiste was then arrested on complaint

20   in August of 2017, right?

21   **A.**  Yes.  I don't know the date, but I know that he was

22   arrested at his home.

23   **Q.**  And you knew that the indictment in this case was then

24   returned on October 4, 2017, right?

25   **A.**  October 4th, sure.  I mean, I don't know the exact dates,

1    but I do know an indictment followed.

2    **Q.**  Okay.  Let's look at September the 8th -- and what's

3    marked for you as Exhibit 9.

4            MR. BASIL:  Could you please bring up BAP 1187.

5    BY MR. BASIL:

6    **Q.**  So this is an e-mail from LaRoche to you and

7    Dr. Baptiste, right?

8    **A.**  Yes.

9    **Q.**  Okay.  And LaRoche says, "They came out with the

10   indictment today.  I'm trying to review it while I'm in a

11   meeting in D.C."

12           Right?  That's what he wrote?

13   **A.**  Uh-huh.  Yes.

14   **Q.**  And that's at 15:32 in the afternoon.  So that's, what,

15   3:30 in the afternoon; is that right?

16   **A.**  Yes.

17   **Q.**  And could you then go to BAP 1206?  And sir, if it's

18   easier for you to look in the paper, it's the same dates --

19           MR. BASIL:  I'll just approach and show him here.

20   BY MR. BASIL:

21   **Q.**  Look through here, and you'll find the Bates number.

22   They're all sequential, and you just go there.

23   **A.**  So which one are we on?

24   **Q.**  Let me look at my notes.  We're looking at BAP 1206.

25   **A.**  That's BAP 012 --

1    **Q.**   01206.  Are you there?

2    **A.**   Okay.  I'm on the page, yes.

3    **Q.**   Okay.  Now, this is an e-mail from you, on October 5th of

4    2017, at 12:30 -- 12:40 in the morning, right?  Is that the

5    e-mail down there?

6    **A.**   Uh-huh.

7    **Q.**   Is that e-mail written by you at 12:30 in the morning?

8    **A.**   Yeah, 12:39.

9    **Q.**   Okay.  So LaRoche sends you the indictment at 3:30 the

10   day before.  And at 12:40 in the morning, so less than a day

11   later, you wrote back, right?

12   **A.**   Okay.

13   **Q.**   And this was an attorney-client communication, right?

14   **A.**   Probably, yes.

15   **Q.**   Well, sir --

16           THE COURT:  Mr. Basil, can you hold on for one

17   second?

18           (The Court and the deputy clerk confer.)

19           THE COURT:  Go ahead.

20   BY MR. BASIL:

21   **Q.**   Well, you wrote this e-mail, didn't you?

22   **A.**   Yes.

23   **Q.**   So you wrote -- this communication is protected by

24   attorney-client privilege, right?

25   **A.**   Did I write that?  Yes.

1    **Q.**   Okay.  So this was, at this time, in your understanding,

2    a communication from you, as an attorney, to Dr. Baptiste,

3    right?

4    **A.**   No.  It was my impression that Donald was asking me for

5    some support, and so it was under his attorney-client

6    privilege that I was providing the support.

7    **Q.**   And you provided an analysis here of the indictment,

8    right?

9    **A.**   Not a legal analysis, but yes, it is an analysis.

10   **Q.**   In Paragraph little number ii, you opined that you felt

11   the Government had the timeline of what had taken place in

12   the case wrong, right?

13   **A.**   Yes.

14   **Q.**   And then paragraph -- in number 3, you thought the

15   Government was relying on -- confusing the jury about what

16   "pay to play" meant, right?

17   **A.**   No, it didn't say that.  It says about confusing a jury

18   about whether that money was for pay to play or bribe versus

19   consulting services.

20   **Q.**   And you were focused on the language of the

21   communications between the FBI and Dr. Baptiste as

22   represented in the indictment, right?

23   **A.**   I thought the indictment was unclear, yes.

24   **Q.**   And this says your acceptance, right?  So this is an

25   e-mail written to Joe, right?

1    **A.**  Yes.

2    **Q.**  Okay.  In fact, the e-mail says, "Greetings, Joe" as the

3    salutation, doesn't it?

4    **A.**  Well, he's my friend.  I call him Joe.

5    **Q.**  And it's not written to Donald LaRoche saying here,

6    "Donald, here's my analysis to assist you in the

7    representation."  It doesn't say that, does it?

8    **A.**  It sure doesn't.

9    **Q.**  And on the next page of this, we're now at BAP 1207, just

10    before you sign off, where you say, "Keep your head up," you

11    say, "I'll check on you tomorrow.  I also need to get other

12    information from you."

13            Right?

14    **A.**  It does say that.

15    **Q.**  Okay.  And that's information from Dr. Baptiste, right?

16    **A.**  Yes.

17    **Q.**  And you were getting information about this case because

18    you were working on it, weren't you?

19    **A.**  I don't believe that's what that was about.  It

20    definitely doesn't say that.

21            MR. BASIL:  Now, I'll go back to 12086, please,

22    Ms. Lewis.

23            THE WITNESS:  In fact --

24            MR. BASIL:  There's no question pending.

25            THE WITNESS:  Oh.  Okay.  I was going to finish

1    answering the prior question.

2    BY MR. BASIL:

3    **Q.**   LaRoche responds "Jason, magnificently put."  Right?

4    **A.**   He does.

5    **Q.**   And he totally agrees with your suggestion on the

6    response that Baptiste should give, right?  He says that,

7    doesn't he?  He agreed with you.

8    **A.**   It says more than that.

9    **Q.**   So here we're -- this document is an October 5, 2017

10   attorney-client communication from you to Joe Baptiste.

11           Now, after this, you know that LaRoche traveled to

12   Boston to meet with prosecutors on October 24, 2017, don't

13   you?

14   **A.**   I know that he went up there.  The dates, I'm not certain

15   about.

16   **Q.**   Okay.  And you know that he reviewed FBI recordings at

17   that meeting with prosecutors, right?

18   **A.**   I think the way he relayed this story was it took hours

19   for you guys to be able to open the disc for him to review

20   them, but ultimately, some of them were reviewed.

21   **Q.**   And you knew that LaRoche then met with Dr. Baptiste on

22   October 28, 2017, to discuss his meeting with the AUSA and

23   the recordings he heard, right?

24   **A.**   Again, you're referring to dates that I'm not certain of,

25   but I know that they met or talked after that meeting.

1    **Q.**  Were you present at that meeting between Dr. Baptiste and

2    Attorney LaRoche?

3    **A.**  I don't know if I was at that meeting.  I don't recall.

4    I know that I was at meetings at times, but any specific one,

5    if you could refresh my recollection, that would be great.

6    **Q.**  And you testified today that you really didn't have any

7    further activity in this case after Mr. LaRoche was retained

8    for some time, right?

9    **A.**  I think I said --

10   **Q.**  You testified to that today?

11   **A.**  I think I said between December and March, I was

12   recovering from an illness.  And then in March, Dr. Baptiste

13   asked me if I had heard from Donald, and I said I had not and

14   he asked me to reach out.

15   **Q.**  Okay.  So earlier today and right at the start of your

16   testimony today, Mr. Marx asked you what your role in the

17   case was after LaRoche and you represented, you testified,

18   that you had no further role at that time, after LaRoche was

19   retained, right?

20   **A.**  I -- is that exactly what I said?

21   **Q.**  I don't have the transcript, sir.

22   **A.**  Okay.  So --

23   **Q.**  Did you --

24   **A.**  That's why I'm questioning --

25   **Q.**  Did you testify today that you had no further role in

1    preparing the defense of this case, after LaRoche was

2    detained until after your sickness in 2019?

3    **A.**   I believe I testified to the fact that Donald LaRoche was

4    retained because I did not plan to serve as an attorney in

5    this case.

6    **Q.**   In November 17th, you provided legal analysis in this

7    case, didn't you?

8    **A.**   I don't know.

9    **Q.**   In fact, you provided an analysis of statutory language

10   in the FCPA, didn't you?

11   **A.**   Can you refer me to a document?

12   **Q.**   Do you remember whether or not you provided legal

13   analysis in this case, in November of 2017?

14   **A.**   In general?

15   **Q.**   Yes, sir.

16   **A.**   I provided analysis of a strategic communications variety

17   at times that fall.  I provided analysis from a business

18   perspective.  My involvement with the FCPA, which is why I

19   was initially familiar with it, was as a businessman, not as

20   an attorney.  If you have a document that says I looked at

21   FCPA language, then I did.

22   **Q.**   So you don't remember what you did to help Dr. Baptiste

23   in terms of the defense of a criminal case, after he had been

24   indicted in the fall of 2017; is that right?  It was just

25   business advice?

1   **A.** I remember having limited involvement and that seems to

2   upset you.

3   **Q.** Let's look at -- this is Tab B-1 in Exhibit 1. This is

4   going to be BAP 00932.

5           Okay. This is an e-mail from you to Joe Baptiste

6   and Donald LaRoche on November 8, 2017, right?

7   **A.** Yes.

8   **Q.** Okay. And this is -- you're forwarding an article about

9   the FCPA, plus your legal analysis, right?

10  **A.** It's my analysis.

11  **Q.** Okay. And you focused on the language of "improper

12  advantage" in the statute, right?

13  **A.** Yes.

14  **Q.** Okay. And then you give an analysis of what that

15  language meant for the Government's case, right?

16  **A.** Yes.

17  **Q.** Okay. And you referred to the case as "our case" at rule

18  number one, right?

19  **A.** Yes, I did.

20  **Q.** And then you go on and give an analysis in number two,

21  that there's no scheme for payments an official in this case,

22  right?

23  **A.** Yes.

24  **Q.** Okay. So it's your testimony that this is business

25  advice?

```
 1    A.  It looks legal to me.

 2    Q.  It looks legal to you.

 3    A.  Yes.

 4    Q.  We'll go forward to BAP 934.

 5    A.  9 which one?

 6    Q.  934.  Same tab.  At the bottom, LaRoche responds to you.

 7        Do you see that?  November 8, 2017.

 8    A.  Yes.

 9    Q.  And he says, "Frat, your analysis is right on the money."

10    A.  Yes.

11    Q.  Do you see that?

12    A.  Yes.

13    Q.  Why does he call you "Frat"?

14    A.  We are members of the same fraternity.

15    Q.  You go to the next page --

16    A.  We are not members of the same chapter.

17        Go ahead.  What?

18    Q.  On the page labeled 935.  And then there's an e-mail from

19    you, directly to LaRoche, right, on November 8th.  Do you see

20    that?

21    A.  Yes.

22    Q.  And you say, "We need to dissect this case, so we can

23    cast it into the land of the ludicrous."

24        Right?

25    A.  Uh-huh.
```

1    **Q.**  Is that a yes?

2    **A.**  Yes.

3    **Q.**  Okay.  You say, "Can't wait to hear/see the recordings.

4    Did you get them yet?"

5           Right?

6    **A.**  Yes.

7    **Q.**  Okay.  And you asked that question using "we" because you

8    were working with LaRoche at this point, weren't you?

9    **A.**  I was supporting LaRoche at this point.

10   **Q.**  Supporting him with your legal analysis in the case,

11   right?

12   **A.**  I think it was more of a law clerk type style.

13   **Q.**  Sir, you're an attorney, aren't you?

14   **A.**  I am, but I was not Joe's attorney.

15   **Q.**  And at the bottom of that same page, there was an e-mail

16   back from Dr. Baptiste to LaRoche and CCing you, right?

17   **A.**  At the bottom of the same page?

18   **Q.**  Yeah.

19   **A.**  Can you repeat that?

20   **Q.**  This was an e-mail back from Mr. Baptiste to Mr. LaRoche,

21   copying you, right?

22   **A.**  Yes.

23   **Q.**  Okay.  Go to the next page.  This is now nine through

24   six, Baptiste thanks you, not Donald, you for your analysis,

25   right?

1    **A.**  Yes.

2    **Q.**  And you didn't say anywhere in this e-mail exchange, "I'm

3    not your lawyer, Dr. Baptiste," did you?

4    **A.**  I told him at the beginning of the process.

5    **Q.**  Was that before or after you sent him that e-mail back in

6    October of 2017 that was labeled "attorney-client privilege"

7    by you?

8    **A.**  Definitely before.

9    **Q.**  Now, you focused, in your analysis, on the letter of

10   support in this case, right?

11   **A.**  Yes.

12   **Q.**  And you did that because you had personal experience

13   getting letters of support from the Haitian government,

14   right?

15   **A.**  Yes.

16   **Q.**  And you had a business in Haiti, right?

17   **A.**  I did.

18   **Q.**  What was that business?

19   **A.**  ConStrat Ayiti.

20   **Q.**  Say it again?

21   **A.**  ConStrat Ayiti.

22   **Q.**  What did it do?

23   **A.**  Strategic communications.

24   **Q.**  What is strategic communications?

25   **A.**  In that particular case, we were working with

1    interpreting and/or trying to help the government with its

2    tourism mission.  That's what we were set up to do.  We

3    didn't necessarily get to do the tourism aspect of it, but

4    strategy communications from the standpoint of things like

5    brand management.

6    **Q.**  Was there any relationship between Dr. Baptiste and your

7    company?

8    **A.**  No.

9    **Q.**  Any connection between NOAH and your company?

10   **A.**  No.

11   **Q.**  Now, in February of 2018, Mr. LaRoche shared a discovery

12   letter that was sent to the Government, right?  He sent that

13   to you?

14   **A.**  I don't know.  Can you show it to me?

15   **Q.**  Sure.  So you don't remember whether he was sharing

16   communications with the Government with you?

17   **A.**  You're asking about things that happened on certain

18   dates.  I don't remember if something happened on a certain

19   date.

20   **Q.**  Do you recall that he was sharing with you his

21   communications, regardless of the date, with the Government

22   about the discovery in this case?

23   **A.**  I know that he shared some, yes.

24   **Q.**  Let's look at Tab B-2, which is the next tab.  This is

25   BAP 938.

1    **A.**  Tab 2.

2    **Q.**  Actually, we'll start on 937, please.

3              Okay.  So this is Mr. LaRoche sending to

4    Dr. Baptiste and you a discovery letter that he had sent to

5    the Government, right?

6    **A.**  Yes.

7    **Q.**  If you go to the next page, this is now at 938.  This is

8    an e-mail from LaRoche to you now, right?

9    **A.**  Uh-huh.

10   **Q.**  Is that yes?

11   **A.**  Yes.

12   **Q.**  Do you remember this e-mail?

13   **A.**  Not in particular, no.

14   **Q.**  Okay.  And he says, in the second paragraph here, "I

15   asked the AUSA yesterday about the conspiracy portion of this

16   case, and he basically said to me, 'I don't know.'  Now,

17   granted, this was a stand-in AUSA.  Frank is on trial.

18   Nonetheless, he is second seating Frank on the case.  Why

19   don't they have an idea of where the conspirators fit in?"

20              Do you see that?

21   **A.**  Yes.

22   **Q.**  And he asked that question because he was focused on the

23   lack of conspiracy in this case, wasn't he?

24   **A.**  I think he was focused on the lack of identified

25   co-conspirators.

1    **Q.**  And you were focused on that, too.  There was an e-mail

2    from you right below that, right?

3    **A.**  Yes.

4    **Q.**  Okay.  And you agreed with him, "Can't conspire to not

5    commit a crime.  There's the problem," right?

6    **A.**  Yes.

7    **Q.**  So part of the strategy, the defense strategy in this

8    case, from at least February of 2018, was to emphasize that

9    there was, in fact, no criminal agreement or conspiracy in

10   this case, right?

11   **A.**  That's what Donald LaRoche wanted to do, yes.

12   **Q.**  And you agreed with that?

13   **A.**  Based on the information that I had seen, yes.

14   **Q.**  Now, as early as -- shortly after this time period --

15   actually, right before this time period, right before this

16   discovery letter, you had contact with Eric Walcott about

17   this case, didn't you?

18   **A.**  Potentially.

19   **Q.**  Okay.  This is now going to be in Exhibit 9, at BAP 1212.

20   Okay.  And this is an e-mail --

21   **A.**  I'm sorry, I'm in the wrong book.  Hold on.

22   **Q.**  Sure.

23   **A.**  Okay.

24   **Q.**  It's an e-mail from Walcott to you and Dr. Baptiste,

25   right?

**A.**  Yes.

**Q.**  LaRoche isn't on here at all, is he?

**A.**  No.

**Q.**  Okay.  And the forwarded message is from Ambassador Curtis A. Ward, right?

**A.**  Yes.

**Q.**  And that was an attestation from Ambassador Ward on behalf of Dr. Baptiste in this case, right?

**A.**  Yes.

**Q.**  And you had coordinated this with Eric Walcott, right?

**A.**  No.

**Q.**  You were obtaining character evidence for Dr. Baptiste, through Eric Walcott?

**A.**  That's incorrect.

**Q.**  In December of 2017, weren't you?

**A.**  No.

**Q.**  So that's not what this e-mail shows?

**A.**  It shows that he provided.  It doesn't show that I obtained it.

**Q.**  Well, it certainly shows that Mr. LaRoche didn't obtain it, right?

**A.**  That's correct.

**Q.**  Okay.  So you were, in fact, in the loop on obtaining witnesses for this case for Dr. Baptiste, weren't you?

**A.**  This is an attestation provided by Eric Walcott that Eric

1    Walcott provided.  I didn't know that he was talking to this

2    person, because I didn't know who that person is.

3    **Q.**  What other witnesses did you receive information from as

4    part of the defense effort in this case?

5    **A.**  There were no other witnesses.  They presented none at

6    trial.

7    **Q.**  You mentioned earlier today that there was some

8    communication between LaRoche and some witness during the

9    trial, right?

10   **A.**  Yes.

11   **Q.**  Who was that?

12   **A.**  I don't know his name.  I was in the car.  They were

13   having a conversation; it was in his ear.

14   **Q.**  So you don't know who he was talking to?

15   **A.**  I don't remember his name.  I believe it was a former

16   government official, but I don't remember his name, no.

17   **Q.**  Do you know where that person was?

18   **A.**  In the country or in the world?

19   **Q.**  Yeah.

20   **A.**  Not in Boston.  I don't know where he's from.

21   **Q.**  Was that a percipient witness to conversations that

22   Dr. Baptiste had had with the FBI?

23   **A.**  Can you explain the word "percipient"?

24   **Q.**  Sure.  Was that a witness, somebody who you can actually

25   talk about directly, to conversations that Dr. Baptiste had

1  had with FBI agents?

2  **A.**  I don't know.

3  **Q.**  Was that a person who could talk about conversations that

4  Dr. Baptiste had had with Mr. Boncy?

5  **A.**  My understanding was that was a person who could talk

6  about the way business was done in Haiti.

7  **Q.**  And that's as specific as it was, what you just said?

8  **A.**  Yes.

9  **Q.**  What witnesses to the actual conduct at issue in this

10  case did you identify in advance of trial?

11  **A.**  I didn't identify any.  It wasn't my job.

12  **Q.**  So you didn't identify any witnesses for Mr. LaRoche?

13  **A.**  Related to the conspiracy trial?

14  **Q.**  Yup.

15  **A.**  I knew nobody who had any information related to the

16  conspiracy that was alleged.  I did testify earlier that I

17  did suggest the type of people that they could talk to in

18  Haiti as it related to doing business in Haiti.

19  **Q.**  If you go to Tab B-3 -- and it's going to be back in

20  Exhibit 1.  This is going to be at BAP 941.

21          Are you there?

22  **A.**  Can you repeat the number?

23  **Q.**  Sure.  It's Tab B-3, then the Bates number ends 941.

24  **A.**  Just bear with me.  The book's falling apart.  941?

25  **Q.**  Yup.

1    **A.**  Okay.

2    **Q.**  And this is an e-mail.  The chain ends here with LaRoche

3    writing to Walcott, Baptiste, and you, right?

4    **A.**  Uh-huh.

5    **Q.**  Is that a yes?

6    **A.**  Yes.

7    **Q.**  Okay.  And LaRoche is providing a letter requested by

8    Walcott to get information from the Haitian government,

9    right?

10   **A.**  Can you just repeat your question for me?

11   **Q.**  Sure.  If you look for -- if you just see the attachment,

12   the attachment is at BAP 943?

13   **A.**  Okay.

14   **Q.**  LaRoche is sending a letter to Walcott, for Walcott to

15   use in getting information about this case from the Haitian

16   government, right?

17   **A.**  Yes.

18   **Q.**  So you knew that LaRoche was, in fact, trying to get

19   information from the Haitian government, right?

20         MR. MARX:  Objection, Your Honor.  Donald LaRoche

21   has already testified that this letter never went to the

22   Haitian government, so I'm not sure -- we're only at risk of

23   confusing a witness who doesn't know the answer.

24         THE COURT:  Stop.  I'm going to sustain the

25   objection.  You can rephrase the question, and get at it

1    another way, if you want.

2            MR. BASIL:  Sure.

3    BY MR. BASIL:

4    Q.  You knew that in this time period that we're looking at,

5    this is October of 2018, that Donald LaRoche was trying to

6    get information from the Haitian government, using Eric

7    Walcott, right?

8    A.  I'm definitely aware of that, when this was sent, yes.

9    Q.  And you didn't put that in your affidavit, did you?

10   A.  What's that?

11   Q.  That Mr. LaRoche was, in fact, trying to get information

12   from the Haitian government?

13   A.  Well, did he send this letter?

14   Q.  You also didn't put that in your affidavit, did you?

15   A.  What?

16   Q.  That he didn't send it.  You didn't mention this at all

17   in your affidavit?

18   A.  I don't have any recollection of this letter.  You just

19   refreshed it.

20   Q.  So you didn't refresh your memory before writing an

21   affidavit to be committed in this case?

22   A.  What I did was primarily focus on what I saw in the trial

23   itself, and that was the main thrust of my letter.

24   Q.  So when you wrote your affidavit, you were interested in

25   telling the Court what you saw at trial, but not telling the

1    Court about your activity before trial; is that right?

2    **A.**  I believe my activity was extremely limited before trial,

3    which is what I wrote.

4    **Q.**  And you didn't want to disclose that to the Court, did

5    you?

6    **A.**  I did say it was extremely limited.

7    **Q.**  You did not disclose the scope of your activity in this

8    case to this Court in your affidavit?

9    **A.**  I believe I did.

10   **Q.**  So you disclosed that you were sending attorney-client

11   communications to Dr. Baptiste as early as October of '17.

12   You did that in your affidavit?

13   **A.**  I wasn't asked to write about that.

14   **Q.**  Oh, you weren't asked to write about that.

15   **A.**  Yes.  I was asked to write an affidavit of what I

16   observed.

17   **Q.**  What did Mr. Marx and Mr. Fick ask you to write about?

18   **A.**  What I observed in the trial.

19   **Q.**  Did they specifically ask you not to mention your work as

20   an attorney in this case before trial?

21   **A.**  Of course not, because I didn't see myself as an attorney

22   in this case, and I believe that they're much more

23   creditable -- or credible than that.

24   **Q.**  And you didn't disclose in your affidavit that your wife

25   also played a role in preparing the defense in this case, did

1    you?

2    **A.**  She didn't play a role in preparing a defense.  In fact,

3    the thrust of the whole motion is that nobody prepared a

4    defense in this case.

5    **Q.**  You certainly didn't talk about things that you had done,

6    substantively, to help LaRoche prepare the defense in this

7    case, right?  You didn't talk about that in your affidavit at

8    all.

9    **A.**  My affidavit focused on a number of things, one of them

10    being not having access to information.  So there were things

11    that I discussed, that we're going through now, that were

12    based upon the lack of information that I had.  It's that

13    lack of information and the lack of preparation that is what

14    I wrote about in my affidavit.

15    **Q.**  And you thought he should have called -- you thought

16    LaRoche should have called Walcott at trial; is that right?

17    **A.**  Absolutely.

18    **Q.**  Okay.  And Walcott has some connection to NOAH, right?

19    **A.**  I believe he was the executive director.

20    **Q.**  Okay.  And NOAH had bank accounts, right, in the United

21    States?

22    **A.**  I learned that in the trial.

23    **Q.**  And NOAH is supposed to be a 503(c) charitable

24    organization, right?

25    **A.**  I think it's a 501(c)(3) charitable organization.

1   **Q.**  Thank you.  I had that legal point wrong.  I --

2           Fair to say, it's reasonable to expect that if Eric

3   Walcott had gotten on the stand as the executive director of

4   NOAH, that a prosecutor like me would have cross-examined him

5   about the use of NOAH's accounts by Dr. Baptiste to receive

6   money from the FBI?

7   **A.**  I don't know.  I'm not a prosecutor at your level.

8   **Q.**  You were a prosecutor, though?

9   **A.**  I did bond hearings.  You know they don't go to trial.

10  **Q.**  Okay.  Let's --

11          MR. BASIL:  Your Honor, do you want to take a break

12  at some point?

13          THE COURT:  I have another -- I have a thing at

14  12:00 and a thing at 12:15, so I was hoping to break from

15  12:00 to 1:00 in this.  So if you want to stop now and take

16  the extra five minutes, but I can't resume until 1:00.

17          MR. BASIL:  I'll take the five minutes, Your Honor.

18          THE COURT:  Okay.  So I'll see you back at 1:00.

19          MR. BASIL:  No, I apologize.  I'll use the five

20  minutes, because we're going to be short on time today.

21          THE COURT:  Yes.  Go ahead.

22          MR. BASIL:  Okay.

23  BY MR. BASIL:

24  **Q.**  So let's talk about 2019.  All right.  If you go to Tab

25  B-4, in Exhibit 1.  This is going to be BAP 944.

1  **A.**  Uh-huh.

2  **Q.**  And this is LaRoche coordinate -- or LaRoche sending you

3  an e-mail on April 1, 2019, about stipulations in the case,

4  right?

5  **A.**  Yes.

6  **Q.**  Okay.  And stipulations, that's an evidentiary issue in a

7  trial, right?

8  **A.**  Yes.

9  **Q.**  And he's conferring with you, isn't he?

10  **A.**  I think he's telling me what he's going to do.

11  **Q.**  He says, "What do you think?"  Doesn't he?

12  **A.**  Okay.

13  **Q.**  Right?  And he's soliciting --

14  **A.**  Before that he says --

15  **Q.**  -- your advice as an attorney, isn't he?

16  **A.**  I guess.

17       Did you ask him?

18  **Q.**  The e-mail below that, from Ms. Rubin-Smith, that lays

19  out some of what was produced in discovery, right?  It

20  mentions Baptiste's Gmail account, doesn't it?

21  **A.**  Yes.

22  **Q.**  Okay.  And it mentions his iPhone, doesn't it?

23  **A.**  Yes.

24  **Q.**  Okay.  And you go to the next page of that, at BAP 945,

25  you responded, "You shouldn't.  I agree."  Right?

1    **A.**  Uh-huh.

2    **Q.**  Is that "yes"?

3    **A.**  Yes, that was my response.

4    **Q.**  Okay.  And you said, "By the way, what was in the new

5    evidence they sent you?"  Right?

6    **A.**  Yes.

7    **Q.**  And that's because you knew what the old evidence was,

8    didn't you?

9    **A.**  No.  It's because I was inquiring as to whether or not he

10   had received and reviewed any evidence.

11   **Q.**  Three weeks later, also on April 2019 -- you look at Tab

12   B-5.  LaRoche shared his --

13   **A.**  If you could just hold on please.

14   **Q.**  Sure.  This is going to be BAP 947.

15   **A.**  Okay.  Thank you.

16   **Q.**  You there?

17   **A.**  Yes.

18   **Q.**  Okay.  So LaRoche is sharing with you his objections to

19   our -- the Government's motions in limine, right?

20   **A.**  Yes.

21   **Q.**  Okay.  And you reviewed these, didn't you?  In fact, you

22   line edited, right?  You find an extra "or" in the sentence,

23   didn't you?

24   **A.**  Yes.

25   **Q.**  Okay.  And you gave advice about needing to file a motion

1    on the charitable deeds of Dr. Baptiste, right?

2    **A.**  Oh, that was a steady mantra from me.

3    **Q.**  Okay.  And on the same day, if you go to the next page,

4    on 948, you forwarded this to your wife, right?

5    **A.**  Yes.

6    **Q.**  And you forwarded that to her, because she was also

7    helping Mr. LaRoche get ready for trial, wasn't she?

8    **A.**  No.  I forwarded it to her so she would be aware of what

9    was going on in the trial.

10            MR. BASIL:  We can stop at that point, Your Honor,

11   come back at 1 o'clock.

12            THE COURT:  All right.  1 o'clock, or as close to

13   that as I can get back, okay?

14            MR. DWYER:  Your Honor, may I inquire to the Court

15   how long we expect to go?

16            THE COURT:  How much do you have?

17            MR. BASIL:  Awhile, Your Honor.

18            MR. DWYER:  I only have one fancy go-to-court suit

19   with me, so do we think we're going into tomorrow?

20            THE COURT:  You can wear the same clothes twice.  I

21   wouldn't even have noticed, had you not mentioned it.

22            Are we going into tomorrow?

23            MR. BASIL:  I expect that we will get to Ms. Hinton

24   today.  I don't know whether we'll get to the other witness

25   today.  And I don't know what the redirect will be.

1    THE COURT:  Okay.

2    MR. FICK:  I'll just say for the record, just so we

3  can do it in the open, that we understand that we are not

4  permitted and would not talk to the witness while the cross

5  is pending.  He should not be offended by that, but we

6  understand that is the ground rule.

7    THE COURT:  He can have lunch with the prosecutors,

8  if he likes, but not with you.

9    MR. FICK:  That's right.

10    THE COURT:  But not with you.  Do you understand

11  that, Mr. Hinton?

12    THE WITNESS:  Yes, I do.

13    MR. FICK:  And that includes, of course,

14  unfortunately, his spouse.  We understand the cross is

15  pending, he will not communicate with anyone.

16    THE COURT:  Yes, he will have lunch with them or

17  alone.

18    THE WITNESS:  If they're paying, I'll go with them.

19    THE COURT:  If you're paying, he'll go with you.

20    I'll see you back at 1:00.

21    (Court in recess at 12:03 p.m.

22    and reconvened at 1:13 p.m.)

23    THE COURT:  Resume.

24  BY MR. BASIL:

25  Q.  Earlier, Mr. Hinton, I was asking you about witnesses

1    that you had identified, right?

2    **A.**  Yes.

3    **Q.**  Okay.  Had you identified a witness who would testify

4    that a government employee in Haiti can be hired into a

5    business in order to get their approval for a government

6    project?

7    **A.**  I'm sorry, can you repeat that question?

8    **Q.**  Sure.  Had you identified a witness who would have

9    testified that it was legal in Haiti to hire a current

10   government employee in order to obtain their actions relative

11   to a development project?

12   **A.**  I did not identify any individual in Haiti.

13   **Q.**  And earlier, I believe on direct, you were testifying

14   about the money laundering part of this case, that topic.  Do

15   you recall questions about that?

16   **A.**  Yes.

17   **Q.**  Okay.  And you thought it was important, I believe you

18   said on direct, to get testimony about NOAH being a

19   legitimate charity; is that right?

20   **A.**  I did think it was important for NOAH to be known for

21   what it has done, yes.

22   **Q.**  Okay.  And you understand, in this case, there was

23   evidence that Dr. Baptiste got the FBI to send money to NOAH.

24   You understood that, right?

25   **A.**  Yes.

1    Q.   And you understood that was not, in fact, a charitable

2    donation that he obtained, right?

3    A.   I believe that was alleged by the prosecution.

4    Q.   You knew that he spent the money himself, right?

5    A.   I learned that here, and I think Mr. Dwyer brought

6    about -- had an explanation of where the money went.

7    Q.   It's possible for a preexisting bank account to be used

8    for money laundering, right?

9    A.   It's possible for a preexisting bank account to be used

10   for money laundering.  Sure.

11   Q.   Okay.  And it's possible for an existing charity to be

12   used for money laundering, right?

13   A.   It's definitely possible.

14   Q.   And it's possible for a charity like NOAH both to do

15   charity work and to be a front for money laundering, right?

16   A.   I guess it's possible, yes.

17   Q.   You testified on direct about catch-up sessions.  Do you

18   recall that?

19   A.   Yes.

20   Q.   Okay.  You saw LaRoche preparing for trial for the next

21   day, in the evenings; is that correct?

22   A.   I saw LaRoche trying to determine what was on the videos

23   he saw that day in trial.

24   Q.   He wasn't sleeping.  He was going over evidence, right?

25   A.   For a portion of the evening, yes.

1    **Q.**   Okay.  And he wasn't reading a novel, right?

2    **A.**   No, he wasn't.

3    **Q.**   He was going over evidence, right?

4    **A.**   Yes.  For the first time.

5    **Q.**   So he was preparing for the case the next day, wasn't he?

6    **A.**   He was preparing -- he was familiarizing himself with the

7    regard he had experienced that day, possibly for use the next

8    day.

9    **Q.**   He never told you that he was reading the evidence after

10   it came in, to understand what had come in, did he?

11   **A.**   What he told me --

12   **Q.**   That's not the question.  I'm asking whether he told you

13   what I asked you.  It's a yes or no question.

14   **A.**   Can you repeat it, so I get it correct?

15   **Q.**   Sure.  He never told you that he was reviewing evidence

16   to understand evidence that had already come in that day, did

17   he?

18   **A.**   He didn't say it like that.

19   **Q.**   Okay.  I'll take you back into the spring of 2019.  I was

20   asking you questions about motions in limine before the lunch

21   break.  Do you recall that?

22   **A.**   Yes, I do.

23   **Q.**   Okay.  If you could go in Exhibit 1, to Tab B-6, please.

24   And this is going to be BAP 5950.

25              Are you at 950?  Are you there, Mr. Hinton?

1    **A.**  950.

2    **Q.**  Yes.

3    **A.**  Yes.

4    **Q.**  And this is an e-mail from you to Donald LaRoche and Joe

5    Baptiste on May 18th.  That's before trial, right?  Yes,

6    that's before the trial?

7    **A.**  Yes, it's before the trial, yes.

8    **Q.**  And here you're sending on a *Brady* demand, right?

9    **A.**  Yes.

10   **Q.**  And this was a draft motion that you had created,

11   correct?

12   **A.**  I believe so.

13   **Q.**  A motion for this case, right?

14   **A.**  Yes.

15   **Q.**  And you were seeking information about a person named

16   Angelo Viard, right?

17   **A.**  Yes.

18   **Q.**  And part of the reason you were doing that is part of the

19   defense strategy in this case was to suggest that the

20   government had manufactured the case here using Mr. Viard,

21   right?

22   **A.**  I don't believe there was actually a defense strategy,

23   but it was a theory that I thought he should look into.

24   **Q.**  So that was a theory you thought the defense should use;

25   is that right?

1    **A.**  That it should look into.

2    **Q.**  And you included your wife on that communication, right?

3    **A.**  No.

4    **Q.**  No?  How about on -- if we could go to, in Exhibit 9, BAP

5    1241.

6    **A.**  What was the number?  12 --

7    **Q.**  1241.  Are you there?

8    **A.**  I'm getting there.  Okay.

9    **Q.**  Okay.  And this is an e-mail from you to -- this is

10   earlier than the last exhibit we were looking at.  This is

11   May 7th.  So about eleven days earlier, right?  And here this

12   is an e-mail from you to LaRoche and to your wife, right?

13   **A.**  Yes.

14   **Q.**  And here you're providing legal research on *Brady*, right?

15   **A.**  Yes.

16   **Q.**  And that's research that you then transformed into a

17   motion for this case, right?

18   **A.**  A motion for Donald to consider, yes.

19   **Q.**  And this was -- this wasn't business advice that you were

20   giving at this point, right?

21   **A.**  No.

22   **Q.**  This is trial work, correct?

23   **A.**  Yes.

24   **Q.**  And you were assisting Mr. LaRoche with pretrial motions

25   at this point, right?

1   **A.**  I was trying to prompt Donald to make some pretrial

2   motions at this point.

3   **Q.**  Let's look at Exhibit -- or pardon me, Tab B-10.  This is

4   BAP 974.

5        Mr. Hinton, this is an e-mail, again, from you to

6   Donald LaRoche and your wife, right?

7   **A.**  Yes.

8   **Q.**  And you were, again, focused on Viard, right?

9   **A.**  Yes.

10  **Q.**  You were providing facts to Mr. LaRoche about Mr. Viard,

11  right?

12  **A.**  I think it was about his wife, wasn't it?  Mr. Viard's

13  wife.

14  **Q.**  Okay.  Fair enough, about his wife.  And that was as part

15  of trying to show, as a defense strategy, that Mr. Viard was

16  bargaining with the government, right?

17  **A.**  Donald had raised that issue, so I went to look for it.

18  **Q.**  Because you were coordinating on the defense in this case

19  with Mr. LaRoche, right, as you just said?

20  **A.**  I didn't say I was coordinating, but at this point, I was

21  becoming more helpful than I had been.

22  **Q.**  Okay.  Let's go to Tab B-7, please.  This is going to be

23  BAP 959.  And this is an e-mail, we'll start at -- this is an

24  e-mail from Donald LaRoche to you and Dr. Baptiste, right?

25  **A.**  Yes.

1    **Q.**  And yeah, he says -- LaRoche says that he hadn't found

2    the recording, but he was giving you the transcription,

3    right?

4    **A.**  Yes.

5    **Q.**  Okay.  And you provided an analysis of the transcript,

6    didn't you?

7    **A.**  Yes.

8    **Q.**  In fact, the first e-mail that Mr. Marx passed over to go

9    to the -- you skipped the first one in this chain.  The first

10   one right below that is from you to your wife, right?

11   **A.**  Yes.

12   **Q.**  May 20th?

13   **A.**  Yes.

14   **Q.**  Okay.  And then there's an e-mail at the end of this,

15   from Joe Baptiste to Donald LaRoche and you, on BAP 961,

16   right?

17   **A.**  Yes.

18   **Q.**  And this is addressed from Dr. Baptiste to Don and Jason,

19   right?

20   **A.**  Yes.

21   **Q.**  And he says "Jason, your analysis is good."  Right?

22   **A.**  Yes.

23   **Q.**  And then he explains what he thinks the transcript

24   involves, right?  In that e-mail?

25   **A.**  Yes.

1    **Q.**  And he concludes his e-mail, "They are trying to put

2    doubt in your mind.  We have a good team, Jason, Arielle, and

3    yourself.  I am confident we will beat them.  Let's get

4    ready."

5             Right?  He wrote that?

6    **A.**  Joe wrote that.

7    **Q.**  Joe wrote that, right?  Joe considered you and Arielle to

8    be part of the team with LaRoche, didn't he?

9    **A.**  I don't think so, no.

10   **Q.**  He wrote it, didn't he?

11   **A.**  He didn't write that specifically, no.  At that point, we

12   knew that --

13   **Q.**  There's no question.

14   **A.**  Oh.  I thought you wanted me to complete my answers.

15   **Q.**  By this time, Arielle Hinton was also providing legal

16   advice in this case, wasn't she?

17   **A.**  No.

18   **Q.**  So that was 2:39, on May 20th, when Baptiste named you,

19   Arielle, and LaRoche as his good team, right?  If you go to

20   BAP 972, in the same tab -- or I guess it's Tab 8 now.

21   **A.**  Uh-huh.

22   **Q.**  This is an e-mail from you to LaRoche and Baptiste,

23   right?

24   **A.**  Yes.

25   **Q.**  Okay.  And this e-mail doesn't say, "Oh, wait a minute.

1    I'm not a member of your team."  Does it?

2    **A.**    No.

3    **Q.**    If you go back one page, to 971, LaRoche is sharing with

4    you legal drafts again, right?

5    **A.**    Yes.

6    **Q.**    And you forwarded those on to your wife, as well, didn't

7    you?

8    **A.**    Yes.

9    **Q.**    And you attached -- you sent the attachments on to your

10    wife, right?

11    **A.**    Yes.

12    **Q.**    Okay.  In your e-mail on May 20th -- this is on 972,

13    you're talking about Mr. Boncy's counsel, correct?  That's

14    Jed Dwyer.

15    **A.**    Yes.

16    **Q.**    And you said, in the second line of the e-mail, you said,

17    "That being said, he didn't allege any illegal act by Joe,

18    which means this should inure to Joe's favor."

19            Right?  You wrote that?  You wrote that because you

20    understood that what Mr. Dwyer was accomplishing in a

21    pretrial and activity and he trial here inured to Joe's

22    favor, right?  That's why you wrote that.

23    **A.**    I thought it was a fantastic motion, and I just thought

24    it was great that he didn't attack Joe.

25    **Q.**    And then he continues, "Like we have been saying."  And

1    that "we" is you and Joe, right?

2    **A.**   No.

3    **Q.**   It's you and Mr. LaRoche.  I'm sorry.

4    **A.**   Yes, it is.

5    **Q.**   Okay.  So as you and Mr. LaRoche had been saying, the

6    Government is killed by the fact that there is no bribe.  So

7    that was part of the strategy for Mr. LaRoche going to trial,

8    right?  And you've laid it out here, correct?

9    **A.**   I believe it should have been part of the strategy.  I

10   don't believe there was a strategy.

11   **Q.**   Okay.  So part of what you've laid out here, what you had

12   been saying was the Government's case was hurt by the fact

13   that, in your view, no bribe had actually been paid, right?

14   That's what you thought?

15   **A.**   That's what I thought.

16   **Q.**   And that was based on a prior conversation you had been

17   having with LaRoche, right?  That's what you wrote.

18   **A.**   It's based on the indictment that didn't allege a

19   substantive crime.

20   **Q.**   Okay.  But you didn't say that here, did you?

21   **A.**   You just asked me what it was based on.

22   **Q.**   I'm just reading your e-mail, sir.  And you continue

23   there, "Its credibility" -- that's the Government's

24   credibility -- "is impeachable because of how it destroys,

25   ignores, and hides exculpatory evidence?"

1          Right?  You wrote that?

2    **A.**  Yes.

3    **Q.**  And part of the strategy was also to go after the

4    Government in this case, right?

5    **A.**  I really liked what I read in Mr. Dwyer's motion.  I

6    thought it was a great approach.

7    **Q.**  You agreed with Mr. Dwyer's approach?

8    **A.**  Did I agree with his approach?  I thought it was a great

9    approach.

10   **Q.**  Okay.  And you wrote here, "Together with Boncy's

11   attorney, you must skewer the prosecution's case."  Right?

12   **A.**  He must, yes.

13   **Q.**  And you wrote that, because you understood that Dwyer was

14   hitting the same points that you needed to hit in the defense

15   of Dr. Baptiste, right?

16   **A.**  In their entirety?  Absolutely not.

17   **Q.**  You continued at the end, "Between you and Boncy's

18   attorney, the prosecution should limp the hell out of the

19   courtroom."  Right?

20   **A.**  Yes, I was hopeful.

21   **Q.**  Because you understood that what Mr. Dwyer was

22   accomplishing was helping Dr. Baptiste, right?

23   **A.**  At the time of that motion, I thought that that motion

24   helped Mr. Baptiste, too.

25   **Q.**  And that motion had numerous transcripts attached to it,

1    didn't it?  The Government's response, I should say.  The

2    Government's response to that motion had numerous transcripts

3    attached to it, right?

4    **A.**   I don't recall, but I'll say yes.

5    **Q.**   In fact, didn't the Government's response to that motion

6    include a large portion of the transcripts actually

7    introduced at trial?

8    **A.**   Can you point to it?  Point it to me, because I don't

9    remember.

10   **Q.**   So you don't remember whether or not you and LaRoche

11   looked at transcripts that were introduced at trial, when

12   those transcripts were attached to the motion that we filed

13   in opposition of Mr. Dwyer.  You don't remember that?

14   **A.**   There were certainly snippets of transcripts that were

15   associated with the motion, but the entire transcripts were

16   not.

17   **Q.**   Did you and LaRoche review the Government's response to

18   Mr. Dwyer's motion?

19   **A.**   I know I read it.  I don't know if he read it.

20   **Q.**   So if there were transcripts that the Government filed

21   its exhibits to its motion, you knew what the content of

22   those transcripts was from that filing, didn't you?

23   **A.**   I knew what snippets you provided in your filing.

24   **Q.**   Let's look at Tab A-2, if we could.

25   **A.**   I didn't hear you.  Which one?

1    **Q.** A-2.  Exhibit 1.  This is BAP 925.

2    **A.** I'm sorry, you said BAP 930?

3    **Q.** 925, sir.

4    **A.** 925.

5    **Q.** And this is yet another e-mail that you sent to Joe

6    Baptiste and Donald LaRoche, right?

7    **A.** I'm having trouble finding the exhibit.

8    **Q.** Exhibit Tab A-2?

9    **A.** Okay.  I found it.

10   **Q.** Okay.  So this is an e-mail that you sent to Joe Baptiste

11   and Don LaRoche on May 27, 2019, right?

12   **A.** Uh-huh.

13   **Q.** Is that a yes?

14   **A.** Yes.

15   **Q.** Okay.  And here, you were offering insights into

16   exculpatory evidence in the case, right?

17   **A.** Please repeat the question.

18   **Q.** You were offering your insights into the exculpatory

19   evidence in the case, right?

20   **A.** Yes.

21   **Q.** Okay.  And you write, "Generally speaking" -- third full

22   sentence -- "we," -- meaning you and LaRoche -- "need to

23   identify the dates in order to create our" -- meaning your

24   and LaRoche and Joe Baptiste's -- "narrative and determine

25   from whom the testimony will be derived."

```
 1            Right?
 2    A.   Yes.
 3    Q.   That's who "we" and "our" refer to, right?
 4    A.   Yes.
 5    Q.   And this isn't business advice now, right?
 6    A.   No.
 7    Q.   In fact, this e-mail lays out a defense strategy for the
 8    case, doesn't it?
 9    A.   It definitely recommends a strategy for the case.
10    Q.   Okay.
11    A.   And it was totally discarded.
12    Q.   At number three, part of that strategy was to emphasize
13    what you called "manufactured charges," right?
14    A.   Yes.
15    Q.   And part of that strategy, at number four, was to show
16    that Boncy and Baptiste had actually rejected the need for
17    bribes, right?  Wasn't that part of the strategy?
18    A.   Please repeat the question.
19    Q.   Sure.  Part of the strategy was to point out that Boncy
20    and Baptiste, according to the defense, had rejected the need
21    for bribes to get a letter of support, right?
22    A.   They did not need bribes for support.
23    Q.   Okay.  And that was part of the strategy; it's in your
24    e-mail, sir, right?
25    A.   I believe that was.  Yes, that was a strategy.
```

1    **Q.**  Okay.  And that strategy, I mean, it's explicit here,

2    right, to show no intent or meeting of the minds to conspire,

3    right?

4    **A.**  Yes.

5    **Q.**  Okay.  And that lack of agreement in meeting of the

6    minds, that was part of Mr. Dwyer's strategy at trial, too,

7    wasn't it?

8    **A.**  Mr. Dwyer did not tell me his strategy, I did not know.

9    **Q.**  You were there at the trial, weren't you?

10   **A.**  Yes.

11   **Q.**  And you heard him, right?

12   **A.**  Say that there was no conspiracy?

13   **Q.**  Yeah.

14   **A.**  Of course.

15   **Q.**  You heard the argument, right?

16   **A.**  Absolutely.

17   **Q.**  That was part of your strategy, wasn't it?

18   **A.**  I guess so.

19   **Q.**  And that was your strategy, too, wasn't it?

20   **A.**  I didn't have a strategy.  Donald didn't have a strategy.

21   But I did recommend a strategy.

22   **Q.**  Okay.  And at number five, you hit the point again, no

23   intent to solicit a crime or enter into a conspiracy and thus

24   no Travel Act violation, right?  That was part of the

25   strategy you were suggesting as part of Joe's good team,

1  right?

2  **A.**  Yes.

3  **Q.**  And again, Mr. Dwyer hammered that point in his

4  cross-examinations, didn't he, that there was no meeting of

5  the minds, right?

6  **A.**  Absolutely.

7  **Q.**  The strategy, also at number four, was to suggest

8  entrapment by the feds, right?

9  **A.**  Yes.

10  **Q.**  And the way to do that, from the defense point of view,

11  was to emphasize what the FBI had actually said and what

12  Boncy and Baptiste had actually said, right?

13  **A.**  Okay.  Please repeat the question.

14  **Q.**  The way that you and LaRoche were contemplating showing a

15  lack of conspiracy was to point out what the FBI had actually

16  said and what Baptiste and Boncy had actually said, right?

17  **A.**  I was suggesting that they could be juxtaposed, yes.

18  **Q.**  And that's a reasonable approach to putting the

19  Government to its burden, right?  To attack holes in the

20  evidence, right?

21  **A.**  Sure.

22  **Q.**  And you also had the idea, in your e-mail here, that

23  making campaign contributions was a form of protected

24  political speech, right?

25  **A.**  Yes.

1   **Q.**   So coming out of this e-mail, there are at least three

2   things, right, that go into the strategy that you say you

3   were suggesting.  First, that there was no conspiracy, no

4   meeting of the minds, right?

5   **A.**   Uh-huh.

6   **Q.**   Yes?

7   **A.**   Yes.

8   **Q.**   Okay.  And second was to suggest entrapment and that the

9   Government had just manufactured this situation, right?

10  **A.**   Based on the evidence I had seen, yes.

11  **Q.**   Okay.  And the third was to say that if there was

12  anything to do with the political contributions, that was

13  just standard political speech, right?

14  **A.**   Lawful, political speech.

15  **Q.**   Right.

16  **A.**   Yes.

17  **Q.**   Mr. Dwyer touched on these points in his case, as well,

18  during the trial, didn't he?

19  **A.**   He did, but it had nothing to do with me.

20  **Q.**   Mr. Dwyer didn't call any experts on Haitian law, did he?

21  **A.**   I don't believe Mr. Dwyer was prosecuting anybody.

22  **Q.**   And he didn't call any witnesses about NOAH's charitable

23  work, right?

24  **A.**   No.

25  **Q.**   And as you point out, he wasn't prosecuting anybody,

1    right?

2  **A.**  Nor defending NOAH.

3  **Q.**  But he was defending Mr. Boncy, right?

4  **A.**  Yes.

5  **Q.**  And defending Mr. Boncy meant attacking much of the same

6    evidence that had to be attacked from Dr. Baptiste's point of

7    view, right?

8  **A.**  I could see why you say that.

9  **Q.**  Yeah.  Didn't you say that?

10 **A.**  Huh?

11 **Q.**  Didn't you say that, almost that exact thing?

12 **A.**  I said it, too.

13 **Q.**  Okay.  Because it's a reasonable -- you point out that he

14   was not prosecuting, he's defending, right?

15 **A.**  Yes.

16 **Q.**  Okay.  And a defendant is under no obligation,

17   whatsoever, to put on an affirmative case, right?

18 **A.**  Yes.

19 **Q.**  Because it's the Government's burden in a criminal case,

20   isn't it?

21 **A.**  It is.

22 **Q.**  Okay.  And it's a reasonable thing to put the Government

23   to its proof, isn't it?  That's a reasonable approach.

24 **A.**  Solely, in every case?

25 **Q.**  No, in any case?

1    **A.**   In any case.

2    **Q.**   Sure.  It's a reasonable approach, isn't it?

3    **A.**   It's speculative.  It depends on what's being charged.

4    **Q.**   Now, in your affidavit that you filed with this Court,

5    you represented that Mr. LaRoche -- well, you represented, in

6    effect, that there was no strategy, whatsoever, in advance of

7    trial, right?

8    **A.**   Yes.

9    **Q.**   Okay.  You didn't disclose to the Court that you had been

10   having conversations with LaRoche and Baptiste about the

11   strategy we just discussed, did you?

12   **A.**   I did not.

13   **Q.**   And that's because you were trying to focus your

14   affidavit on Mr. LaRoche, right?

15   **A.**   That would be an incomplete assessment.

16   **Q.**   And Dr. Baptiste is your friend, correct?

17   **A.**   We've become friends over the last few years, yes.

18   **Q.**   Let's look at Tab B-11, still in Exhibit 1, please.

19   Okay.  This is that same e-mail we were looking at, right,

20   just in a different form.

21          Do you recognize that?  This is BAP 97.

22   **A.**   Okay.  I see it.

23   **Q.**   And then you can go to the second page of this one, at

24   BAP 98.  There's a response from your wife here, right?

25   **A.**   Yes.

1    **Q.**  And this is before trial, right?

2    **A.**  Yes.

3    **Q.**  And she's responding, "All of this is great."  She's

4    responding to your e-mail, right?

5    **A.**  Yes, she's responding to me.

6    **Q.**  Okay.  And she's a state prosecutor, correct?

7    **A.**  She is.

8    **Q.**  She's been a state prosecutor for a lot of years, right?

9    **A.**  Yes.

10   **Q.**  Okay.  And she's had criminal trials?

11   **A.**  Yes.

12   **Q.**  She's cross-examined witnesses?

13   **A.**  Sure.

14   **Q.**  And she's had to -- strike that.

15           She says here, "All of this is great and can be

16   shown proven in two ways."  Right?

17   **A.**  Uh-huh.  Yes.

18   **Q.**  She says, "One way is cross-examination of the

19   Government's witnesses."  Right?

20   **A.**  Yes.

21   **Q.**  Okay.  And so your wife agreed that one way to do this

22   was just to go after the Government, based on what the

23   Government agents had said in the recordings, right?

24   **A.**  Yes.

25   **Q.**  And to show that the Government wasn't getting a full

1    picture to point out the bad evidence on the recordings,

2    right?

3    **A.**  I'm sorry, I've been reviewing the document.  I missed

4    the question.

5    **Q.**  Sure.  Part of the strategy here was to point out what

6    the defense considered to be the bad language used by the FBI

7    on the recordings, right?

8    **A.**  It appears to be the case.

9    **Q.**  She at least was focused on getting some of the evidence

10   the Government needed -- pardon me, the defense needed, so

11   just cross-examination of the Government's witnesses, right?

12   **A.**  I prefer that you ask her that question, but that appears

13   to be the case.

14   **Q.**  Now, at trial, Mr. Dwyer, he also attacked the agents on

15   cross-examination based on what you said, right?

16   **A.**  He had a very thorough attack, yes.

17   **Q.**  He questioned the agent's credibility, right?  Right?

18   **A.**  The FBI agent in charge of the recording definitely.

19   **Q.**  Okay.  And Mr. Dwyer attacked the quality of the wire

20   recordings, right?

21   **A.**  He -- he attacked a number of things, yes.  Donald

22   didn't, but he did.

23   **Q.**  We'll get to Mr. LaRoche's relationship with Mr. Dwyer in

24   a moment.

25              Now, in an e-mail, if you could turn back one page,

1    you were talking about a timeline, right?  A project

2    timeline, exculpatory nature of the timeline.  Do you see

3    that?

4    **A.**  Uh-huh.

5    **Q.**  And did you know there was a timeline in the attorney

6    file in this case?

7    **A.**  No.

8    **Q.**  Did you help Dr. Baptiste create a written timeline at

9    any time?

10   **A.**  I don't believe so.

11            MR. BASIL:  Okay.  I'll go ahead and mark this as

12   the Exhibit next, Your Honor.  This is going to be -- the

13   first page is BAP 494.

14            I'll do this one on the ELMO, so everyone can see.

15            MR. BASIL:  Exhibit 10?

16            THE DEPUTY CLERK:  Yes, it's Exhibit 10.

17   BY MR. BASIL:

18   **Q.**  We're looking at Exhibit 10 now.

19            MR. BASIL:  Is it upside down on your screens, as

20   well?

21            (Affirmative responses.)

22            MR. BASIL:  Well, I'm going to improvise and do it

23   backwards, Your Honor.

24            THE COURT:  You can turn your back to me.

25            MR. BASIL:  Okay.

BY MR. BASIL:

**Q.**  So can you see the top of the document there?

**A.**  I can't.

**Q.**  And how about now?

          THE COURT:  Is it better to look at me or
Mr. Frank?

          MR. BASIL:  I'm actually looking at the screen,
Your Honor.  Even though I prefer to look at you.

          THE COURT:  Too late, that was way too slow.
Mr. Dwyer gets points for that.

          MR. BASIL:  I'm trying to be more like Mr. Dwyer
all the time, Your Honor.

          THE COURT:  It's a worthy aspiration.

BY MR. BASIL:

**Q.**  Okay.  And you see here, there's a title "Foreign Corrupt
Practices Act," do you see that?

**A.**  Yes.

**Q.**  And you see, "In 2014, I was invited by Mr. Angelo
Viard."  Do you see that?

**A.**  Yes.

**Q.**  Do you understand that this was written in the first
person as if it was Mr. Baptiste?

**A.**  Yes.

**Q.**  Okay.  And do you know whose handwriting is on this?  Do
you recognize the handwriting on this form?  Whose

1   handwriting is that?

2   **A.**   It's not mine.  It's not my wife's.  Maybe Donald's.

3   **Q.**   And if we go forward -- actually, we're right there

4   already.

5            Can you see that?

6            MS. RUBIN-SMITH:  Yes.

7   BY MR. BASIL:

8   **Q.**   So there's an entry here for December 7th.  Do you see

9   that?

10  **A.**   Yes.

11  **Q.**   In the timeline?  And there's an entry there.

12           "Send pictures of cash that NOAH will distribute

13  for donation for Christmas."

14           Do you see that?

15  **A.**   Yes.

16  **Q.**   Now, if we go forward in this document, you'll see --

17  I'll show you, we're now at a slightly different version.

18  This is BAP 498.  And on December 6th, we have the same

19  entry, without the handwriting, "Send pictures of cash that

20  NOAH will distribute for Christmas."  Right?

21  **A.**   Yes.

22  **Q.**   And that doesn't say anything there about pictures of

23  money being for bonuses to dental employees, does it?

24           MR. MARX:  Objection, Your Honor.  I don't know

25  whether this has come in yet as an exhibit, but I don't

1    believe there's been a foundation laid because I've never

2    seen this document before and I know nothing about it.

3         MR. BASIL:  It's from the attorney file, Your

4    Honor.  It probably would have made sense to ask the attorney

5    about it.

6         THE COURT:  I got it.  And I think you need to lay

7    a better foundation for it.  So if you've seen it, you can

8    ask him about it.  If he hasn't, you can't.

9    BY MR. BASIL:

10   Q.  Prior to filing the affidavit, did you review the

11   attorney file in this case?

12   A.  No.

13   Q.  Did you ever talk to Donald LaRoche about his

14   investigation of a timeline for Dr. Baptiste?

15   A.  No.

16   Q.  So you don't know anything about whether Dr. Baptiste

17   made any representations to Mr. LaRoche, do you, from this

18   timeline?  You don't know?

19   A.  I do not know.

20   Q.  So you don't know what effect this timeline might have

21   had on Mr. LaRoche's decisions about what lines of evidence

22   he would pursue at trial, do you?

23        MR. MARX:  Objection, Your Honor.  We're now asking

24   him to speculate about a document that we just established

25   he's never seen before or knew about.

1            THE COURT:  No, that one is overruled.

2            MR. BASIL:  Your Honor, I offered that as a

3    document produced by them in the attorney filings in this

4    case.

5            Just for the record, not for the witness.

6            THE COURT:  Isn't it already in?

7            MR. BASIL:  I don't believe in its entirety, Your

8    Honor.

9            THE COURT:  It's Exhibit 10, isn't it?

10           MR. BASIL:  Yes, I just offered it as Exhibit 10.

11   If it's in.

12           THE COURT:  I'm sorry, she marked it, I assumed it

13   was in.

14           Any objection?

15           MR. MARX:  We object for the reasons stated, Your

16   Honor.

17           THE COURT:  Okay.  It's admitted.

18           (Exhibit No. 10 admitted into evidence.)

19           MR. BASIL:  Let's go to Tab D-24, please, in

20   Exhibit 1.

21           And if we could go back to the computer, Ms. Folan,

22   I would appreciate it.  Okay.

23   BY MR. BASIL:

24   Q.  This is going to be BAP 1101.  So this is an e-mail from

25   Donald LaRoche to Joe Baptiste and you on May 31st, right?

1    Yes?

2    **A.**  Yes.

3    **Q.**  And LaRoche is forwarding to you discovery that he had

4    received from the Government, right?

5    **A.**  Yes.

6    **Q.**  And that included transcripts, right?

7    **A.**  Yes.

8    **Q.**  And if you go to the next page, we're now at 1101.

9    There's a whole list of exhibits and translations included

10   there, right?

11   **A.**  Yes.

12   **Q.**  Okay.  And at the bottom of that page, on 1102, there's

13   an e-mail from you to LaRoche and Baptiste on June 2nd.  If

14   you look at the next page after that, with your analysis of

15   the exhibits -- right?

16   **A.**  Is that the Saturday, June 1st, 2019, 7:51 a.m. e-mail?

17   **Q.**  Yup.

18   **A.**  That one is from me.

19   **Q.**  And that's providing your analysis of the exhibits that

20   Mr. LaRoche had just sent you, right?

21   **A.**  Yes.

22   **Q.**  And underneath -- in your e-mail there, underneath

23   "accordingly," you pointed out, you asked, "What advantage

24   was conferred?"  Right?

25   **A.**  What page there -- okay.  Yes, I wrote that.

```
 1   Q.   Okay.  And that has to do with the improper advantage,
 2   right?
 3   A.   Yes.
 4   Q.   The question you're asking?
 5   A.   Uh-huh.
 6   Q.   And that's the same question you had asked all the way
 7   back in November of 2017, right?
 8   A.   I -- sure.
 9   Q.   And this isn't business advice that you're providing
10   here, right?
11   A.   By June of 2019?  No.
12   Q.   Your role in helping Mr. LaRoche understanding -- you had
13   been emphasizing improper benefit since November of 2017,
14   right?
15   A.   Unfortunately, yes.
16   Q.   And your affidavit that you submitted to the Court, you
17   didn't discuss how you had helped LaRoche understand the
18   Government's exhibits, did you?
19   A.   I don't think that was addressed in the affidavit.
20   Q.   You just left that part out, right?
21   A.   Did not discuss everything in the affidavit.
22   Q.   So you didn't have to tell the Court everything that you
23   had been doing to help LaRoche get ready for trial, right?
24   A.   I told the Court --
25   Q.   It's a yes or no question, sir.
```

1  **A.**  Then I have to disagree with that phraseology of that

2  question.

3  **Q.**  You left it out, right?  You left this out, for your

4  review of the exhibits.

5  **A.**  I covered the things I thought were important to cover.

6  **Q.**  And one of the things that you did not think was

7  important to cover was your role in helping LaRoche get ready

8  for trial, right?

9  **A.**  My involvement was nominal.

10 **Q.**  I'm not asking what your involvement was; I'm asking what

11 you put in the affidavit, sir.

12 **A.**  I'm trying to address that question.

13 **Q.**  You didn't discuss how you helped -- in your affidavit,

14 you did not discuss how you helped LaRoche understand the

15 Government's pretrial discovery, did you?

16 **A.**  I think I noted that most of the pretrial discovery was

17 not seen by me.  That's what I noted.

18 **Q.**  You sure didn't say that this pretrial discovery had been

19 seen by you, did you?

20 **A.**  That's true.

21 **Q.**  Let's look in Exhibit -- and it was Number 9 at BAP 1315.

22        Now, Mr. Dwyer, at some point, he sent along a

23 transcript, as well, right?

24 **A.**  It appears to be the case.

25 **Q.**  I'm sorry?

1    **A.**   It appears to be the case.

2    **Q.**   Well, you read the transcript that was sent, right?

3    **A.**   Yes.

4    **Q.**   You reviewed it -- you actually pointed out what you

5    considered to be the important lines in your e-mail.  You

6    said, "Page 15, lines 9 to 16."  Right?

7    **A.**   Yes.

8    **Q.**   Let's look at Tab B-17 back in Exhibit 1, please, of the

9    BAP 1017.  And this is an e-mail that you sent to LaRoche and

10   Baptiste on June 3, 2019, right?

11   **A.**   Yes.  June 3rd, yes.

12   **Q.**   June 3rd.  And here you say, "Per our conversation,

13   please find my analysis below."  Right?

14   **A.**   Yes.

15   **Q.**   And "our" means you and LaRoche, right?

16   **A.**   Yes.

17   **Q.**   So you had, in fact, been talking about an analysis of

18   the charges and the evidence in this case, right?

19   **A.**   Yes.

20   **Q.**   And you go to the next page of this document, there's

21   actually an analysis of the indictment provided by you,

22   correct?

23   **A.**   Yes.

24   **Q.**   And one of the things that you're going to point out --

25   if you go to 1019, you pointed out, in the middle of the page

1  there, "they," meaning the Government, "have to show that

2  two-plus people conspired and that one of these people did

3  something to effect, AKA, start, advance, etc, the crime.

4  Reviewing the elements of the FCPA, the following weaknesses

5  in this case arise and suggest nothing was done by a member

6  of the conspiracy to effect a crime."

7        Do you see that?

8  **A.**  Yes.

9  **Q.**  And you were pointing out, yet again, as part of the

10  strategy, that the defense should say there was no meeting of

11  the minds, there was no conspiracy, right?

12  **A.**  Yes.

13  **Q.**  And then you pointed out, at the bottom of the page

14  there, it says, "The above combined with the fact that the

15  co-defendant did not know about SEW's $50,000 payment to JB,"

16  and it continues -- and this is on now 1020.  You write,

17  "Without co-conspirators, there's no conspiracy.  We should

18  note here that there's never a solicitation by JB or RD for

19  criminal activity.  Those were made purely by FBI personnel."

20  Right?

21  **A.**  Based on the discovery that I had seen, yes.

22  **Q.**  Okay.  So you were working up an analysis of the elements

23  in this case with Mr. LaRoche, right?

24  **A.**  For Mr. LaRoche, yes.

25  **Q.**  And you testified earlier that LaRoche had no

1    understanding of the elements, right?

2    **A.**    Probably.

3    **Q.**    But you were educating on them, right?

4    **A.**    It was too late.

5    **Q.**    You didn't disclose to the Court your role in helping the

6    Government understand your evidence, did you, in the

7    affidavit?

8    **A.**    There was no evidence of --

9    **Q.**    You didn't say that in your affidavit, did you?

10   **A.**    I did not see it in the courtroom, so I didn't talk about

11   it in the affidavit.

12   **Q.**    Mr. Dwyer also pointed out that Mr. Boncy didn't know

13   about the money, right, in his case?

14   **A.**    Yes.

15   **Q.**    And that was consistent in your review of the defense

16   case, that Dwyer's case and the case put on by Mr. LaRoche at

17   trial, those were consistent, right, that was with showing no

18   conspiracy, correct?

19   **A.**    In hindsight, I can say yes.

20   **Q.**    And if you go to BAP 1021, you also suggested a jury

21   instruction on political contributions, right?  The bottom

22   there?

23   **A.**    Absolutely.

24   **Q.**    And Mr. Dwyer eventually did that, as well, didn't he?

25   **A.**    Coincidence.

1    **Q.**  Coincidence.

2    **A.**  Because I was not coordinating with Mr. Dwyer.

3    **Q.**  Let's go to Tab A-4, still in Exhibit 1.

4            Now, the wife, Ms. Hinton, she responded to your

5    analysis in this e-mail, right?  Remember --

6            This is going to be Bates 929?

7    **A.**  Yes, she responded.

8    **Q.**  And she's commenting on Jason's analysis, right?

9    **A.**  Yes.

10   **Q.**  And she wants things to be considered as part of the

11   overall trial strategy, right?  First line of the e-mail.

12   **A.**  First line of the e-mail.

13   **Q.**  Of the body.  Second to last word.

14   **A.**  Can you just tell me the first word that you want me to

15   look at?

16   **Q.**  Sure.  Your wife is referring to the overall trial

17   strategy in the case, right?

18   **A.**  I think she's talking about a litigation strategy.

19   **Q.**  So when she'S saying "overall trial strategy," it didn't

20   mean overall trial strategy?

21   **A.**  I'm trying to see where you're looking.  I asked you for

22   help in finding that part.

23   **Q.**  I'll come over and show you.

24   **A.**  Sure, that would be great.

25   **Q.**  She wrote that, right?

1   **A.**  She wrote that.

2   **Q.**  And under Jason's first point, the first full paragraph

3   below that, she's talking about your points about the FCPA's

4   elements, right?

5   **A.**  Yes.

6   **Q.**  Skip down a couple paragraphs, the paragraph starting

7   with the word "though."  She recommends that the Government's

8   account of things has to be flipped on its head to show that

9   the undercovers were ordering, asking, and requesting that

10   certain things be done.  Right?  That was part of the overall

11   trial strategy, right?

12   **A.**  She was recommending that, yes.

13   **Q.**  All right.  And if you go to the paragraph below that, at

14   the line that says number 25, there's a quote.  "That piece

15   confirmed that bribes totaling five percent."  And then she

16   says, "Joe doesn't confirm anything."

17         Do you see that?

18   **A.**  Yes, I see that line.

19   **Q.**  And she was pointing out there the language actually used

20   in the indictment, right?

21   **A.**  Okay.

22   **Q.**  And then she says, "Joe doesn't confirm anything.  At one

23   point he may give up arguing with them about terminology,

24   'you can call it what you want.'"

25         Do you see that?

1    **A.**  Yes.

2    **Q.**  So she was recommending a strategy that would point out

3    what Baptiste said versus what the FBI said, right?

4    **A.**  It appears from the text.

5    **Q.**  Let's go to Tab B-18, and this is BAP 1060.  And this is

6    still on June 5th.  Here your wife is commenting on the

7    transcript forwarded by Mr. Dwyer, right?

8    **A.**  I don't --

9    **Q.**  You see the embedded e-mail there from Jed Dwyer, in the

10   middle of that page?

11   **A.**  Yes, I see that.

12   **Q.**  And your wife is commenting on that transcript, right?

13   **A.**  Potentially.

14   **Q.**  She writes, "Well, as a prosecutor, I would use that,

15   too."  Right?

16   **A.**  Did you find that helpful?

17   **Q.**  She recommends down below, the bottom of the page,

18   "You'll have to establish a timeline of when Joe made

19   comments about keeping things legitimate."  Right?

20   **A.**  Yes.

21   **Q.**  This is your wife commenting on how to structure the

22   defense in this case, correct?

23   **A.**  I think that's an overstatement.

24   **Q.**  Okay.  Well, then let's look at Tab B-19, now at BAP

25   1082.  And this is an e-mail that your wife sent to you and

1    LaRoche and Baptiste, right?  Isn't that what it is, sir?

2    **A.**  It is an e-mail to all of us, yes.

3    **Q.**  And it's addressed to Joe, right?

4    **A.**  Yes.

5    **Q.**  And she's laying out the elements of entrapment, right?

6    **A.**  Yes.

7    **Q.**  And she's explaining to him how an entrapment defense

8    might work in the case, right?

9    **A.**  I think she was explaining to him that this is not going

10   to work.

11   **Q.**  And that's legal work, isn't it?

12   **A.**  I think she's giving her general opinion and is

13   acknowledging in that e-mail that she knows far less than

14   anybody else.

15   **Q.**  She says, "I'm not sure we can prove all of the

16   elements."

17          Right?  That's "we," you and LaRoche and the team.

18   It's the team, right?

19   **A.**  I don't know why she used the term "we."

20   **Q.**  Now, LaRoche actually responds at the bottom there,

21   right?  There's an e-mail back to Arielle Hinton, right?

22   **A.**  Uh-huh.

23   **Q.**  And he writes, "Entrapment is not really an option."

24          Do you see that?

25          He says, "I originally explored that option at the

1    onset, but as Arielle has noted, the first step related to

2    the Government coercing Joe is not really" -- and he

3    continues, right?

4    **A.**   Uh-huh.

5    **Q.**   Is that a yes?  Do you see that, sir?

6    **A.**   Donald wrote that, yes.

7    **Q.**   And he wrote that because he had, in fact, considered the

8    entrapment defense, right?  That's what he says.

9    **A.**   Yes, he says he considered it.

10   **Q.**   Okay.  And below that, he says that you had said

11   something that was the key to the whole defense, right?

12              Here, I'll read it for you.

13              "Jason said something to me this afternoon that's

14   the key to the whole case."

15              Did you see that he wrote that?

16   **A.**   He did write that.

17   **Q.**   Okay.  And the key to the whole case was to show that Joe

18   Baptiste didn't actually act on the suggestions of the

19   Government, right?  That was the key, in your view?

20   **A.**   That was the key in his view.  He sees it as the key in

21   the case.

22   **Q.**   Based on something that you had said to him?

23   **A.**   Well, based on the comment that I made, but I don't know

24   what I said in total context.

25   **Q.**   Do you remember the conversation with him about how to

1   develop the strategy for the case?

2   **A.** I believe I had a conversation with him about how to

3   develop the strategy for the case.

4   **Q.** Let's go to an exhibit, number 9 to BAP 1485.

5   **A.** Can you say that again?

6   **Q.** Sure. 1485. And 1485, this is your wife writing to you

7   and LaRoche, talking about how you had reviewed the

8   Government's trial brief, right?

9   **A.** I don't know that she read the Government's trial brief.

10  **Q.** She writes, "I am just now reading from the Government's

11  brief."

12  **A.** Maybe I'm on the wrong page. Where does it say that?

13  **Q.** 1485.

14  **A.** Oh, I was on 84. Excuse me. Okay. I'm here.

15  **Q.** Okay. She had been reading the Government's trial brief,

16  right?

17  **A.** It appears to be the case.

18  **Q.** Okay. And you and Arielle Hinton and LaRoche were

19  considering how to respond to the Government's allegations

20  and the Government's theory of the case based on the trial

21  brief, right?

22  **A.** My opinions were based upon what I read. I don't know

23  what Arielle's opinions were based upon.

24  **Q.** Let's go to B-20, back in Exhibit 1. It's going to be

25  Bates 1084.

1  **A.**  1084.

2  **Q.**  Yes, sir.

3  **A.**  Okay.

4  **Q.**  And here's LaRoche writing to you and your wife on

5  June 10th, right?

6  **A.**  Uh-huh.

7  **Q.**  And you remember this happening, yes?

8  **A.**  I do remember, yes.

9  **Q.**  Okay.  And in fact, you had the PowerPoint for the

10  Government's opening, right?

11  **A.**  Yes.

12  **Q.**  You knew the Government was going to offer a picture of

13  the money by this point, right?

14  **A.**  You indicated that, yes.

15  **Q.**  In fact, your wife writes at the bottom, "You have to

16  object to the photo of the money."  Right?

17  **A.**  Yes.

18  **Q.**  And if you go to the next page, we're now on 1085, you

19  actually thought the Government's PowerPoint was dumb, right?

20  **A.**  Yes.

21  **Q.**  And you were thinking about how to address it in the

22  opening or the closing, right?

23  **A.**  By June 10th, yes.

24  **Q.**  Okay.  So by June 10th, you were thinking about how the

25  case was going to open, right?

1    **A.**  Yes.

2    **Q.**  And you were thinking about how the case was going to

3    close, right?

4    **A.**  Yes.

5    **Q.**  And you were thinking about this in coordination with

6    your wife and Don LaRoche, right?

7    **A.**  Not really in coordination with my wife, but definitely

8    with Donald.

9    **Q.**  And the preexisting -- the strategy that you had at this

10   point was emphasize the Government had been manufacturing the

11   crime, right?

12   **A.**  I believe that was worth pursuing.

13   **Q.**  And that was something that had already existed by this

14   time in your correspondence with Mr. LaRoche and

15   Dr. Baptiste, right?

16   **A.**  I definitely suggested that it be pursued.

17   **Q.**  And that ended up in the opening, right?

18   **A.**  That I wrote, yes.

19   **Q.**  And that was part of the -- you wrote the opening, the

20   whole opening?

21   **A.**  Yes.

22   **Q.**  Let's go to, in Exhibit 9, it's going to be 1488 to 89.

23   **A.**  Okay.

24   **Q.**  Now, I'm going to start with the lower e-mail here on

25   page -- and then work backwards.  So the e-mail below is from

1    you, right, June 10th at 2:30 p.m.  Do you see that?

2    **A.**  Uh-huh.  Yes.

3    **Q.**  Okay.  Thank you.  And you're commenting on what stands

4    out in a motion, right?

5    **A.**  Yes.

6    **Q.**  Okay.  And you say in that paragraph, middle of the

7    paragraph, "The Government provided recordings, which make it

8    clear that J and Boncy never intended to make bribes.  The

9    search in trying to get a letter of support due to the fact

10   that a new government is coming into office" -- and so on.

11          Do you see that?

12   **A.**  Yes.

13   **Q.**  So your analysis at this point is based upon Government

14   provided recordings, wasn't it?

15   **A.**  I believe it was based upon what I had read in some of

16   the motions.

17   **Q.**  That's not what you say here.  You say the Government

18   provided recordings, right?

19   **A.**  But I didn't have them.

20   **Q.**  You only referred to them; is that right?

21   **A.**  I'm telling you that I had access to the snippets of the

22   transcripts.  I didn't have access to the recordings.

23   **Q.**  The bottom of that page, you write, "I like the idea of

24   Dwyer and LaRoche crushing them on the point of how the money

25   was used from the remainder of the record."

1          Right?  You wrote that.

2     **A.**   I wrote it, yes.

3     **Q.**   And now, because in your view, the remainder of the

4     record that you are familiar with could be used to attack the

5     Government on the disposition of the funds that Baptiste had

6     received from the FBI, right?

7     **A.**   I think the operative phrase there was that I was

8     familiar with.

9     **Q.**   And the next page, please, on 1489, third paragraph down,

10    you write, "Donald, I defer to you on how to proceed."

11         Right?  Do you see that?

12    **A.**   Yes.

13    **Q.**   Okay.  And then skip the next two sentences to the

14    sentence beginning "ultimately."  "Ultimately, Boncy's

15    attorney is here to destroy all the same allegations we are."

16         Right?  You wrote that.

17    **A.**   Yes.

18    **Q.**   Because you understood the defense that Jed Dwyer was

19    putting on on behalf of Mr. Boncy was consistent with the

20    defense that needed to be put on for Mr. Baptiste, right?

21    **A.**   More accurately, I had my concerns about the ability of

22    Donald to put on a defense at this point.

23    **Q.**   In fact, you urged Donald LaRoche to rely on the great

24    Jed Dwyer, right?

25    **A.**   To work with him.

1   **Q.**  Uh-huh.  You say, "Why not unleash him?"

2        Right?  You wrote that?

3   **A.**  Yes, because Donald told me how wonderful he was.

4   **Q.**  So you encouraged Mr. LaRoche to rely on Jed Dwyer's

5   cross-examination of witnesses, right?

6   **A.**  Not solely, no.

7   **Q.**  Because Jed Dwyer had demonstrated how good he was at

8   cross-examining witnesses, right?

9   **A.**  If I remember at trial, I think we all were impressed.

10  **Q.**  And the points that Jed Dwyer was scoring against the

11  Government, those inured to the benefit of Dr. Baptiste,

12  didn't they?

13  **A.**  No, because he put Joe through the mud.

14  **Q.**  That's not what you said here.  What you said here is

15  that ultimately Mr. Dwyer was knocking down the same evidence

16  that had to be knocked down as part of LaRoche's defense of

17  Baptiste, right?

18  **A.**  I think the fact that it's June 10th is relevant to your

19  question.

20  **Q.**  Go back to 1488.  And your number one, you were again

21  going to -- you thought it should be emphasized that there

22  was no intent to pay a bribe, right?

23  **A.**  Can you repeat your question now, please.

24  **Q.**  Sure.  You thought what should be done, as part of the

25  defendants case, was to emphasize that Boncy and Baptiste

1    never intended to make a bribe, right?

2    **A.**  Yes.

3    **Q.**  Okay.  And you thought that the defense should point out

4    that the Government, in your view, solicited the bribe, not

5    the other way around, right?

6    **A.**  Yes.

7    **Q.**  And that number two here, you again emphasize the lack of

8    a conspiracy, of an actual criminal agreement, right?

9    **A.**  I believe there's a lack of conspiracy, yes.

10   **Q.**  Okay.  And at number four, you thought it was important

11   to draw out, in front of a jury, evidence that you thought

12   would show the Government's malicious prosecution of

13   Dr. Baptiste, right?

14   **A.**  Can you repeat the question?

15   **Q.**  Sure.  You thought part of the defense strategy would be

16   to put on a case that would suggest that the Government had a

17   malicious prosecution of Dr. Baptiste, right?

18   **A.**  Does it say that?

19   **Q.**  You used the word "malicious" to refer to the Government

20   here, correct?

21   **A.**  I referred to a dream.

22   **Q.**  You put, "And their malicious dream of prosecuting people

23   for a conspiracy where that was no conspirator."

24         Do you see that?

25   **A.**  Yes.

1    Q.  And that was part of the strategy, as well, right?

2    A.  I'm saying that you won't stipulate, the Government, that

3    is, because it wouldn't be to your favor.

4    Q.  Let's go to -- now, in 1488, still on that same page,

5    let's look at the e-mail above.  This is your wife's e-mail,

6    right?  E-mail back to you.  She says "Regarding your point,

7    I agree with everything else you wrote, by the way, I think

8    the Government will take the angle that the 5 percent was for

9    bribing, not the 50K."

10           Do you see that?

11   A.  That's page 1488.

12   Q.  1488, the top e-mail on the page.  E-mail from Arielle

13   Hinton to you?

14   A.  Yes.

15   Q.  Okay.  So she understood that the Government's case was

16   going to focus not just the $50,000 for the letter, but on

17   the overall bribe scheme involving the 5 percent, right?  She

18   says.

19   A.  Yes.  But I think she can confirm that better than me.

20   Q.  She writes, "I'm tired as I read this, but I think we

21   need to compose your thoughts into cross-exam questions."

22   Right?

23   A.  Yes.

24   Q.  And that's because you and your wife and Mr. LaRoche were

25   collaborating on cross-examination questions, right?

1    **A.**  I don't believe my wife was helping with the

2    cross-examination questions.  I don't believe I was in Boston

3    on June 10th.

4    **Q.**  You were communicating with her on June 10th, right?

5    **A.**  Yes.

6    **Q.**  And she says that "we" -- that means you and her, doesn't

7    it?

8    **A.**  There's a lot of people on that chain.

9    **Q.**  Okay.  So fair enough.  There's also LaRoche, right?

10   **A.**  Uh-huh.

11   **Q.**  So "we" would be you and LaRoche and her.  That's we,

12   right?  Need to compose your, meaning Jason's thoughts, into

13   cross-exam questions, right?

14   **A.**  I think they're talking about my thoughts.  I think who

15   the we is is a question better asked of her.

16   **Q.**  Let's go to Tab B-21, back in Exhibit Number 1.  And by

17   June 10th -- this is BAP 1086.  Look at the bottom of page --

18   it's an e-mail from you to LaRoche and Baptiste, right?  Do

19   you see that?

20   **A.**  From me to them, yes.

21   **Q.**  Okay.  And you write, "Here are my suggested edits."

22   Right?

23   **A.**  Yes.

24   **Q.**  You just testified a moment ago that you wrote the whole

25   thing, not that you provided edits, didn't you?

1    **A.**   That's how I remembered it.

2    **Q.**   But back then, it was providing suggested edits, right?

3    That's what you wrote then, on the day, right?

4    **A.**   I wrote an opening statement after getting a call from my

5    wife saying that Donald will not share any information about

6    strategy or whether he's done an opening statement, so I

7    wrote it.  I sent something up.  If he sent something back

8    that was mostly consistent with what I originally wrote and

9    then I edited something from there, then maybe that can

10   explain that.  But as far as I knew, he didn't write one.

11   **Q.**   Are you saying that there's a communication back from

12   Mr. LaRoche to you that has not been produced in this case?

13   **A.**   No.  I'm speculating as to why there could possibly be an

14   opening statement from Donald.  Because from what I was

15   told --

16   **Q.**   Is it possible, sir, that he wrote an opening statement,

17   and you were providing suggested edits, exactly as you said

18   contemporaneously here?

19   **A.**   I'm telling you that I wrote an opening statement and

20   sent it up.  And then my understanding of what happened when

21   he opened, was that he read my opening statement.  I don't

22   believe he wrote one.

23   **Q.**   Back then, you said you were providing suggested edits,

24   right?

25   **A.**   Huh?

1    **Q.**  Back then you said you were providing suggested edits and

2    track changes, right?

3    **A.**  Well, if you can show me the document.

4    **Q.**  You're looking at it right now.

5    **A.**  Not the e-mail, but the actual one.

6    **Q.**  Turn the page, sir, two pages in.  There's track changes

7    on a document.

8    **A.**  This --

9    **Q.**  Sir, isn't the truth that you don't know what happened.

10    You just said you don't remember what LaRoche did?

11    **A.**  You're showing me an outline, not an opening statement.

12    I did make these track changes on this outline.

13    **Q.**  So LaRoche provided notes on how to do an opening

14    statement, and you gave comments back.  And it was a

15    collaboration, right?

16    **A.**  Fine.

17    **Q.**  So when you testified earlier that you wrote the whole

18    thing, that wasn't true, was it?

19    **A.**  It's as I recollected it.

20    **Q.**  It's how you remember today, for the purpose of this

21    hearing; is that right?

22    **A.**  That's inaccurate.

23    **Q.**  Inaccurate.  Let's go to Exhibit 10, please, BAP 1347,

24    please.

25              Are you there, sir?

1    **A.**  I am.

2    **Q.**  This is an e-mail from you to Arielle Hinton, Joe

3    Baptiste, and Don LaRoche, about the opening again, right?

4    Do you see that?

5    **A.**  Yes.

6    **Q.**  And here you're getting advice about how to adjust the

7    opening that you had just been providing comments on, right?

8    **A.**  Yes.

9    **Q.**  And if you look to the number one, number two, number

10   three, you identify three photos in the Government's

11   PowerPoint, right?

12   **A.**  Uh-huh.

13   **Q.**  Is that a yes?

14   **A.**  Yes.

15   **Q.**  Okay.  And you knew that the first one was from

16   Mr. Boncy's mobile project flyer, right?

17   **A.**  Yes.

18   **Q.**  Okay.  And you knew that the second one was an image of

19   Dr. Baptiste standing with an official, right?  And the third

20   one was the photo with stacks of cash, right?

21   **A.**  Yes.

22   **Q.**  Okay.  And you were able to recognize the first

23   photograph as coming from Mr. Boncy's pamphlet, because that

24   was in the discovery, right?

25   **A.**  No.  Dr. Baptiste had shared that PowerPoint with me.

1    **Q.**  You just stay right in that same exhibit and go to the

2    next page, please.  This is a *Law 360* article that you

3    forwarded to Joe and Arielle Hinton.  We're on BAP 1448.

4    Right?  Do you see that?

5    **A.**  Yes.

6    **Q.**  And this is the media coverage of the two openings by the

7    defendants in the case, right?

8    **A.**  Yes.

9    **Q.**  What's quoted here as being salient in Dr. Baptiste's

10   defense is that the Government manufactured the case, right?

11   **A.**  Did I write that somewhere?

12   **Q.**  It says right here, "The FBI, LaRoche said in his opening

13   statements, sought to manufacture a crime."

14            Do you see that in the article?

15   **A.**  I see that in the article.

16   **Q.**  Okay.  And you've seen that word before in e-mails that

17   you wrote to Baptiste and LaRoche, right?

18   **A.**  Yes.

19   **Q.**  You used that word, right?

20   **A.**  Not just me.

21   **Q.**  Not just you.  Right.  Because it was part of the joint

22   defense strategy in this case to argue that the FBI had just

23   come up with this on their own, right?

24   **A.**  I think it was an observation.

25   **Q.**  Okay.  And Mr. Dwyer, just looking at the news coverage

1  here, right below that, he says that the crime was engineered

2  by the FBI, right?

3  **A.**  Therefore become an observation.

4  **Q.**  Yeah.  So Mr. Dwyer's strategy was to emphasize how it

5  was engineered, and your strategy with LaRoche and Baptiste

6  was to emphasize how it was manufactured, right?

7  **A.**  I have no idea what Mr. Dwyer's strategy was.

8  **Q.**  Now, you testified earlier, you wrote in your affidavit

9  that you never saw Donald LaRoche prepare for any

10  cross-examinations; is that right?

11  **A.**  Yes.  Something like that.

12  **Q.**  Yeah.  And you said that you never saw any work-product

13  showing preparation, right?

14  **A.**  Before the trial, that is correct.

15  **Q.**  And I believe you said just a moment ago that you didn't

16  think your wife was helping prepare cross-examinations, at

17  all; is that right?

18  **A.**  I don't recall if she was.  Ask her.

19  **Q.**  You don't remember today.

20  **A.**  Yes.

21  **Q.**  Let's look at Tab B-22, please.  And so this is on BAP

22  1092.

23  **A.**  Yes.

24  **Q.**  Okay.  This is you sending a cross-examination to Donald

25  LaRoche, right?

1   **A.**   Yes.

2   **Q.**   Okay.  Now, in your affidavit, this is Exhibit 8,

3   Paragraph 16.  You say, "I believe that Attorney LaRoche did

4   not prepare in any meaningful way to cross-examine the

5   prosecution witnesses, including the two undercover agents."

6         Right?  You wrote that?

7   **A.**   Yes.

8   **Q.**   Peter Anderson, he was an undercover agent, right?

9   **A.**   Yes.

10  **Q.**   And LaRoche did prepare -- you prepared them, right?

11  **A.**   I prepared it, because he didn't.

12  **Q.**   Sir, you were acting as his co-counsel in this case, and

13  you wrote a cross-examination of a witness, right?

14  **A.**   No.  I was his -- I was assisting them.

15  **Q.**   And in your affidavit that you submit to this Court to

16  represent how LaRoche was prepared in this case, you didn't

17  mention that you had actually been the one to write the

18  questions, did you?

19  **A.**   I don't think so.

20  **Q.**   And this is not technical or video advice being provided,

21  is it?

22  **A.**   No.

23  **Q.**   And this is not business advice, right?

24  **A.**   That's correct.

25  **Q.**   You said that you never saw any work-product from

1    Mr. LaRoche, right?

2    **A.**   That's correct.

3    **Q.**   Because the work-product was from you, right?

4    **A.**   I did great work-product for Mr. LaRoche, once I got

5    here.

6    **Q.**   And that's something that co-counsel does, right?

7    Co-counsel helps prepare examination of witnesses.  That

8    happens, right?

9    **A.**   I stood as an intern, too.

10   **Q.**   But at the time of the trial, you weren't an intern, were

11   you?  You were a licensed attorney, licensed and admitted to

12   the bar in Maryland and New Jersey, weren't you?

13   **A.**   But I was not Joe's counsel.

14   **Q.**   You sent him attorney-client communications, sir.

15   **A.**   I did seek to protect those communications under the

16   rubric of Donald's representation.

17   **Q.**   By June 15th, you were in Boston, right?

18   **A.**   I think so.

19   **Q.**   And you worked with your wife on this cross-examination,

20   didn't you?

21   **A.**   Can you show me that?

22   **Q.**   Sure.  It's in Exhibit 9, at BAP 1498.  You invited her

23   to help you with this cross-examination, didn't you?

24          MR. MARX:  Objection, Your Honor.  We've already

25   represented to the Government, this was produced in an

1    abundance of caution.  He has never opened the document.  So

2    I just want that on the record.

3              THE COURT:  It's just a question.  You invited them

4    to help you with the cross-examination.

5    BY MR. BASIL:

6    **Q.**  And Mr. Hinton, you wrote here, per your request, access

7    is granted, right?

8    **A.**  I'm sorry, where are you?  1498?

9    **Q.**  1498.  "Jason Hinton@Gmail has invited you to edit the

10   following comment."  And there's a little box there, there's

11   an outline.  It says, "Per your request, access is granted."

12   Right?

13   **A.**  Yes.

14   **Q.**  So even if she didn't open this e-mail, she was helping

15   you with this exam, wasn't she?

16   **A.**  Not necessarily.

17              And who wrote, "Per your request, access is

18   granted"?  Because I don't believe I wrote that.

19   **Q.**  Let's look at BAP 1495, please.  Here's an e-mail on

20   June 19th, from Arielle Hinton to Donald LaRoche and --

21   actually, just to Donald LaRoche, asking for the jury

22   instructions, right?

23   **A.**  Yup.  Yes.

24   **Q.**  And that's because you had been thinking about the jury

25   instructions in this case for some time, right?  We looked at

1    the document where you wanted to have a jury instruction on

2    political contributions.

3    **A.**    That's not on this page.

4    **Q.**    Do you recall seeing, in your analysis of the case, you

5    asked to have a jury instruction on political contribution?

6    **A.**    What does that have to do with Arielle's e-mail?

7    **Q.**    I'm asking, sir, whether you recall that you wanted to

8    have a jury instruction on political contributions.  Do you

9    recall that?

10   **A.**    I do.

11   **Q.**    Okay.  And do you see here that your wife is also part of

12   the conversation with Donald LaRoche about jury instructions?

13   **A.**    I see that she sent them an e-mail.

14   **Q.**    Let's go to Tab B-25.  This is the e-mail that has to do

15   with the closing argument, right?  This is BAP 1107?

16   **A.**    Yes.

17   **Q.**    And in the closing that you say you wrote, it talks about

18   how the Government manufactured a conspiracy, right?

19   **A.**    Which page are you on?

20   **Q.**    Last question, Your Honor.  Part of the closing was you

21   emphasized that Baptiste had been swept up in a crime that

22   the Government had manufactured, right?

23   **A.**    I do believe that, yes.

24   **Q.**    And that was also part of the opening, right?

25   **A.**    Yes.

1    **Q.**  And that was part of Mr. Dwyer's suggestions, as well,

2    about engineered, right?

3    **A.**  Coincidentally.

4    **Q.**  And this idea about the case being manufactured, that was

5    part of your e-mailed correspondence with the client,

6    Dr. Baptiste and with LaRoche, earlier in the spring, right?

7    **A.**  Yes.

8    **Q.**  And the closing also talked about the lack of a

9    conspiracy, the lack of a criminal agreement between Boncy

10   and Baptiste, right?

11   **A.**  Based on the documents that I saw, yes.

12   **Q.**  Okay.  And that was also in the opening, right?

13   **A.**  I'm going to take your word for it.  I'm having trouble

14   remembering all these documents at once.

15   **Q.**  Mr. Dwyer, he emphasized the lack of criminal agreement,

16   as well, didn't he?

17   **A.**  Yes.

18   **Q.**  Now, at trial, you sat at counsel table, right?

19   **A.**  Yes.

20   **Q.**  You personally did not tell the Court that you were an

21   attorney working with Mr. LaRoche, did you?

22   **A.**  Donald told me that --

23   **Q.**  That's not my question, sir.  My question is whether you,

24   personally, as a member of the bar, represented to the Court

25   that you were an attorney working with Mr. LaRoche.  Did you

1  do that personally?

2  **A.**  I did not do that personally.

3  **Q.**  Did you represent to the Government that you were an

4  attorney working with Mr. LaRoche?

5  **A.**  I did not represent myself as co-counsel, no.

6  **Q.**  Mr. Hinton, do you recall --

7       You were seated right there, right?  Right about

8  where Mr. Fick is seated, right?

9  **A.**  Yes.

10  **Q.**  Okay.  And I was typically seated right about here,

11  right?  Right next to you, right?

12  **A.**  Yes.

13  **Q.**  Okay.  And when you showed up, do you recall, I walked

14  over and I introduced myself to you, right?

15  **A.**  Yes.

16  **Q.**  And I said, "Hi, I'm Kriss Basil."  Right?

17  **A.**  Yes.

18  **Q.**  And you said, "I'm Jason Hinton."  Right?

19  **A.**  Yes.

20  **Q.**  You didn't say, "I'm an attorney."

21  **A.**  I wasn't there as my role as an attorney.

22  **Q.**  So this process of writing the opening that you had done

23  and reviewing the discovery and going through evidence, that

24  wasn't attorney work?

25  **A.**  There was no closing written when I arrived.

1    **Q.**  You had just been working on the opening, sir.

2    **A.**  Yes, I sent a recommended opening to him.

3    **Q.**  And you weren't here as an attorney, even though,

4    according to you, on this opening that you wrote in its

5    entirety, that wasn't legal work?

6    **A.**  If I was here as an attorney, I would have addressed the

7    Court.  I would have done a lot of things I didn't do.  I sat

8    there quietly.

9    **Q.**  You wanted to not disclose your activity, in the scope of

10   this motion, the activity in this case, didn't you?

11   **A.**  I disclosed what I thought was relevant.

12   **Q.**  You disclosed what you thought was useful for this

13   motion, sir, right?

14   **A.**  I disclosed what I thought was relevant.

15   **Q.**  Because that's what they asked you to do, right?  That's

16   what you testified to earlier?

17   **A.**  I did not write anything they asked me to write.  I wrote

18   what my observations were.

19   **Q.**  And did you tell Mr. Dwyer that you were an attorney

20   working on the case?

21   **A.**  I told Mr. Dwyer I was not counsel for Mr. Baptiste.

22   **Q.**  How did you pay your expenses during the trial?

23   **A.**  Joe, on his credit card, booked the hotel, and he paid

24   for my flight.

25   **Q.**  To your knowledge, was Dr. Baptiste paying Mr. LaRoche at

1    all in this time period?

2    **A.**   Yes.  For his time.

3    **Q.**   Have you been paid by Dr. Baptiste for anything else from

4    2015 to present?

5    **A.**   No.

6    **Q.**   Has NOAH paid you for anything?

7    **A.**   No.

8    **Q.**   Have you been paid by any entity in relation to this

9    trial?

10   **A.**   No.

11   **Q.**   No legal defense fund has made any payments to you?

12   **A.**   No.

13   **Q.**   Now, you took notes during the trial, right?

14   **A.**   At the beginning, yes.

15   **Q.**   Where are those notes?

16   **A.**   Everything was left with Donald.

17   **Q.**   You didn't just recently give notes to the defense

18   lawyers in this case?

19   **A.**   I gave what I had remaining to them, yes.

20   **Q.**   Okay.  Well, so -- I'm sorry, which is it?  You gave

21   everything to LaRoche, or you gave some things to LaRoche and

22   then later gave some other things to defense counsel?

23   **A.**   I apologize, I thought you knew that I sent that file,

24   and you were talking about other information.  So yes, I sent

25   that file to the attorneys, which they turned over to you.

1  But everything else that existed was turned over to Attorney

2  LaRoche.

3  **Q.**  Let's look at Exhibit 9, BAP 1513, please.

4        THE COURT:  The court reporter has asked for a

5  break, until -- 3 o'clock.

6        MR. BASIL:  Thank you, Your Honor.

7        (Court in recess at 2:45 p.m.

8        and reconvened at 3:01 p.m.)

9        MS. RUBIN-SMITH:  Your Honor, could we see the

10 exhibit that was just admitted today, this morning.

11        MR. MARX:  Judge, just to be clear, that was the

12 document that privilege was asserted.

13        THE DEPUTY CLERK:  I think so.

14        THE COURT:  Is that the document where privilege

15 was asserted?

16        THE DEPUTY CLERK:  Yes, Your Honor.

17        THE COURT:  That's privileged.

18        MS. RUBIN-SMITH:  I thought that it was admitted.

19        THE COURT:  It wasn't admitted.  It was just marked

20 for identification, because I made a ruling on it.

21        MS. RUBIN-SMITH:  Apologies, I thought in the

22 beginning it was admitted as Exhibit 7.

23        THE DEPUTY CLERK:  We gave it number 7.

24        MS. RUBIN-SMITH:  But it's not admitted.

25        THE COURT:  No.

1          MS. RUBIN-SMITH:  But the finding that it was
2    relevant?
3          THE COURT:  Not relevant.
4          MS. RUBIN-SMITH:  Okay.
5          MR. BASIL:  Your Honor, may I inquire?
6          THE COURT:  Sure.
7    BY MR. BASIL:
8    **Q.**  Mr. Hinton, before we took the break, I was asking you
9    about your work during trial, right?
10   **A.**  Yes.
11   **Q.**  Okay.  And I asked you about your notes, right?
12   **A.**  Yes.
13   **Q.**  And in Exhibit 9, could you look at the number -- it's on
14   the screen, but it's also BAP 1513?
15   **A.**  Yes.
16   **Q.**  I -- Mr. Hinton, what is this?
17   **A.**  I was taking notes, and I was trying to show Donald some
18   questions that he should consider asking.
19   **Q.**  So whose handwriting is on here?
20   **A.**  Mine and Donald's.
21   **Q.**  I'm sorry, yours and who?
22   **A.**  Donald's.
23   **Q.**  Where is Donald's?
24   **A.**  It's at the bottom.  It starts with, "They are now
25   trying."

1   **Q.**   Okay.  And these are notes that you actually took during

2   the trial; is that right?

3   **A.**   Yes.

4   **Q.**   Okay.  And this is you again suggesting questions to

5   Donald LaRoche; is that right?

6   **A.**   That's correct.

7   **Q.**   And he's answering some of your concerns at the bottom,

8   right?  He's writing back to you in response to the questions

9   that you were suggesting?

10  **A.**   I'm not sure that it's responsive to me, but he's

11  definitely asserting something.

12  **Q.**   And this doesn't have to do with audio-visual, this page,

13  does it?

14  **A.**   No.

15  **Q.**   Okay.  And you were suggesting -- you were suggesting

16  cross-examination questions, right?

17  **A.**   I was.

18  **Q.**   Are you aware that trial counsel often give each other

19  questions during the course of trial?  You know that happens?

20  **A.**   I've seen that happen.

21  **Q.**   If you go to the next page, 1514 --

22  **A.**   Yes.

23  **Q.**   -- what's this?

24  **A.**   These look like Donald's notes that got caught up in that

25  file that I took home from the trial.

1    **Q.**   So this is Donald LaRoche's notes; is that right?

2    **A.**   Yes.

3    **Q.**   If you go to the next page, are those still Donald

4    LaRoche's notes?

5    **A.**   Yes.

6    **Q.**   And this is -- this is like a minute-by-minute note on

7    something called "disc A," right?

8    **A.**   Yes.

9    **Q.**   And it's from the discovery in this case, right?

10   **A.**   Yes.  I believe he was watching it during the trial,

11   writing that down.

12   **Q.**   And he's pointing out language on the tapes, right?

13   **A.**   It appears to be doing that, yes.

14   **Q.**   And so when you testified earlier that you never saw any

15   work-product where LaRoche was identifying language that

16   could be useful for cross-examination, that wasn't right, was

17   it?

18   **A.**   I believe I said that in context of the lead-up to the

19   trial.

20   **Q.**   Paragraph 16 of your affidavit, you wrote, "I believe

21   that Attorney LaRoche did not prepare in any meaningful way

22   to cross-examine the prosecution's witnesses, including the

23   two undercover agents.  I never saw any work-product or other

24   notes from Attorney LaRoche concerning exculpatory excerpts

25   and reports of other evidence that he planned to use on

1    cross-examination."

2              That's in your affidavit, sir?

3    **A.**   Yes.

4    **Q.**   Do you remember writing that?

5    **A.**   I do.

6    **Q.**   Okay.  And these are, in fact, notes from LaRoche about

7    recordings in order to cross-examine one of the agents,

8    right?

9    **A.**   I don't know what the use of them was.  I know that he

10   was writing them down while the trial was going on.

11   **Q.**   It is work-product, isn't it?

12   **A.**   I guess so.

13   **Q.**   Okay.  And it is identifying exculpatory moments on an

14   audio tape, right?

15   **A.**   I haven't reviewed everything that's written down, but

16   I'll take your word for it.

17   **Q.**   You go to page 1516.  Okay.  What's this?

18   **A.**   It appears to be asking if I can pull some stuff on a

19   video file for him.  I appear to be responding "no."  And

20   then I appear to be saying, "You need time to review the

21   video."

22   **Q.**   Whose handwriting is on here?  Could you identify each

23   section of whose handwriting it is?

24   **A.**   Across the top?

25   **Q.**   Yeah.

1    **A.**   Starting with "I'm," next line starting with "can," next

2    line starting with "them," that's all Donald.  Then the word

3    "no," followed by an explanation of why I can't get the --

4    help him retrieve the file that he had to review, and I tell

5    them because they're likely too big for me to have them here.

6    He asked me if I can parse it, and basically, I'm like, no.

7    I need time to pull together a video, so get to lunch and do

8    it then.  He hadn't prepared.

9    **Q.**   The little arrow down with the handwriting, whose

10   handwriting is that?

11   **A.**   That's mine.

12   **Q.**   And you wrote, "This helps that travel was not

13   responsive, not intended to make bribe"; is that right?

14   **A.**   Yes.

15   **Q.**   And that's analysis of evidence, right?

16   **A.**   At trial, yes.  I told you I saw the evidence at trial.

17   **Q.**   You testified that Baptiste wasn't actually asking you to

18   prepare audio, right, didn't you testify before?  Sorry,

19   LaRoche.

20   **A.**   I'm sorry, say that again.

21   **Q.**   Didn't you testify that LaRoche never asked you to get

22   anything ready for cross-examination, any audio/visual?

23   Didn't you say that?

24   **A.**   Yes.

25   **Q.**   Okay.  And this is a contemporaneous note where he does

1    that, right?

2    **A.**   Yes.  We did that sitting at the table, yes.

3    **Q.**   So that part of your testimony earlier, that was

4    inaccurate, too, right?

5    **A.**   No.  I think you're conflating it.

6    **Q.**   Let's go to the next page, please.  Now on 1517.  What's

7    this?

8    **A.**   Some more of his notes that get caught up in my file.

9    **Q.**   So these are more of his notes that you had in your

10   possession, that he didn't have in his; is that right?

11   **A.**   These are notes that went home with me after trial.  They

12   were in his possession, obviously.

13   **Q.**   Okay.  And this was work-product, wasn't it?  Yes?

14   **A.**   Work-product that I definitely saw after the trial, yes.

15   **Q.**   But before you wrote your affidavit.

16   **A.**   What was that?

17   **Q.**   But before you wrote your affidavit?

18   **A.**   No.  Defense counsel asked me to see -- to scour my

19   belongings to see if I could find anything in my files and

20   that's when I discovered that.  That would be within the last

21   month.

22   **Q.**   This was prepared during trial, wasn't it?

23   **A.**   It appears Donald did that during trial, yes.

24   **Q.**   So that's, again, work-product prepared to cross-examine

25   witnesses?

1    **A.**  Could be, yes.

2    **Q.**  Let's go to the next page, 1518.  What's that?

3    **A.**  That's my handwriting.

4    **Q.**  All of this handwriting is yours?

5    **A.**  Yes, that's my handwriting.

6    **Q.**  And the first note, looking at the side of the page, is

7    JB -- well, actually, can you just read that, the line

8    starting "JB"?  I can't read your hand writing.

9              MR. FICK:  I can't read that, either.

10   BY MR. BASIL:

11   **Q.**  It says something about "unequivocal, tried to hire Joe."

12   Do you see that?

13   **A.**  Yes.

14   **Q.**  And below that, "Nothing memorable about 7:15 call, no

15   notes from JB to" -- something -- "business call."

16              Do you see that?

17   **A.**  Yes.

18   **Q.**  And this isn't audio-visual advice, is it?

19   **A.**  This is a note that I'm taking for some reason, but I

20   don't know what I was referring to.

21   **Q.**  Okay.  Look at 1519.  What's 1519?

22   **A.**  Okay.

23   **Q.**  What is it?

24   **A.**  It's Exhibit 3, and then it has some time stamps.

25   **Q.**  Is that your handwriting?

1    **A.**  I think it is.  I'm not sure.

2    **Q.**  Could it be LaRoche's handwriting?

3    **A.**  It's either his or mine.

4    **Q.**  Go forward, if you could, to 1558, please.  And if you

5    could just look at 1558 through 1564.  I mean -- actually,

6    keep going.  Boy, how many pages are there?  All the way up

7    to 1569.  Take a look through all of those pages of

8    handwriting.  Whose handwriting is that?

9    **A.**  It's different per page.

10   **Q.**  Do you recognize your handwriting in here?

11   **A.**  Yes.

12   **Q.**  On which page do you see your handwriting?

13   **A.**  On page 1561 is the first one.

14   **Q.**  1561.  Okay.  And this is notes used by Mr. LaRoche

15   during trial, right?

16   **A.**  Yes.

17   **Q.**  And these are notes on useful sections of recordings for

18   the defense, right?

19   **A.**  These are notes that you took that day and wanted me to

20   play.

21   **Q.**  And you had these in your possession when you wrote your

22   affidavit, right?

23   **A.**  What's that?

24   **Q.**  You had these notes in your possession when you wrote

25   your affidavit, right?

1    **A.**   Not knowingly.

2    **Q.**   And these are notes from trial with your comments on them

3    during trial, right?

4    **A.**   This page.  Not all these notes.

5    **Q.**   So you knew, in fact, that he was taking notes on useful

6    language, in order to help his cross-examinations, right?

7    **A.**   I know that he was attempting to do that during trial.

8    **Q.**   I mean, we went over your affidavit before.  You say you

9    never saw any work-product from him?

10   **A.**   In lead-up to trial.  That was the context.

11   **Q.**   That was not what you said in your affidavit?

12   **A.**   I'm telling you, that's what I meant.

13   **Q.**   I understand that's what you are saying in your testimony

14   today.

15   **A.**   I thought you were seeking a clarification.

16   **Q.**   Where else in this series of pages do you see your

17   handwriting on LaRoche's trial and evidence?

18   **A.**   1562.

19   **Q.**   Anywhere else?

20   **A.**   1563.

21   **Q.**   Okay.  Well, let's just go through.  How about 1564?

22   **A.**   I see some notes underneath 149 -- under time stamp

23   1:49:55, there are a couple words there that are mine.  The

24   rest is Donald's handwriting.

25   **Q.**   On 1565?

1    **A.**  It appears to be all Donald's handwriting.

2    **Q.**  66?

3    **A.**  Donald.

4    **Q.**  How about there under the two-hour mark, the handwriting

5    in the margin?  Is that you or Donald?

6    **A.**  I'm not sure whose that is.

7    **Q.**  Okay.  How about on 1567?

8    **A.**  There's some marginality of notes that are mine.

9    **Q.**  Just two more pages will do it.  How about 1568?

10   **A.**  Donald.

11   **Q.**  And 1569?

12   **A.**  That is Donald.  And that marginal area under 2:11:36 is

13   probably mine.

14   **Q.**  So these are notes that were taken during trial on notes

15   that LaRoche was using during trial in order to prepare to

16   cross-examine witnesses; is that right?

17   **A.**  These are notes that I made on notes that Donald made

18   during trial.

19   **Q.**  Where on these does it say that he made them during

20   trial?

21   **A.**  What?

22   **Q.**  Where on these notes does it say that he made them during

23   trial?

24   **A.**  I watched him do it.

25   **Q.**  But you said in your affidavit that you never saw him

1    create any work-product to prepare to examine witnesses?

2    **A.**   In lead-up to the trial.  That's why he was doing it

3    during the trial.

4    **Q.**   Let's look at 1596.  Whose handwriting is this?

5    **A.**   I think that's Donald's.

6    **Q.**   So this is -- this is Donald taking notes on money

7    laundering; is that right?

8    **A.**   What?  I don't know.  I said I think it's Donald's.

9    **Q.**   Okay.  And this is a page about money laundering, right?

10   **A.**   Yes.

11   **Q.**   And this was also in your possession?

12   **A.**   I had this one, yes.

13   **Q.**   And this was in your possession at the time you wrote

14   your affidavit; is that right?

15   **A.**   Unknowingly, yes.

16   **Q.**   Did you play any part -- so if you go forward to 1563 --

17   pardon me, 1603.  Is this Donald's handwriting here on

18   stings?

19   **A.**   No, that's mine.

20   **Q.**   That's yours.

21   **A.**   Uh-huh.

22   **Q.**   So you were also analyzing the law in this case, right?

23   **A.**   Yes.

24   **Q.**   And when did you do this?

25   **A.**   I have no idea.  Before the trial.

1   **Q.**  Before the trial.  So before the trial, you were doing
2   analysis of how a sting works; is that right?
3   **A.**  I was trying to understand how it worked.
4   **Q.**  And the under -- are you able to say whether the
5   underlining in the page that followed is you or LaRoche
6   taking the notes and underlining the key passages?
7   **A.**  Oh.  If I go through this document, this is my document.
8   These are my notes and my lines.
9   **Q.**  You knew that Donald LaRoche had you here for
10  audio-visual, right?
11  **A.**  Yes.
12  **Q.**  You knew that you were doing much more than audio-visual
13  help, didn't you?
14  **A.**  When I came, I did not expect to do nearly as much as I
15  ended up doing.
16  **Q.**  Sir, you had already been doing work beyond audio-visual
17  work, hadn't you?
18  **A.**  I came here to do audio-visual work.  You asked me about
19  my time here.
20  **Q.**  You didn't disclose to the Court -- he didn't disclose to
21  the Court that he was part of the defense team, right?  You
22  didn't do that?
23  **A.**  My understanding, Donald told the judge why I was here,
24  which was to help with AV, and that I wouldn't be addressing
25  the Court.  And that's why I sat at that table, as opposed to

1    the gallery.

2    **Q.**  And while you were seated at the table, you were passing

3    him notes about the evidence, right?

4    **A.**  In the beginning I tried, but it was so voluminous I had

5    to quit, because it was all stuff we had never seen before.

6    **Q.**  And you were also commenting on his work-product to

7    cross-examine witnesses, right?

8    **A.**  Sometimes.

9    **Q.**  And you had a part in writing the opening, right?

10    **A.**  I did.

11    **Q.**  And that's all trial work, isn't it?

12    **A.**  Could be seen that way.  Also could be litigation support

13    work.

14    **Q.**  And you have a duty of candor to the Court, right, as an

15    attorney?

16    **A.**  We all do.

17    **Q.**  And that applies even if you're working as a subordinate

18    attorney, right?

19    **A.**  I don't believe I was here as a subordinate attorney.

20    But as an attorney, I do have candor to the Court.

21              MR. BASIL:  May I just have a moment, Your Honor.

22              (Counsel confers.)

23              MR. BASIL:  Nothing further.

24              MR. DWYER:  It will be short, Your Honor.

25              MR. BASIL:  Your Honor, we're going to object to

1    Mr. Dwyer asking questions.  He doesn't have standing; no one

2    alleges that he's ineffective.  And it's my understanding

3    from a conversation with him that he plans to ask questions

4    about communications that he had with defense team.  And as

5    the Court knows, we actually asked for discovery from

6    Mr. Dwyer, and at the last hearing we sought to cross-examine

7    using materials from Mr. Dwyer.  He objected based on joint

8    defense.  The Court sustained the objection and stopped

9    Ms. Rubin-Smith from cross-examining Mr. LaRoche.

10              THE COURT:  Well, he's not going to get into joint

11   defense unless there's a waiver.  But here's the thing.  What

12   I'm concerned about is that his trial strategy was impacted

13   by what Mr. LaRoche was doing or not doing, and I think that

14   he's entitled to make that point.

15              MR. DWYER:  Okay.

16              THE COURT:  If that's the point that he's going to

17   make.

18              MR. DWYER:  There will be, Your Honor.  There will

19   be some discussion of a meeting that Mr. Hinton was at.  To

20   the extent that it's joint defense, my client has authorized

21   a limited waiver on that subject matter, which was a

22   confrontation between Mr. LaRoche and myself.

23              MR. BASIL:  Your Honor, it is too late for that

24   waiver.  That is a sandbag on us based on the last hearing.

25   And if he's going to ask questions about joint defense at

1    this point, we're entitled to discovery on that.  We didn't

2    ask any questions.

3                THE COURT:  Calm down.  I haven't done anything to

4    make you angry.  Just calm it down.

5                MR. BASIL:  I am not angry, Your Honor.  I'm

6    speaking forcibly, and that's all.

7                THE COURT:  I feel like you're yelling at me.

8                Go ahead, Mr. Dwyer.  I'll take the objections as

9    they come.  But you wouldn't let them cross Mr. LaRoche on

10   it.

11               MR. DWYER:  I think it was one note, Your Honor, if

12   I recollect correctly.

13               THE COURT:  I'll take the questions as they come,

14   but --

15               MR. BASIL:  Your Honor, I believe Mr. Dwyer is

16   about to make himself a witness in this case.

17               MR. DWYER:  I'll be asking questions of the

18   witness.

19               THE COURT:  Let's -- we'll take it question by

20   question.

21               MR. DWYER:  Mr. Frank just warned me to be careful,

22   so I shall be.

23          **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT BONCY**

24   BY MR. DWYER:

25   Q.  Mr. Hinton, the first time we met was here in this

1    courtroom, correct?

2    **A.**  That's correct.

3    **Q.**  And that was when the jury had already been seated,

4    correct?

5    **A.**  Yes.

6    **Q.**  And the trial was under way, correct?

7    **A.**  Yes.

8    **Q.**  All right.  And the last time that you and I spoke,

9    except for a minimal conversation that we had at the last

10   hearing, was after the verdict came in, correct?

11   **A.**  Approximately that time, yes.

12   **Q.**  Okay.  I'd like to push back and direct your attention to

13   the -- about the second day of trial.  You were present -- or

14   third day of trial.  You were present for that, correct?

15   **A.**  I believe I was here on the third -- third day of trial.

16   **Q.**  Okay.  And at the end of that day, did you attend a

17   meeting in one of the witness rooms back here where I was

18   present and Mr. LaRoche was present?

19   **A.**  Yes, Donald asked me to come in the room, too.

20           MR. DWYER:  Okay.

21           MR. BASIL:  Your Honor, I'm objecting at this

22   point.  He's going to get directly into communications

23   involving the joint defense.

24           THE COURT:  Well, wait until he asks the question.

25   Wait until he asks the question.  I'll take them as they

1    come.

2    BY MR. DWYER:

3    **Q.**   And in that room, were binders of transcripts present?

4    **A.**   Yes.

5    **Q.**   And were binders of transcripts and portions of

6    transcripts showed to Mr. LaRoche in that room?

7    **A.**   Yes.

8    **Q.**   And when -- those portions of the transcripts, did they

9    relate to testimony of upcoming witnesses?

10   **A.**   Yes.

11   **Q.**   When Mr. LaRoche reviewed those transcripts, did it

12   appear that he had seen them before?

13   **A.**   No.

14   **Q.**   When he was -- how would you describe my demeanor in the

15   room?

16   **A.**   Sharp and forceful.

17          MR. BASIL:  Your Honor, Mr. Dwyer is now eliciting

18   testimony that he's a direct recipient witness to.  We're not

19   going to be able to call Dr. Baptiste, I don't know about

20   Mr. LaRoche, but he's making himself a witness, Your Honor.

21          THE COURT:  Not yet he hasn't.

22          Go ahead.

23   BY MR. DWYER:

24   **Q.**   After that meeting, the next day, were you present in

25   open Court?

1    **A.**   Yes.

2    **Q.**   The next day, did I move to sever and ask for a mistrial?

3    **A.**   Yes.

4    **Q.**   Did I indicate to the Court that I believed that

5    Mr. LaRoche's -- or represent to the Court that Mr. LaRoche

6    had a theory, and it was up to him, but I felt that we were

7    heading in the direction where the two would no longer be

8    consistent?

9            THE COURT:  Sustained.

10   BY MR. DWYER:

11   **Q.**   On the record, in the courtroom, not in the meeting back

12   there?

13           THE COURT:  I was here, I got it.

14   BY MR. DWYER:

15   **Q.**   That afternoon, did my approach and treatment of

16   Dr. Baptiste change?

17           MR. BASIL:  Objection.  Vague.

18   BY MR. DWYER:

19   **Q.**   In my cross-examination of the Government witness?

20           THE COURT:  Are you talking about in court?

21           MR. DWYER:  In court.

22           THE WITNESS:  I'm sorry, can you repeat that?

23   BY MR. DWYER:

24   **Q.**   That afternoon, the day after the meeting in the back,

25   did my approach with Dr. Baptiste and his involvement in the

 1    case, change?

 2    **A.**  I don't think so.

 3    **Q.**  Did I begin to refer at that time to theft of money,

 4    lying, fraud?

 5    **A.**  Yes.

 6    **Q.**  Okay.  And did that become a larger part of my case after

 7    the meeting with Mr. LaRoche?

 8             THE COURT:  Sustained.

 9             MR. DWYER:  Basis?

10             THE COURT:  That's what I get to ask you.

11             MR. DWYER:  All right.

12             THE COURT:  Because he -- all he can discuss of his

13    observation of it.  We were all here.  All right.

14    BY MR. DWYER:

15    **Q.**  Mr. Basil made some points about how my defense of my

16    Boncy inured to Mr. Baptiste, or Dr. Baptiste's, defense.  Do

17    you remember that?

18    **A.**  Yes.

19    **Q.**  And your -- and he asked you your opinion as to whether

20    or not it inured to Dr. Baptiste.  Do you recall that?

21    **A.**  Yes.

22    **Q.**  And by me calling Dr. Baptiste, that he had stolen money,

23    did that inure to Dr. Baptiste's benefit?

24    **A.**  Not in my opinion.

25    **Q.**  Did the fact that I stated that he misled and lied to the

1    FBI agents on certain phone call, did that inure to

2    Dr. Baptiste's benefit?

3    **A.**   Not in my opinion.

4    **Q.**   In addition, subsequent to the meeting back here, and

5    moving forward in trial, did Mr. LaRoche cross-examine

6    Undercover Number Two, to your recollection?

7    **A.**   I don't believe he did.

8    **Q.**   Did Mr. LaRoche cross-examine the witness who met with

9    Dr. Baptiste and took the confession?

10   **A.**   No.

11   **Q.**   Did Mr. LaRoche cross-examine the case agent in this

12   case?

13   **A.**   No.

14   **Q.**   Who was left to do all of that?

15   **A.**   Mr. Dwyer.

16   **Q.**   And in addition to that, was Mr. Dwyer, myself, asking

17   questions that would harm Dr. Baptiste?

18   **A.**   In my opinion, yes.

19            MR. DWYER:  If I could just have a moment, Your

20   Honor.

21   BY MR. DWYER:

22   **Q.**   The transcripts in the room in the back --

23   **A.**   Yes.

24   **Q.**   -- that we had in the meeting, was that the first time

25   that you had ever seen them?

1    **A.**  Absolutely.

2    **Q.**  The portions of the transcripts, was that the first time

3    that you had ever read them, reviewed them, and realized

4    their impact?

5    **A.**  I would say that about almost all the evidence in this

6    case.

7    **Q.**  Okay.  There were a number of wiretap calls played in

8    this case.  Do you recall that?

9    **A.**  Yes.

10   **Q.**  Prior to trial, did you listen to any of those wiretap

11   calls?

12   **A.**  I didn't.  And I don't believe Donald did, either.

13   **Q.**  Okay.  And with regard to Mr. LaRoche's response to

14   seeing the transcripts in the back room, did it appear to you

15   that he had ever seen those materials before?

16   **A.**  It did not appear to be the case to me.

17           MR. DWYER:  Nothing further, Your Honor.

18           MR. BASIL:  Your Honor, I'll simply note for the

19   record that Mr. Dwyer has now put at issue in this case a

20   change in his defense strategy.  He took testimony on it, and

21   he also took testimony from this witness as if this witness

22   were an expert.

23           THE COURT:  No, I don't think he did that.  And I

24   was here for the whole thing, anyway, so there's nothing new

25   that's been introduced.

1          Now I've lost track of where we are.  Do you want

2    to do redirect?

3          MR. MARX:  Briefly, Your Honor.

4          THE COURT:  All right.

5    **REDIRECT EXAMINATION BY COUNSEL FOR DEFENDANT BAPTISTE**

6    BY MR. MARX:

7    **Q.**  Mr. Hinton, Attorney Basil identified a handful of

8    recordings and documents that at some point Attorney LaRoche

9    reviewed with you and Dr. Baptiste.  Do you remember that?

10   **A.**  Yes.

11   **Q.**  Were those all pieces of prosecution evidence that the

12   Government had picked as it planned to present its case

13   against Dr. Baptiste?

14   **A.**  Yes.

15   **Q.**  Did he ever review with you anything that he considered

16   defense evidence that might be used to rebut the Government's

17   case?

18   **A.**  No.

19   **Q.**  During trial, did he, in fact -- Attorney LaRoche, say to

20   you that he had not reviewed all the discovery?

21   **A.**  Absolutely.

22   **Q.**  Did he also say to you, during trial, that he was seeing

23   some of the evidence for the very first time?

24   **A.**  Yes.

25   **Q.**  And I want to ask you just a couple of questions about

1    your affidavit.  Were you asked to write an affidavit

2    concerning your observations of Attorney LaRoche at trial,

3    but before and during the trial?

4    **A.**  Yes.

5    **Q.**  And did you understand that that was from a motion for

6    new trial concerning allegations that Attorney LaRoche had

7    provided ineffective assistance.  Did you understand that?

8    **A.**  Yes.

9    **Q.**  Okay.  And you provided that affidavit; is that right?

10   **A.**  Yes.

11   **Q.**  And that included your observations of what Attorney

12   LaRoche did and didn't do before the trial; is that right?

13   **A.**  Yes.

14   **Q.**  Okay.  And did you intend that affidavit to be accurate?

15   **A.**  Yes.

16   **Q.**  And do you believe that it is, in fact, accurate?

17   **A.**  Yes.

18   **Q.**  Okay.  Take a look at your affidavit.  It should be there

19   at the table.  There was much discussion on cross-examination

20   about these notes that have both your handwriting and

21   Attorney LaRoche's handwriting.  Do you remember that?

22   **A.**  Yes.

23   **Q.**  Take a look at Paragraphs 15 and 16 of your affidavit.

24   Are you with me?

25   **A.**  I am.

1    **Q.**  Do you see that Paragraph 15 starts with the phrase
2    "during trial"?
3    **A.**  Yes.
4    **Q.**  And those paragraphs go on to talk about the catch-up
5    sessions you referred to or described in your directed
6    testimony?
7    **A.**  Yes.
8    **Q.**  Okay.  And as far as you know, were these notes that you
9    described being made during trial, notes that were produced
10   during these catch-up sessions that occurred while trial was
11   already underway?
12   **A.**  Both inside of the courtroom and during these catch-up
13   sessions.
14   **Q.**  Have you ever seen any notes or work-product like that
15   before the trial?
16   **A.**  No.
17   **Q.**  And did you ever observe Attorney LaRoche actually using
18   any of those notes to cross-examine a witness?
19   **A.**  No.
20   **Q.**  Now, could you turn, in the Government's, Exhibit 9, the
21   large binder.  And if I can impose on you to pull up
22   page 1206.
23          Are you with me?
24   **A.**  I'm here.
25   **Q.**  Okay.  Great.  So this is a document that Attorney Basil

1    asked you about.  Do you remember that?

2    **A.**  Yes.

3    **Q.**  And this is the one where you used the phrase, "This

4    communication is protected by the attorney-client privilege."

5            And he asked you a number of questions specifically

6    about that?

7    **A.**  Yes.

8    **Q.**  Do you remember that?

9    **A.**  Yes.

10   **Q.**  Okay.  I want to draw your attention to two things in

11   this e-mail that Attorney Basil didn't ask you about.  First

12   is the e-mail at the top.  Do you see Donald LaRoche has

13   responded to your e-mail?

14   **A.**  Yes.

15   **Q.**  Okay.  And do you see he writes, "Jason, magnificently

16   put.  I totally agree with the response that Joe should give.

17   My template response, as Joe's lawyer, will be exactly what I

18   have been saying all along."

19           Was it your understanding at that time that Donald

20   LaRoche was Joe's lawyer?

21   **A.**  His only attorney.

22   **Q.**  Now, look at the bottom of the e-mail.  You actually

23   wrote, which Attorney Basil asked you about, and look at the

24   very bottom, which hasn't been the subject of testimony yet,

25   but do you see you've written, in all caps, the word

1    "caveat"?

2    **A.**  Yes.

3    **Q.**  So this is a discussion about your thoughts and your

4    reactions to the indictment and you end it with the words

5    "caveat."

6            And you write, "Of course, I haven't heard the

7    recordings or read any transcripts, but based on what I know

8    thus far, I have some strong reservations about the strength

9    of the prosecution's case."

10           Do you see that?

11   **A.**  I do.

12   **Q.**  Okay.  And at that time, you hadn't heard the recordings

13   or read the transcript; isn't that right?

14   **A.**  Yes.

15   **Q.**  And through the end of the trial, you only ever saw a

16   portion of the transcripts and heard a portion of the

17   recordings; isn't that right?

18   **A.**  That's correct.

19   **Q.**  In fact, you never had access to all of the recordings

20   and all of the discovery in this case?

21   **A.**  That's correct.

22   **Q.**  And you certainly never reviewed it?

23   **A.**  That's correct.

24   **Q.**  Turn, if you would, in the other binder to the first tab.

25   It's document B-1.  This is another e-mail that Attorney

1    Basil asked you about.  It's a Gmail thread about an FCPA

2    article.  Do you see that?

3    **A.**  Yes.

4    **Q.**  If you could turn to page 4 of that document.  This is

5    Bates labeled BAP 00935.  And do you see you've written an

6    e-mail to Donald LaRoche at 6:43 on November 8th, where you

7    write, "We need to dissect this case, so we can cast it into

8    the land of the ludicrous.  Can't wait to see/hear the

9    recordings."

10           Did you see you wrote that?

11   **A.**  Yet.

12   **Q.**  Did he ever show you the recordings that you wanted to

13   see in order to cast this case to the land of the ludicrous?

14   **A.**  No.

15   **Q.**  So he didn't follow-up with you about that?

16   **A.**  No.

17   **Q.**  Take a look at B-2, the next tab in that same binder.

18   This is another document that Attorney Basil asked you about.

19   This is a Gmail thread with the header, "Discovery letter

20   sent to AUSA."  It's a February 27th, '18, e-mail, Bates

21   stamped BAP 00937.  Do you see the first e-mail in the thread

22   is from Attorney LaRoche?

23   **A.**  Yes.

24   **Q.**  And you see that he writes in the second paragraph that

25   he anticipates getting CDs, discovery from the Government,

1   and he writes, "As soon as I get it, I will make time to come

2   to your office to review it with you."

3         Do you see that?

4   **A.**  Yes.

5   **Q.**  Did he ever do that?

6   **A.**  No.

7   **Q.**  On the following page, Attorney LaRoche writes again, to

8   you.  In the second paragraph he says, "I'm going to request

9   any and all notes and recordings from the meeting that the

10  FBI had with Joe in Miami, where they reveal that they're the

11  FBI."

12        Do you see that he wrote that?

13  **A.**  Yes.

14  **Q.**  Did he ever do that, as far as you know?

15  **A.**  I don't think he did.

16  **Q.**  Turn to B-6 in that same binder.  This is one that

17  Attorney Basil asked you about.  This is the first draft

18  demand for exculpatory and impeaching information.  This is

19  the draft letter that you wrote?

20  **A.**  Yes.

21  **Q.**  Okay.  Do you know whether Attorney LaRoche ever sent a

22  Brady demand to the Government?

23  **A.**  He did not.

24  **Q.**  On the cover e-mail you send, you write, "FYI, if you

25  haven't done so already, please arrange for Joe to hear the

1    recordings that were just provided to you by the

2    prosecution."  Do you see that?

3    **A.**  Yes.

4    **Q.**  And this is May 18th.  This is just a month before the

5    trial; is that right?

6    **A.**  Less than a month.

7    **Q.**  And did Attorney LaRoche make those recordings available?

8    **A.**  No.

9    **Q.**  Turn to B-10.  I just have two more of these I want to

10   ask you about, just to make sure the record is clear.  This

11   is the one about Angelo Viard that you got some questions

12   about.  This is the one Bates stamp BAP 00974.

13          In this e-mail thread, you provide information to

14   Attorney LaRoche, background information about a cooperator

15   in this case that you think may be helpful in putting on a

16   defense and undermining the Government's case; is that right?

17   Is that a fair summary?

18   **A.**  Yes.

19   **Q.**  And at the bottom, the first page, Donald LaRoche writes

20   to you, on May 14th, a month before the trial, "Wow, that's

21   really good stuff."

22          Do you see that?

23   **A.**  Uh-huh.

24   **Q.**  And then Donald writes again, in the middle of that page,

25   "What I'm thinking is writing to the Government, put them on

1    the notion that we plan on putting Viard on, to put the case

2    in context, as to how JB," -- Dr. Baptiste -- "was approached

3    and questioning him about bringing Joe to the FBI at their

4    request."

5           Do you see that?

6    **A.**   Yes.

7    **Q.**   And you responded to Attorney LaRoche, "Do that ASAP.  I

8    think that's a great approach, if we know what he's going to

9    say."  And you ask, "Have you contacted him?"

10          Do you see that?

11   **A.**   Yes.

12   **Q.**   And Attorney LaRoche says, "I will reach out to his

13   counsel."

14   **A.**   Yes.

15   **Q.**   As far as you know, did Attorney LaRoche ever reach out

16   to Viard's counsel?

17   **A.**   He did not do so.

18   **Q.**   As far as you know, did he ever develop -- conduct any

19   investigation to support this potential piece of a defense at

20   trial?

21   **A.**   He did nothing.

22   **Q.**   And did he present any evidence at trial concerning

23   Angelo Viard as part of a defense strategy?

24   **A.**   He didn't present any evidence at trial.

25   **Q.**   Okay.  Last one I want to show you is B-20 in that same

1    binder.  This is the e-mail thread about the PowerPoint.  And

2    in this e-mail, at the bottom, this is BAP-01084, your wife,

3    Arielle Hinton, writes to Donald and you, and she writes,

4    with respect to the photograph and the PowerPoint of the

5    money on the table, "Donald, you have to object to the photo

6    of the money.  It has nothing to do with the case.  It's

7    money they were using to pay bonuses to workers at Joe's

8    clinic."  Excuse me.  "The Government is trying to suggest

9    that the money is related to the case.  They have to lay a

10   foundation for that, and they probably can't show how it's

11   related to the case."

12        Do you see that?

13   **A.**  Yes.

14   **Q.**  Okay.  Did Attorney LaRoche object to the use of that

15   photograph?

16   **A.**  I don't think he did.

17   **Q.**  Did he conduct any investigation to develop evidence that

18   would have put that photograph into context?

19   **A.**  No.

20   **Q.**  Did he present any evidence at trial that would have put

21   that photograph in context and shown what that cash really

22   was for?

23   **A.**  No, he didn't present any evidence at trial.

24   **Q.**  Do you know whether Attorney LaRoche had even seen that

25   photograph, before the Government provided a copy of its

1    opening PowerPoint presentation?

2    **A.**   He told me that he had never seen it before.

3    **Q.**   Even though it was in the discovery?

4    **A.**   The prosecution asserted it was in the discovery, so yes.

5    **Q.**   But he told you he had never seen it?

6    **A.**   That's correct.

7    **Q.**   Attorney Hinton, who was ultimately responsible at trial

8    for ensuring that Dr. Baptiste got effective assistance of

9    counsel?

10   **A.**   His sole counsel, Donald LaRoche.

11   **Q.**   And who was the only person in the courtroom who actually

12   could provide effective assistance to Dr. Baptiste in this

13   case?

14   **A.**   Donald LaRoche.

15   **Q.**   And to the extent that a strategy was developed or

16   analysis was done or suggestions were made by other people,

17   who was the only attorney at the trial who could execute on

18   those strategies and suggestions on behalf of Dr. Baptiste?

19   **A.**   Donald LaRoche.

20   **Q.**   And in your view, did the strategies or analysis that you

21   may have provided over the course of months leading up to the

22   trial, did those ever coalesce, in your view, into a coherent

23   defense strategy for Attorney LaRoche?

24   **A.**   In my opinion, no, he never had a coherent defense

25   strategy.

1    **Q.**  And in your opinion, was he able to effectively execute

2    on the suggestions you made to him about how to defend

3    Dr. Baptiste at trial?

4    **A.**  I'm sorry, can you repeat that?

5    **Q.**  In your opinion, was he able to effectively execute on

6    the strategies and suggestions that you discussed with him on

7    behalf of Dr. Baptiste at trial?

8    **A.**  No.

9            MR. MARX:  Nothing further, Your Honor.

10           MR. BASIL:  Just very brief redirect, Your Honor.

11   Or recross, I should say.

12           THE COURT:  Redirect.  But I don't think there's

13   been a new theme developed in the last three hours.  I'm

14   happy to have you -- I get it, but I'm happy -- he did it,

15   now you can have your chance at it, too.

16           **RECROSS-EXAMINATION BY COUNSEL FOR PLAINTIFF**

17   BY MR. BASIL:

18   **Q.**  Could you just look at Exhibit 1, at B-2, at BAP 938?

19   **A.**  938?

20   **Q.**  Yeah.

21   **A.**  Okay.

22   **Q.**  And this is what Mr. Marx was just asking about.  He says

23   that LaRoche said he was going to request any and all notes

24   and recordings from the meeting with the FBI with Joe in

25   Miami.  Do you see that?

1    **A.**  Yes.

2    **Q.**  And you just said a moment ago that he never did that,

3    right?

4    **A.**  Not to my knowledge.

5    **Q.**  And do you remember, on cross, you testified that, in

6    fact, you were at Baptiste's house, with your wife, and you

7    guys went over the notes from the meeting with the FBI in

8    Miami.  You testified to that here today, didn't you?

9    **A.**  I did.

10                   MR. BASIL:  Okay.  Nothing further.

11                   THE COURT:  Everyone done with him?

12                   MR. MARX:  Yes, Your Honor.

13                   THE COURT:  All right.  You're excused.

14                   How long are we anticipating direct with --

15                   MR. MARX:  It's the Government's witness, Your

16   Honor.

17                   MS. RUBIN-SMITH:  Yes.  Probably about an hour.

18                   THE COURT:  And how long are you going to cross her

19   for?

20                   MR. MARX:  I'm hoping it will be short, Your Honor.

21   I think it would be less than a half an hour.  I think a lot

22   of what we expected to cover with Arielle Hinton has already

23   been covered.  Because many of her e-mails have already been

24   seen, and we certainly don't need to retread that ground.

25                   THE COURT:  Let's go.

1    THE DEPUTY CLERK:  Can you please raise your right

2    hand.

3          (The witness was duly sworn.)

4          THE DEPUTY CLERK:  Can you please state your name,

5    and spell your last name for the record.

6          THE WITNESS:  First name is Arielle, A-r-i-e-l-l-e,

7    last name Hinton, H-i-n-t-o-n.

8                    **ARIELLE HINTON**

9          having been duly sworn, testified as follows:

10        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

11   BY MS. RUBIN-SMITH:

12   **Q.**  Good afternoon.

13   **A.**  Good afternoon.

14   **Q.**  Mrs. Hinton, are you represented by counsel in this

15   matter?

16   **A.**  I am not.

17   **Q.**  Do you have an attorney-client relationship with

18   Mr. Marx, Mr. Fick?

19   **A.**  I do not.

20   **Q.**  Now, you recall last week, we spoke on the phone about

21   this matter for about an hour?

22   **A.**  I don't remember how long, but yes, we did speak.

23   **Q.**  And do you remember that also on the phone were AUSA

24   Kriss Basil?

25   **A.**  Yes.

1  **Q.**  And also an FBI agent by the name of Matt Elio?

2  **A.**  Yes.

3  **Q.**  Have you spoken with Mr. Fick or Mr. Marx?

4  **A.**  Yes.

5  **Q.**  Approximately how many times have you spoken to them?

6  **A.**  Twice, I think.

7  **Q.**  Do you recall when?

8  **A.**  Well, maybe three times, actually, because I did speak

9  with them today when I got here.  I don't remember exact -- I

10  mean, I don't remember exact dates that I spoke with them,

11  but I would say earlier this week and I think the day before

12  I spoke with you, I spoke with him.

13  **Q.**  Okay.  Have you turned over all of your documents to

14  Mr. Fick and Mr. Marx related to this case?

15  **A.**  Yes.

16  **Q.**  Have you deleted anything in your e-mail account or any

17  other documents related to this case?

18  **A.**  Prior -- yes, but prior to knowing that I was going to be

19  called as a witness for anything.

20  **Q.**  Okay.  What do you recall deleting in connection with

21  this case?

22  **A.**  I -- I just did a blanket clearing of everything, simply

23  because my cloud got full.  So I just -- so it wasn't only

24  things related to this case, it was everything that I had on

25  my e-mail, so that I could make more space for other e-mails

1    and so forth.  So specifically, I didn't go through and look

2    for, you know, e-mails related to this case.  I just did like

3    a blanket clearing.  And then what I did have or what was

4    left over, I did provide to Mr. Fick and Mr. Marx.

5    **Q.**  Okay.  And when you talked about the blanket clearing,

6    what account did you do the clearing for?  Which e-mail

7    account?

8    **A.**  Well, I -- both my work account, as totally unrelated to

9    this, my work account, and then I also have a private e-mail,

10   which is the R-E-L e-mail, which I think I've made you guys

11   aware of.

12   **Q.**  Yes, the r_e_l@mac.com?

13   **A.**  Correct.

14   **Q.**  Is that the one you did the blanket clearing for?

15   **A.**  I did it for that one.  I also did it for my work e-mail,

16   so Arielle@MontgomeryCountyMD.gov.

17   **Q.**  Okay.  Now, let's go through the personal one first, the

18   Mac one.  Do you recall when you did the clearing?

19   **A.**  Probably about -- some time in 2019.  Maybe -- I don't

20   want to give a date.  It might not be -- probably like right

21   after Thanksgiving, I think.

22   **Q.**  In 2019?

23   **A.**  In 2019.

24   **Q.**  Okay.  So -- and do you recall exchanging any e-mails

25   with Mr. Hinton or Mr. Baptiste or Mr. LaRoche about this

1  case before Thanksgiving 2019?

2  **A.**  No.

3  **Q.**  Okay.  When did you clear your work account e-mail?

4  **A.**  It would have been the same time frame, like maybe a day

5  before, day after.  I mean, I was all done like -- I was

6  pretty much all done in one day.

7  **Q.**  And is there a reason why you did the work one and the

8  personal one in one day?

9  **A.**  I was just clearing.  I just needed to make room on my

10  phone.  I just needed to make room on my phone.  So it

11  wasn't -- I didn't pick a particular day.  That was the day.

12  And I was like, oh, I have time to do this, so I cleared it.

13  I cleared both of them, because they're both on my phone.

14  **Q.**  Okay.  So both accounts are on your work phone, on your

15  cell phone?

16  **A.**  On my cell phone, yeah.  I don't have a separate work

17  phone.

18  **Q.**  Okay.  Understood.  Okay.

19  What is your educational background?

20  **A.**  I have a juris doctor from Temple University.

21  **Q.**  When did you receive your JD?

22  **A.**  1998.

23  **Q.**  Are you a member of any state bars?

24  **A.**  Maryland.

25  **Q.**  Maryland.  Okay.  And can you please summarize your post

1    law school professional experience since 1998 through today.

2    **A.**   Yes.  So right out of law school, I did some temporary

3    contract work on the Exxon/Mobile merger.  After that, I

4    became an assistant state's attorney at the Montgomery County

5    State Attorney's Office in Maryland.  Following that, I

6    became deputy counsel to the governor of Maryland.  Following

7    that, I went into private practice in D.C.  So at that time,

8    I was barred in D.C., as well.  And then after that, I took

9    some time off from working altogether, when I had my son.

10   And then I went back to work at the State Attorney's Office

11   in 2014.

12   **Q.**   Are you currently at the State Attorney's Office in

13   Maryland?

14   **A.**   I am.

15   **Q.**   And during this trial, were you employed by the State

16   Attorney's Office in Maryland?

17   **A.**   I was.

18   **Q.**   What kinds of cases have you prosecuted at the State

19   Attorney's office?

20   **A.**   You want me to go through all of them?  All of the types?

21   I can tell you what I haven't prosecuted.  That might be

22   shorter.

23   **Q.**   Sure.

24   **A.**   So I haven't prosecuted any fraud.  I haven't prosecuted

25   any economic crimes.  I haven't prosecuted any white collar

1    crime.  I haven't prosecuted what would be -- so I've

2    prosecuted child abuse cases, but not rape cases, whether

3    domestic violence related or stranger on stranger.  But I've

4    pretty much done sort of run-of-the-mill robberies, murder --

5    well, murder is not really run of the mill, but -- robberies,

6    burglaries, lots of drug cases, burglaries, kidnapping,

7    thefts.  A lot of domestic violence, because I was on that

8    specific team.  First degree assault, second degree assault,

9    attempted murders, those types of cases.

10   **Q.**  Okay.  And approximately how many trials have you done as

11   an assistant state's attorney?

12   **A.**  So jury trials, less than 30.  Bench trials, numerous.  I

13   couldn't count them.  I don't know.  A lot.

14   **Q.**  Okay.  And now, we talked about your Mac e-mail address.

15   Do you also have an e-mail address that's -- and I'll just

16   spell it, a-f-o-u-g-y-h-i-n-t at gmail.com?

17   **A.**  I do.

18   **Q.**  Okay.  Now, moving on to Mr. Hinton, are you and

19   Mr. Hinton legally married?

20   **A.**  Yes.

21   **Q.**  How many years have you been married for?

22   **A.**  Twenty- -- why are you doing this to me?

23   **Q.**  Approximately is fine.

24   **A.**  We got married in 1997.

25   **Q.**  Okay.  And have you ever worked cases together?

1    **A.**   No.  Never.  I am a trial attorney; he's not.

2    **Q.**   Okay.  How long have you known Mr. Joseph Baptiste?

3    **A.**   So Joe -- I personally have known Joe probably since

4    two-thousand -- 2014 or 2015.  He has been -- his family and

5    my family, or him and my father have been friends for a

6    very -- for a long time, since I think I was even a child.

7    So I think he's known me for longer than I've really known

8    him.

9    **Q.**   Okay.  How did you meet Mr. Baptiste, in the 2014, I

10   think you said, or 2015 timeframe?

11   **A.**   I think just my father asked me to bring him over to

12   Joe's house, and I met him.

13   **Q.**   Did you introduce Mr. Hinton to Mr. Baptiste?

14   **A.**   No.

15   **Q.**   How does Mr. Hinton know Mr. Baptiste?

16   **A.**   I believe the same way.  My father is -- well, is going

17   blind, and so he needs a lot of care.  So either one of us

18   would bring him to Joe's house just to hang out.  And I think

19   my husband actually took him to Joe's house before I ever

20   did.

21   **Q.**   Okay.  When did you first meet Donald LaRoche?

22   **A.**   I think I probably met Donald at Joe's house.  I think

23   2018, some time in 2018.

24   **Q.**   Now, before this trial, in the summer of 2019, how many

25   times had you met with Mr. LaRoche in person?

1    **A.**   I've never met with Mr. LaRoche in person, by myself.

2    The only times I ever saw him was either at Joe's house --

3    and that was more happenstance.  I did see him one time after

4    meeting him at Joe's house.  I did see him in court.  And

5    that was the only other time that I saw him.

6    **Q.**   So again, before trial started, approximately how many

7    times, by yourself or with others, did you meet with

8    Mr. LaRoche?

9    **A.**   A handful.  I mean, maybe five times.

10   **Q.**   Okay.  And where did these meetings occur?

11   **A.**   At Joe's house.

12   **Q.**   Who was there during the meetings?

13   **A.**   Normally my husband, myself, Joe, Joe's wife, Michelle.

14   There were -- it was usually a -- I mean, it was usually like

15   a family gathering or family event.  It wasn't specifically

16   to talk about this case.  There might have been other people

17   there.  I couldn't necessarily tell you their names.  So

18   there might have been other people there, but I don't

19   necessarily know all of them.

20   **Q.**   How did the meetings come about?

21   **A.**   I mean, I normally found out about them either through my

22   husband or my father and possibly Michelle, Joe's wife,

23   because she invited me to them.

24   **Q.**   Why did you attend?

25   **A.**   Our children play together, so I would bring my son.  The

1    kids were -- they also have a son.  The kids would hang out.

2    I would hang out with Michelle.  Occasionally -- occasionally

3    we talked about the case, but that wasn't normally the main

4    reason why I was there.

5    Q.   When did you first learn about the case?

6    A.   So I think in 2018, I mean, I think I heard about the

7    case.  I may have heard about the case before then, but

8    didn't really learn about kind of like dates and things that

9    were going on or happening until 2018.

10   Q.   Okay.  And how did you learn about the case in 2018, in

11   terms of more details about the case?  Who told you about

12   that?

13   A.   Probably either Joe or my husband.

14   Q.   When did you become personally involved in the case?

15   A.   I'm sorry, can you repeat that?

16   Q.   When did you become personally involved in the case?

17   A.   I'm not sure what you mean by "personally involved."

18   Q.   Well, as you know, we have communications between you,

19   Mr. Hinton, Mr. LaRoche, Mr. Baptiste about the case,

20   correct?

21   A.   Correct.

22   Q.   So when I say personally involved, I mean either

23   reviewing documents or listening to recordings or reviewing

24   transcripts or doing legal research, or reviewing legal

25   research done by your husband, anything where you personally

1    worked on the case.

2    **A.**   I mean, I think -- 2018 is when I think I became more

3    familiar with the case and what was going on.  I didn't do

4    any research.  I did review research that my husband had

5    done, and I did --

6           I think there's one document that I recall

7    reviewing, which was notes from two agents, a male and a

8    female.  I don't remember their names.  And then there was an

9    audio recording that I had heard, at one of the times that we

10   were at Joe's house.  And so at that -- at that one

11   meeting --

12          There are two times specifically that I remember

13   being at Joe's house, where we did talk about the case.  And

14   the same -- the same day that I saw the writing by the agent,

15   or the notes by the agents and saw the -- and heard the

16   audio, that all happened at one time.  And so I gave

17   commentary, thoughts, whatever I thought about what I had

18   heard or what I had listened to, what I had heard and what I

19   had read.

20          And then there was another time when we were, I

21   think, having dinner or eating, and we were at the table and

22   there was some discussion about the case.  I don't really

23   remember what specifically we were discussing, and so I

24   offered thoughts about what I thought was happening or going

25   on or -- I don't really remember what the discussion was, but

1    I know I offered some feedback or some commentary.

2    **Q.**  And that was legal feedback, legal opinion that you

3    offered?

4    **A.**  I mean, it would be based on my knowledge as an attorney

5    and as a prosecutor, but I'm not -- I'm not barred in

6    Massachusetts and I don't do federal work, so I'm a state

7    prosecutor.

8    **Q.**  I understand.

9         Now, in terms of Mr. Hinton's involvement, you

10   recall when we spoke last week, I asked if Mr. Hinton was

11   paid for the work that he did in this case.  And do you

12   recall that you said you were uncomfortable with answering

13   that question at first?

14   **A.**  I do recall saying to you that I was uncomfortable.  I

15   don't know if it was in reference to that specific question,

16   but there were some questions that you asked that I said was

17   uncomfortable in answering, because I thought it was

18   appropriate for the defense attorneys to be there.  And then

19   I recall that specific question saying, no, that I did not

20   believe my husband was paid for any information or assistance

21   or anything that he provided.

22   **Q.**  And is that your testimony here today, that he was not

23   paid?

24   **A.**  That's my understanding.

25   **Q.**  Okay.  Now, you mentioned reviewing some of the discovery

1    in this case, and I think you mentioned reviewing notes by

2    agents and a recording; is that correct?

3    **A.**   I reviewed a recording, and I reviewed one maybe three-

4    or four-page document that had notes, both by a female and

5    male agent on it.

6    **Q.**   Did you review these at Mr. Baptiste's home?

7    **A.**   Yes.

8    **Q.**   And was Mr. LaRoche and Mr. Hinton there?

9    **A.**   Yes.

10   **Q.**   Did you and Mr. Hinton discuss the case?

11   **A.**   Yes.

12   **Q.**   Did you discuss the strength of the Government's evidence

13   in the case?

14   **A.**   I'm sorry, I didn't hear you.

15   **Q.**   Did you discuss the Government's evidence and the

16   strength of the Government's case?

17   **A.**   I didn't see all of the evidence in the case.  I didn't

18   hear -- what I saw in Court, compared to what I saw, I

19   didn't -- I didn't even see half of what came out in court.

20   I saw like two or three things.  So in reference to that

21   document and that recording that I heard, yes, we talked

22   about it.

23   **Q.**   Okay.

24   **A.**   The rest of it, no.  So in terms of the strength of the

25   Government's case, I had no idea -- I had no idea what it was

1    or wasn't.

2    **Q.**  Let me direct you to Bates 959.  And this is in

3    Exhibit 1.

4    **A.**  Is it what I'm looking at on the screen, or is it just in

5    the book?

6          MR. BASIL:  Your Honor, I'm just going to help her

7    with the exhibit.

8          What Bates number?

9          MS. RUBIN-SMITH:  959.

10         THE WITNESS:  Yes.

11   BY MS. RUBIN-SMITH:

12   **Q.**  And you see in the middle of the page, Jason is sending

13   you an e-mail.  This is May 20, 9:02 a.m.?

14   **A.**  Yes.

15   **Q.**  And this is the header at the top, it says, "Conversation

16   between JP-AP translated and transcribed."  And Jason is

17   writing, "Good morning, All.  A few things jump out at me."

18   **A.**  Yes.

19   **Q.**  So Jason's e-mail is addressed, "Good morning, All" but

20   he's only sending it to you, correct?

21   **A.**  On this page, that's correct.

22   **Q.**  And that's at 9:02 a.m., on May 20th?

23   **A.**  That's correct.

24   **Q.**  And you see on point two, he talks about "*blanc*," and

25   then he says, "My experience in Haiti tells me that '*blanc*'

1    also means 'foreigners'."

2              What is Mr. Hinton's experience in Haiti?

3    **A.**   He -- he was attempting to do work in Haiti.  And he did

4    some work in Haiti, and so he would travel back and forth to

5    Haiti fairly often.

6    **Q.**   What kind of work?

7    **A.**   I mean, at the time, he was doing -- he was doing a lot

8    of different things.  I'm not specifically sure what he was

9    trying to get going in Haiti.

10   **Q.**   So you said you were married since 1997, I believe?

11   **A.**   Uh-huh.

12   **Q.**   Over 20 years?

13   **A.**   Yup.

14   **Q.**   And you talked about this case.  And Mr. Hinton is

15   writing an e-mail to you about "my experience in Haiti," but

16   you don't know what type of work he was doing in Haiti?

17   **A.**   I know that he was trying to open a business in Haiti,

18   and -- yeah.

19   **Q.**   Do you know anything about what type of business he was

20   trying to open in Haiti?

21   **A.**   So he's done work with campaigns and -- which he's done

22   here and he's done there.  I don't know specifically if he

23   was doing that there.  He's also done work with the arts.  I

24   think he was doing some of that in Haiti, as well.  I mean,

25   he would be the better person to talk to you about that, what

1    he was doing there.

2    **Q.**  So it looks like he's sending you a draft of an e-mail

3    that he was going to send to the group about his -- about his

4    commentary on the transcript, correct?  Because if you look

5    on the next page, two minutes later, at 9:04, he's sending

6    the same e-mail that he sent you two minutes prior, and this

7    time he's sending it to Donald LaRoche and Joseph Baptiste.

8    **A.**  Yeah.  So are you asking me about the timeframe?  What's

9    the question?

10   **Q.**  Yes.  Did you review -- did you review the transcript or

11   discuss it with Mr. Hinton?

12   **A.**  I don't know which -- I don't know what transcript this

13   is referring to.  I don't recall.  Did I respond to it?  I

14   don't recall.  If it was sent to me -- there were many

15   e-mails that were sent to me that I never opened and I never

16   head.  So it might have been sent to me.  I don't

17   specifically remember this one.

18          If you have a reply or response, that would help

19   refresh my recollection as to whether or not I actually saw

20   this or not.

21   **Q.**  Okay.  Sure.  Let's move on to Bates 1101.  It falls in

22   Exhibit 1.  Okay.

23   **A.**  1001.

24   **Q.**  1101.  And it looks like it's a chain that's from 1101,

25   through 1106.  And the first time that your name appears in

1    this chain is at 1103, where it's an e-mail from Jason Hinton

2    to you, on Sunday, June 2nd.

3    **A.**  1103.

4    **Q.**  1103.

5    **A.**  Yes.

6    **Q.**  And it looks like Jason is forwarding you ten

7    attachments, which are labeled as exhibits, originals and

8    translations, correct?

9    **A.**  Correct.

10   **Q.**  Do you remember receiving that e-mail?

11   **A.**  Receiving it?  I'm sure I received it.  I don't recall

12   necessarily what the exhibits were, but it probably went to

13   my e-mail.

14   **Q.**  And you would check this e-mail pretty regularly, right?

15   The Mac e-mail?

16   **A.**  No.

17   **Q.**  Isn't that the e-mail that you said you have on your

18   phone?

19   **A.**  Yes.

20   **Q.**  Is that the e-mail that you would use to write personal

21   correspondence?

22   **A.**  It's mostly for ordering stuff, shopping.

23   **Q.**  So is there another e-mail address that you have that you

24   use for personal correspondence?

25   **A.**  This is the one I would use primarily for personal

1  correspondence, although I use my work e-mail for most of my

2  correspondence.

3  **Q.**  Including personal correspondence?

4  **A.**  Some.  It depends on what it is.

5  **Q.**  Okay.  Did you use your work e-mail in connection with

6  this case?

7  **A.**  All of the e-mails that are between you and -- well, you,

8  the Government, and me, are on my work e-mail.

9  **Q.**  Right.  I understand.  But before -- before the motion

10  for ineffective assistance was filed, when you were helping

11  out on the case, did you use your work e-mail for e-mails

12  related to the case?

13  **A.**  No.

14  **Q.**  Okay.  So what was the primary e-mail address that you

15  used when you wrote e-mails in connection with this case?

16  **A.**  I primarily responded to e-mails that were sent to me,

17  and they were to the r_e_l@mac.com.

18  **Q.**  Okay.  So you checked that e-mail account, correct?

19  **A.**  Infrequently, but yes, I check it.

20  **Q.**  Okay.  When you say "infrequently," how frequently would

21  you check it?

22  **A.**  You mean specifically in response to this, or generally?

23  You mean in response to this case generally?  Generally, I do

24  not check that e-mail very often.  I check it like once a

25  week or when I think about it.  It is not an e-mail that I go

1   to normally.

2   **Q.**  Okay.

3   **A.**  So maybe once a week.

4   **Q.**  Okay.  So directing you to Bates 1060, which is still in

5   Exhibit 1, and the header --

6           Are you at Bates 1060?

7   **A.**  Yes.

8   **Q.**  And the header on this is "Transcript of Recorded

9   Conversation 992"?

10  **A.**  Yes.

11  **Q.**  And at the top you're writing to Donald LaRoche and Jason

12  Hinton?

13  **A.**  Yes.

14  **Q.**  "Well, as a prosecutor, I would use that, too."

15  **A.**  Yes.

16  **Q.**  And it looks like this is in response to the chain below

17  that's from Donald LaRoche on that same day, at 2:51 p.m.,

18  where he's sending you the transcript; is that correct?

19  **A.**  So I don't know -- oh, yeah.  Subject, "transcript of

20  recorded conversation."  Is that what you're referring to?

21  **Q.**  Yes.  So I think it's -- so sometimes the chronology is

22  in reverse and sometimes it's in the right order.  So it

23  looks like here's the first e-mail is from Donald LaRoche.

24  It's in the middle of the page, on Wednesday, June 5, at

25  2:51.  And he's forwarding -- the subject is "Forwarded, A

1    Transcript of a Recorded Conversation"?

2    **A.**  Yes.

3    **Q.**  And if you look right above it, it looks like you did

4    check your e-mail on the same day that this was sent.  A

5    couple hours later, you write, "Well, as a prosecutor, I

6    would use that, too."

7           You're referring to the transcript that you

8    received, correct?

9    **A.**  That is what it appears to be.  I don't have a

10   recollection as to what the transcript was or anything.  But

11   yeah, I say, "Well, as a prosecutor, I would use that, too.

12   Have you spoken to Joe about this communication?  Have you

13   heard the recording?  Has Joe?"

14          I don't know that I had heard the recording.  It

15   looks like it was -- it looks like it was forwarded to me,

16   but I don't know that I actually listened to it.

17   **Q.**  Well, it looks like you received the transcript, correct?

18   It's a PDF symbol in the middle of the page, and it says,

19   "Transcript of Recorded Conversation."

20   **A.**  Yes.  Transcript of Recorded Conversation.

21   **Q.**  And you're commenting, "As a prosecutor, I would use

22   that, too," that you would use that transcript if you were

23   the prosecutor on the case, correct?

24   **A.**  Yes.

25   **Q.**  And then you write an e-mail, not in response to

1    anything, it looks like it's just an e-mail a couple of hours

2    later, Wednesday, June 25th, at the bottom of the same page,

3    where you write to Donald and to Jason, "You'll have to

4    establish a timeline of when Joe made the comments about

5    keeping things legitimate."

6                You see that?

7    **A.**   Yes.  Oh, yeah, this makes more sense now.

8                Can I have a moment to read this part?

9                (Witness reviews document.)

10   BY MS. BASIL:

11   **Q.**   So in this e-mail you're providing your legal opinion and

12   legal advice to Donald and to Jason, correct?

13   **A.**   Yes.  Now reading what I wrote, I do recall this.

14               So this is actually a point of what I was referring

15   to is how he would get this information, basically, how he

16   would be able to get that information in, in terms of the

17   recording, and was he prepared to do that.

18   **Q.**   Now, you also discussed with Mr. Hinton potential

19   defenses in the case, correct?

20   **A.**   I recall that there was a discussion about entrapment.

21   **Q.**   Now, directing you to Bates 996, it's also in Exhibit 1.

22   And the chain is from 996 to 1000.  And the header is

23   "NOAH-Haiti."

24   **A.**   996 to what page, did you say?

25   **Q.**   On 996 through 1000.  And if you look at your name first

1  appears in 1000, the last page, Sunday, June 2nd at

2  7:58 a.m., where Jason writes, "FYI," and he's forwarding you

3  evidence or information about NOAH and Haiti, correct?

4  **A.**  Yes.

5  **Q.**  Now, you mentioned "entrapment research"?

6  **A.**  Yes.

7  **Q.**  Did you conduct research on entrapment?

8  **A.**  No.  My husband sent, I think, research that he had done.

9  He sent it to me.  And I commented back to him about it, or

10  maybe to all of them.  I don't recall.

11  **Q.**  Okay.  Let's take a look at that.  That's at Bates 1017

12  in Exhibit 1.  "Analysis of charges of evidence and jury

13  instruction."

14  **A.**  Yes.  I do recall reading this.

15  **Q.**  And here in this one, this is a pretty long chain, but it

16  looks like at 1024, 1-0-2-4, Jason is forwarding you his

17  analysis?  And then that was on June 3rd.  And two days

18  later, on June 5th, on Bates 1030, you e-mailed Jason,

19  Donald, and Baptiste, and you write, "In reviewing Jason's

20  analysis and the indictment itself."

21          So you reviewed the indictment in this case prior

22  to the trial?

23  **A.**  I reviewed the -- I do remember reviewing an indictment,

24  and then I remember hearing about a superseding indictment.

25  I'm not sure which one of those I read, or possibly I read

1    both.

2    **Q.**  Okay.  So if you look down lower in the page, where it

3    says numbers 18 through 19, it looks like you're referencing

4    the indictment.  Number 18 through 19 of the indictment

5    indicates that Baptiste held a meeting with UC-1?

6    **A.**  Yes.

7    **Q.**  And then if you look on that same chain, on Bates 1037,

8    in response to your e-mail -- your e-mail appears again at

9    1038, and it looks like, in response, Joseph Baptiste writes

10   to you and Jason, also CCing Donald, that says, "Your

11   analysis is outstanding, well taken."

12            And then he asks about enticement.

13   **A.**  Yes.

14   **Q.**  Now, if you keep going to 1045, Bates 1045 in that same

15   e-mail chain, Joseph Baptiste, on the same day, Wednesday,

16   June 5th, e-mails you and Jason Hinton, CCing Donald LaRoche,

17   and his e-mail starts on the next page at 1046.  "We talked

18   about entrapment, where do we stand on that?"

19   **A.**  I'm sorry, what's your question?

20   **Q.**  I'll be asking you a question in one minute about the

21   entrapment research that you mentioned.  If you look at Bates

22   1082, which is also in Exhibit 1, this is on the same day,

23   June 5th.

24   **A.**  I'm sorry, what was the page number that you said, or

25   Bates number?

1  **Q.**  1082, 1-0-8-2.

2  **A.**  Yes.

3  **Q.**  And the header is "645 Entrapment Elements"?

4  **A.**  Yes.

5  **Q.**  And on the same day, June 5th, you write to Mr. Baptiste,

6  Mr. LaRoche, and Jason Hinton, "Below are the elements of

7  entrapment, based on the information I know about the case,

8  and Donald and Jason know more than I do.  I'm not sure I can

9  prove all of the elements."

10          And then if you look below, it looks like is this

11  your work address, Arielle.hinton@MontgomeryCountyMD.gov?

12  **A.**  That is my work address.

13  **Q.**  So it looks like you researched the elements of

14  entrapment; is that correct?

15  **A.**  I don't recall doing that.  I don't know if it was what

16  Jason had sent to me, and then I just copied and pasted it

17  and then sent it.  Most of what I reviewed was stuff that he

18  had sent to me.

19  **Q.**  So on this particular one, it looks like the e-mail is

20  from your work address to your personal address, and you're

21  e-mailing yourself a link, correct?

22  **A.**  Oh.  Perhaps I'm not looking at the same thing --

23  **Q.**  This is 1-0-8-2.

24  **A.**  Okay.  Yes, I see.

25  **Q.**  So it --

1    **A.**   Oh, well -- oh, possibly, then, yeah.

2    **Q.**   So if you're e-mailing yourself from your work e-mail

3    address, does that mean that you are at work?

4    **A.**   Not necessarily, because I have both on my phone.  So you

5    mean, am I physically at the office?  Not necessarily.  I

6    could be elsewhere, because I have it on my phone.

7    **Q.**   Okay.  But you're -- but here, you agree that you're

8    e-mailing a link to entrapment elements from the justice

9    manual, from your work address to your personal address?

10   **A.**   Yes.

11   **Q.**   And then you're forwarding that from your personal

12   address to Baptiste, LaRoche, and Jason Hinton?

13   **A.**   Yes, that's what it looks like here.

14   **Q.**   Did you meet with potential witnesses in this case?

15   **A.**   No.

16   **Q.**   Did you ever meet with Mr. Walcott?

17   **A.**   I know that Mr. Walcott was at Joe's house sometimes.

18   **Q.**   Did you meet with Mr. Walcott?

19   **A.**   No.

20   **Q.**   Were you ever at Mr. Baptiste's house at the same time as

21   Mr. Walcott?

22   **A.**   Yes.

23   **Q.**   Did you discuss the case with Mr. Walcott?

24   **A.**   It's possible that Walcott was at two -- the two -- the

25   two times that I referred to earlier, it is possible that

1    Mr. Walcott was there.  As a matter of fact, I think he was

2    at -- I think he was -- he might have been at both.  He

3    was -- he was present when I think I heard the recording and

4    looked at the -- the document from the two agents.  I believe

5    he was there at that time.  He also might have been at the

6    other one.  I don't really remember if he was or not.

7    **Q.**  Okay.

8    **A.**  Did I -- but I didn't meet with him personally in terms

9    of -- he was there.  He was present.

10   **Q.**  Okay.  So when I say "meet," I mean did you engage in

11   discussions with him and other members of the legal team,

12   including Mr. LaRoche or Mr. Hinton, and discuss having

13   Mr. Walcott potentially testify?

14   **A.**  So there -- he was -- Mr. Walcott was there.  I didn't

15   have a conversation with Mr. Walcott about him being a

16   witness or him testifying.  If -- I didn't know if he was

17   going to be or was not going to be.  I didn't have that

18   conversation with anybody else about being witnesses or not

19   being witnesses.

20            There were times that I suggested, "You need a

21   witness who will cover this.  You need a witness who will

22   cover this," in speaking with Donald.  I don't know if that

23   occurred at that time.  I think that was the first time that

24   I had ever seen any of the documents at all.  Like that was

25   the first time I had seen any of the documents, so I was not

1    part of a legal team.  So I was there, and I listened to the

2    things I listened to.  And I looked at those documents and we

3    had conversations about it, but I was not preparing a case to

4    go to trial.  I was not preparing anything.  And I was not

5    meeting with the witnesses to depose them and -- or anything

6    like that.

7    **Q.**  Now, you mentioned suggesting witnesses to Mr. LaRoche.

8    Did you suggest witnesses to Mr. Hinton?

9    **A.**  Possibly.  I'm sure I suggested witnesses to -- I know I

10    suggested witnesses to Donald.  I'm sure my husband was

11    there, too, because I never had any conversations with

12    Donald, like it was just the two of us.  So most likely Joe

13    and my husband were there, and I would say I would suggest,

14    "Oh, it might be a good idea to have, you know, a witness on

15    languages."

16    **Q.**  And did you ever suggest witnesses to Mr. Hinton when

17    Donald was not there?

18    **A.**  I mean, he's my husband, so I'm sure I had conversations

19    with him about it.  I don't specifically remember if I did,

20    but possibly, yeah.

21    **Q.**  Did you discuss proposed stipulations in this case?

22    **A.**  Possibly.

23    **Q.**  Let's look at Bates 1491.  And this is from Exhibit 9.

24    I'm sorry, it may be Exhibit 7.  Exhibit 9.

25            THE COURT:  Are you still on track to finish at a

1  quarter of?

2          MS. RUBIN-SMITH:  Let's see.  I should be able to

3  finish by 5:00.

4          THE COURT:  You said quarter of.

5          MS. RUBIN-SMITH:  I said about an hour.  I'm

6  guessing about half an hour, Your Honor.

7          THE COURT:  All right.  Then we're not going to

8  finish today.  So I'm not going to hold the court reporter

9  and Karen and everybody here until 5:00 if we're not going to

10 finish today.

11         So what do you want to do?

12         MR. MARX:  I'm hoping I can do a cross in five

13 minutes, Your Honor.  But I understand your concern.

14         THE COURT:  What are you thinking, Mr. Dwyer?

15         MR. DWYER:  Judge, I'm not going to have any cross.

16         THE COURT:  All right.  You have until five of

17 5:00, and then he gets five minutes.

18         MS. RUBIN-SMITH:  I'm sorry, until what time?

19         THE COURT:  Five of 5:00.

20 BY MS. RUBIN-SMITH:

21 Q.  Let's jump to the trial, and I'll come back to some of

22 the e-mails if we have time.

23         Were you present at the trial of Mr. Baptiste?

24 A.  Yes.

25 Q.  Were you present for the entire trial?

1    **A.**  Yes.

2    **Q.**  Why did you come for the trial?

3    **A.**  Because Joe and Michelle asked me to.

4    **Q.**  I'm sorry?

5    **A.**  Because Joe and Michelle asked me to.

6    **Q.**  Okay.  What was your role here at the trial?

7    **A.**  Support.

8    **Q.**  When you say "support," what do you mean?

9    **A.**  Primarily for Michelle, who was very stressed out about

10   the whole thing.  And I think they wanted me to be able to

11   explain kind of legally what was going on in the courtroom,

12   just to kind of keep -- just to make it easier to understand

13   what was happening in the courtroom.

14   **Q.**  Okay.  And did you take leave from your job as an

15   assistant state attorney to come here for the trial?

16   **A.**  I did.

17   **Q.**  Who paid for your travel here?

18   **A.**  I think Joe did.

19   **Q.**  Did you fly?

20   **A.**  Yes.

21   **Q.**  Who paid for your hotel during the trial?

22   **A.**  Joe.

23   **Q.**  Were you staying in the same hotel as Mr. LaRoche?

24   **A.**  Yes.

25   **Q.**  Where did you sit during the trial?

1    **A.**   In the front row, on the bench right there.

2    **Q.**   During breaks or after court ended for the day, did you

3    participate in discussions with Joseph Baptiste about the

4    trial?

5    **A.**   Yes.

6    **Q.**   Who else was there during these discussions?

7    **A.**   Generally my husband, Jason Hinton, and Donald.

8    **Q.**   Did you discuss the evidence presented by the Government

9    during these discussions?

10   **A.**   Yes.

11   **Q.**   Did you discuss how the defense should address the

12   evidence?

13   **A.**   Did I discuss that?  Yes, I did.

14   **Q.**   And did you review any trial related materials?

15   **A.**   So my recollection is there were binders similar to

16   these, that were provided by Mr. Dwyer, and there were

17   documents that Donald had.  So the documents that Donald

18   had -- actually, no.  The only things that I reviewed or saw

19   were here in the trial, and then we would go back to the room

20   and we would discuss whatever happened that day in trial.

21         I did not -- Donald did not -- Donald, I know he

22   had stuff, but when we asked -- well, when I asked about

23   showing things or could I see something, he generally didn't

24   have the ability to access them or to provide them.  So --

25   **Q.**   Directing your attention to Bates 1496 in Exhibit 9.  And

1    this is on June 13th from Jason Hinton to your Gmail account.

2    **A.**  Yes.

3    **Q.**  And it says, "JHinton@Gmail has invited you to edit the

4    following document, 'Entrapment Research for Jury

5    Instruction.'"

6    **A.**  Yes.  Dated June 13th?

7    **Q.**  Yes.

8    **A.**  Yes.

9    **Q.**  This is when you're both in Boston for the trial?

10   **A.**  Based on the date, I think so, yes.

11   **Q.**  Did you talk about jury instructions with Mr. Hinton?

12   **A.**  Yes.

13   **Q.**  Did you edit jury instructions?

14   **A.**  I remember reviewing -- possibly.  I remember reviewing

15   the jury instructions.  And I think it was whatever was

16   provided by -- I think -- I remember reviewing jury

17   instructions that I thought were provided by the Government.

18   And there was -- I remember there was research done by my

19   husband that I looked at on entrapment.  I -- I may have

20   reviewed this -- this one, as well.

21   **Q.**  Okay.  And now just, if you move on to Bates 1498, just a

22   few pages later, this is an e-mail from Jason Hinton to your

23   Gmail account, on Saturday, June 15th, and it says,

24   "JHinton@Gmail has invited you to edit the following

25   document," and it says, "Final of 14, 2019, Peter Anderson

1    questions."

2              And it says, "Per your request, access is granted."

3              So you requested access to edit the Peter Anderson

4    questions?

5    **A.**  Actually, now that I recall, I didn't review any of the

6    e-mails that went to my Gmail account.

7    **Q.**  So do you know how it is that Jason Hinton would have

8    granted your access request, if you never made an access

9    request?

10   **A.**  No.  I recall that, because when I -- the Gmail account I

11   use even less frequently than my r_e_l account.  And I gave

12   these documents or the Gmail account to Joe's defense

13   attorneys, and I had said to them, "I have these e-mails, but

14   I had never opened them."  So they were sent to my e-mail,

15   but I never opened them or read them.

16   **Q.**  And at this time on Saturday, June 15th, you and Jason

17   are both together in Boston, correct?

18   **A.**  I believe so.  If that's the trial timeframe, then yes.

19   **Q.**  Yes.  Did you know that your husband was filing an

20   affidavit in support of a motion for a new trial?

21   **A.**  Yes.

22   **Q.**  Did you review that affidavit?

23   **A.**  Probably.

24   **Q.**  You discussed it with him?

25   **A.**  I probably reviewed it.  We probably discussed it.  I

1   don't know that I would have made any comments on it.  It was

2   whatever -- it was his affidavit.

3   **Q.**  Now, you knew that your husband did legal research in

4   this case, correct?

5   **A.**  Yes.

6   **Q.**  You knew that he provided legal analysis on this case?

7   **A.**  I knew that he did legal research on entrapment.  I don't

8   know what other, if any, legal research he did.  I do know

9   about the entrapment, though.

10  **Q.**  But some of the e-mails that we just reviewed, where you

11  analyzed the indictment and you say Jason and Donald know

12  more, correct?  You knew that he was involved in this case as

13  a lawyer.

14  **A.**  I know that he -- yes.

15  **Q.**  Okay.  And you also knew that he did not disclose that in

16  his affidavit.

17  **A.**  I have no idea.

18  **Q.**  You just testified that you reviewed the affidavit,

19  correct?

20  **A.**  I reviewed the affidavit when he wrote it.  I have not

21  reviewed the affidavit to be able to answer your question to

22  say that what was in or was not in his affidavit.  I don't

23  remember what was in his affidavit, but I did look at it at

24  some point in time when he wrote it.

25            MS. RUBIN-SMITH:  May I have a moment, Your Honor?

1          THE COURT:  Yes.

2          (Counsel confers.)

3          MS. RUBIN-SMITH:  Nothing further.  Thank you.

4          MR. MARX:  I don't need the podium, Your Honor.  I

5     have three questions.

6          THE COURT:  Any place you want.

7     **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT BAPTISTE**

8     BY MR. MARX:

9     **Q.**  Ms. Hinton, at some point did you become concerned about

10    the quality of representation that Mr. LaRoche was providing

11    to Dr. Baptiste?

12    **A.**  Yes.

13    **Q.**  And is it fair to say that those developed before the

14    trial started?

15    **A.**  Yes.

16    **Q.**  Could you describe those concerns to the Court?

17    **A.**  Donald never answered any questions straight.  So if I --

18    if I asked to see something, or if I -- I mean, what I really

19    recollect is more about being here, because I remember asking

20    if he wanted to like practice his opening argument, if he

21    wanted any help with that or any commentary or whatever.  And

22    he never wanted to talk to me before -- before trial -- yeah,

23    before trial, Donald never wanted to have anything to do with

24    me.  He never spoke with me about anything regarding the

25    case.  He never asked me any questions about the case.  If I

1    asked questions, he ignored me; not 100 percent for sure why,

2    although I have my suspicions.  Donald basically stayed away

3    from me as much as he possibly could.

4    **Q.**  And is it also fair to say that once you came to Boston

5    and were here for the trial, you developed even more serious

6    concerns about the quality of Attorney LaRoche's performance

7    in this case?

8    **A.**  100 percent.

9    **Q.**  Could you describe those for the Court?

10   **A.**  Donald could not formulate a question to ask any of --

11   any of the witnesses that the Government called.  He couldn't

12   phrase a question.  He repeated questions several times over

13   and over again.  Prior to -- prior to even coming, I had

14   asked him what his theory of the case was.  He could not tell

15   me, or chose not to tell me.  He -- when I asked him, you

16   know, what his closing was, what his arguments were going to

17   be, he never would answer the question.  When I asked to see

18   his cross-examination of the witnesses, he didn't provide me

19   with any.  I don't know if he had them or not, but in trial,

20   it was clear that he didn't have any, because he didn't refer

21   to anything.  He didn't -- he didn't -- and he didn't ask any

22   questions.  I mean, he was incapable of asking any questions.

23            There was -- there was a point in time where I was

24   getting really, really concerned.  And I don't remember

25   who -- the names of the witnesses who they are, where I was

1    so nervous that I started writing questions, because I was

2    like you have to ask questions about this.  I did provide

3    those to Donald, and he stuck them in a notebook and he never

4    asked a single question.  He was just incompetent, in my

5    opinion.

6              MR. MARX:  Nothing further, Your Honor.

7              MS. RUBIN-SMITH:  No redirect.

8              THE COURT:  Mr. Dwyer?

9              MR. DWYER:  Nothing, Your Honor.

10             THE COURT:  I saw that.

11             You're excused.

12             Are there any other witnesses?

13             MR. BASIL:  Your Honor, we're not going to call

14   Mr. Benowitz.

15             THE COURT:  All right.  What do you want to do?  Do

16   you want to rely on the briefs?  Do you want to file closing

17   briefs?  I don't think I need them, but I don't want to

18   deprive anybody of an opportunity to speak.

19             MR. BASIL:  I think -- well, the defendants will

20   have the final say on this, I think, because it's their

21   rights that are an issue.  This is pretty very heavily

22   briefed, I would think, at this point.

23             THE COURT:  It is.  I'm happy to have you -- if you

24   have more to say, I'm happy to have you say it, but don't do

25   it for the sake of doing it.

1          MR. FICK:  I mean, I don't think we need to file

2     any more legal briefs.  The transcripts are what they are.

3     I'm sure both sides would love to point through things, but

4     the Court sat through this and the Court can read.  So I

5     think we're probably done.

6          THE COURT:  Okay.  All right.  Then we will try and

7     get through this as quickly as we can.  Okay?

8          Thank you.  You're free to go.

9          (Court in recess at 4:49 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4        I, Rachel M. Lopez, Certified Realtime Reporter, in

5   and for the United States District Court for the District of

6   Massachusetts, do hereby certify that pursuant to Section

7   753, Title 28, United States Code, the foregoing pages

8   are a true and correct transcript of the stenographically

9   reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                        Dated this 13th day of April, 2020.

14

15

16

17                   /s/ RACHEL M. LOPEZ

18

19

20   _____

     Rachel M. Lopez, CRR
21   Official Court Reporter

22

23

24

25